## IN THE UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF LOUISIANA

In re:

**OCA, INC.,** *Et al.,*

    **Debtors,**

**NUMBER**
**06-10179(B)**

**CHAPTER 11**

---

### AMENDED AND RESTATED
### JOINT DISCLOSURE STATEMENT FOR JOINT CHAPTER 11
### PLAN FOR OCA, INC. AND FILED SUBSIDIARIES AS OF JULY 24, 2006

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT CHAPTER 11 PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO DETERMINE IF IT PROVIDES ADEQUATE INFORMATION. IF THE DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A SUBSEQUENT HEARING TO CONSIDER CONFIRMATION OF THE JOINT PLAN. ALL CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE DATE OF SUCH CONFIRMATION HEARING.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**TABLE OF CONTENTS**             **PAGE**

INTRODUCTION ...................................................................................5

I.     PURPOSE AND SUMMARY OF PLAN ............................................6
    A.    DEBT AND CAPITAL STRUCTURE ....................................6
    B.    EXIT FINANCING........................................................7
    C.    CURRENT MANAGEMENT OF OCA ...................................7
    D.    DOCTORS' INCENTIVE PLAN .........................................8
    E.    MANAGEMENT INCENTIVE PLAN ...................................8
    F.    GENERAL UNSECURED DEFERRED PAYMENT...........................9
    G.    SUBORDINATED CLAIMS .............................................10
    H.    EQUITY AND SUBORDINATED CLAIM DEFERRED
         PAYMENT ...............................................................10
    I.    DIRECTORS AND OFFICERS OF THE REORGANIZED
         DEBTORS ...............................................................13
    J.    DEEMED CONSOLIDATION OF DEBTORS FOR PLAN
         PURPOSES ONLY......................................................14
         1. STANDARDS FOR CONSOLIDATION ...........................14
         2. APPLYING CONSOLIDATION PRINCIPLES IN THESE
           CASES ...............................................................15
    K.    PLAN SUPPLEMENT .................................................16

II.    SUMMARY OF CLASSIFICATION AND TREATMENT
     OF CLAIMANTS ...................................................................17

III.   GENERAL OVERVIEW AND BACKGROUND INFORMATION..................21
    A.    BACKGROUND AND GENERAL INFORMATION ...........................21
    B.    DEFAULTS BY AND LITIGATION WITH AFFILIATED
         PRACTICES ...........................................................24
    C.    FAILURE TO FILE FORM 10-K FOR THE YEARS 2004
         AND 2005 ...............................................................25
    D.    OCA IS DELISTED FROM THE NYSE...................................27
    E.    HURRICANES ADVERSELY IMPACT THE DEBTORS ....................27
    F.    DEBTORS' DEBT STRUCTURE ............................................28
    G.    CHANGES TO PREPETITION OFFICERS .............................32
    H.    PRE-PETITION TRANSFER OF OCA'S INTERNATIONAL
         ENTITIES ...............................................................33
    I.    EVENTS LEADING TO CHAPTER 11 FILINGS OF DEBTORS ........36
         1. AFFILIATED PRACTICE LITIGATION .........................36
         2. SECURITIES ACTIONS..........................................40
    J.    DISTRIBUTIONS TO DOCTORS ........................................44
    K.    FILING OF CHAPTER 11 PETITION BY DEBTORS .........................44
    L.    SIGNIFICANT POST-PETITION EVENTS ............................45
         1. SIGNIFICANT PLEADINGS .....................................45
         2. RETENTION OF ALVAREZ & MARSAL AND
           CONWAY, DELGENIO GRIES & CO ...........................47

      3.   RETENTION OF SPENCER STUART ...............................................49

      4.   UNSECURED CREDITORS COMMITTEE....................................49

      5.   DIP FINANCING .................................................................50

      6.   BAR DATE FOR FILING PROOFS OF CLAIM............................51

      7.   OCA LITIGATION AGAINST AFFILIATED PRACTICES
          WHO DEFAULTED/TERMINATED PERFORMANCE
          UNDER BSA'S ...........................................................52

      8.   PLAN TERM SHEET............................................................60

      9.   KATRINA CARRY-BACKS AND OTHER TAX REFUNDS .........62

      10. THE 341 MEETING ..............................................................63

      11. APPOINTMENT OF EQUITY COMMITTEE.................................63

IV.     THE PLAN .......................................................................................64

      1. BUSINESS MODEL (SSA'S) UNDER PLAN ..................................64

V.      DESCRIPTION OF PROBABLE ADMINISTRATIVE CLAIMS AND
       PROVISIONS FOR PAYMENT OF ADMINISTRATIVE CLAIMS ...............64

VI.     VESTING OF ASSETS AND RIGHTS OF ACTIONS ....................................65

VII.    EXCULPATION....................................................................................69

VIII.   RELEASE OF CONTRIBUTING OFFICERS AND DIRECTORS ..................70

IX.     EXECUTORY CONTRACTS ................................................................74

X.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES
       OF THE PLAN ..................................................................................77

XI.     LIQUIDATION ANALYSIS UNDER CHAPTER 7.........................................93

XII.    CONFIRMATION AND OTHER PROCEDURES ...........................................94

     A.     VOTING AND OTHER PROCEDURES ...............................................94

     B.     DISCLAIMERS AND ENDORSEMENTS .............................................98

     C.     THE CONFIRMATION HEARING .....................................................98

     D.     CONFIRMATION....................................................................100

     E.     UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE
         TESTS ................................................................................100

        1.   SECURED CREDITORS .................................................101

        2.   UNSECURED CREDITORS ...........................................101

        3.   INTEREST HOLDERS ..................................................101

        4.   UNFAIR DISCRIMINATION ..........................................102

     F.     FEASIBILITY ........................................................................102

     G.     BEST INTEREST TEST ...........................................................102

     H.     POST CONFIRMATION BOARD OF DIRECTORS AND
         MANAGEMENT.....................................................................103

     I.      STATUS OF REORGANIZDED OCA.......................................................103

     J.      CHARTER OF REORGANIZED DEBTORS ..........................................103

     K.     CERTAIN RISK FACTORS TO BE CONSIDERED .............................104

           A.  GENERAL CONSIDERATIONS ........................................................104

           B.  CERTAIN BANKRUPTCY CONSIDERATIONS ...........................104

           C.  OTHER RISK FACTORS ..................................................................106

     L.      FUTURE OPERATIONS AND FEASIBILITY OF PLAN
           AND VALUATION .............................................................................107

XIII.   CONCLUSION AND RECOMMENDATION....................................................108

EXHIBIT "D-1"     - RETAINED CLAIMS AND CAUSES OF ACTIONS
EXHIBIT "D-2"     - VALUATION
EXHIBIT "D-3"     - LIQUIDATION ANALYSIS
EXHIBIT "D-4"     - FINANCIAL PROJECTIONS
EXHIBIT "D-5"     - LIST OF BSA'S TO BE ASSUMED OR NOT BE ASSUMED

## INTRODUCTION

OCA, Inc. ("OCA") and the Subsidiaries[1] (each a "Debtor" and collectively, the "Debtors" and/or in their capacity as such, the "Plan Proponents"), have filed a first amended and restated joint plan in the above captioned bankruptcy case. The Plan Proponents submit this First Amended and Restated Joint Disclosure Statement for the Joint Plan of OCA, Inc, and Debtor Subsidiaries (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims and Equity Interests in the Debtors. The Disclosure Statement is submitted in connection with (i) the solicitation of acceptances or rejections of the First Amended and Restated Joint Plan Under Chapter 11 of the Bankruptcy Code (the "Plan") filed by the Plan Proponents with the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court") and (ii) the hearing to consider approval of the Plan (the "Confirmation Hearing") scheduled for the date set forth in the accompanying notice. Unless otherwise defined herein or unless the context requires otherwise,

---

[1] Orthodontic Centers of Alabama, Inc. (06-10180); Orthodontic Centers of Arizona, Inc. (06-10181); Orthodontic Centers of Arkansas, Inc. (06-10182); Orthodontic Centers of California, Inc. (06-10183); Orthodontic Centers of Colorado, Inc. (06-10184); Orthodontic Centers of Connecticut, Inc. (06-10185); Orthodontic Centers of Florida, Inc. (06-10186); Orthodontic Centers of Georgia, Inc. (06-10187); Orthodontic Centers of Illinois, Inc. (06-10188); Orthodontic Centers of Indiana, Inc. (06-10189); Orthodontic Centers of Kansas, Inc. (06-10190); Orthodontic Centers of Kentucky, Inc. (06-10191); Orthodontic Centers of Louisiana, Inc. (06-10192); Orthodontic Centers of Maine, Inc. (06-10193); Orthodontic Centers of Maryland, Inc. (06-10194); Orthodontic Centers of Massachusetts, Inc. (06-10195); Orthodontic Centers of Michigan, Inc. (06-10196); Orthodontic Centers of Minnesota, Inc. (06-10197);Orthodontic Centers of Mississippi, Inc. (06-10198); Orthodontic Centers of Missouri, Inc. (06-10199); Orthodontic Centers of Nebraska, Inc. (06-10200);Orthodontic Centers of Nevada, Inc. (06-10201); Orthodontic Centers of New Hampshire, Inc. (06-10202); Orthodontic Centers of New Jersey, Inc. (06-10203); Orthodontic Centers of New Mexico, Inc. (06-10204); Orthodontic Centers of New York (06-10205); Orthodontic Centers of North Carolina, Inc. (06-10206); Orthodontic Centers of North Dakota, Inc. (06-10207); Orthodontic Centers of Ohio, Inc. (06-10208); Orthodontic Centers of Oklahoma, Inc. (06-10209); Orthodontic Centers of Oregon, Inc. (06-10210); Orthodontic Centers of Pennsylvania, Inc. (06-10211); Orthodontic Centers of Puerto Rico, Inc. (06-10212); Orthodontic Centers of Rhode Island, Inc. (06-10213); Orthodontic Centers of  South Carolina, Inc. (06-10214); Orthodontic Centers of Tennessee, Inc. (06-10215); Orthodontic Centers of Texas, Inc. (06-10216); Orthodontic Centers of Utah, Inc. (06-10217); Orthodontic Centers of Virginia, Inc. (06-10218); Orthodontic Centers of Washington, Inc. (06-10219); Orthodontic Centers of Washington, D.C., Inc. (06-10220); Orthodontic Centers of West Virginia, Inc. (06-10221); Orthodontic Centers of Wisconsin, Inc. (06-10222); Orthodontic Centers of Wyoming, Inc. (06-10223); OrthAlliance, Inc. (06-10229); OrthAlliance New Image, Inc. (06-10230); OCA Outsource, Inc. (06-10231);  PedoAlliance, Inc. (06-10232); Orthodontic Centers of  Hawaii, Inc. (06-10503); Orthodontic Centers of Iowa, Inc. (06-10504); and Orthodontic Centers of Idaho, Inc. (06-10505).

all capitalized terms contained herein have the meanings ascribed to them in the Plan. In the event of a conflict or difference between the definitions used in the Disclosure Statement and the Plan, the definition contained in the Plan shall control.

## I. PURPOSE AND SUMMARY OF PLAN

**THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY.**

The primary purposes of the Plan are to:

- Provide for the continued operation and renewed growth of the Debtors' businesses;

- Rationalize the Debtors' debt structure by satisfying the Senior Lender Claims[2] through the New Term Loan Facility and the issuance of 100% of the equity in the Reorganized OCA to the Senior Lenders (subject to the dilution by the Management Incentive Plan and the Doctors' Incentive Plan);

- Provide for $10 million in exit financing to repay the DIP Facility, pay the expenses of the bankruptcy cases and the allowed claims against the Debtors and to provide additional working capital for the Debtors' businesses;

- Provide for new senior management and ownership of the Debtors; and

- Provide distributions to holders of allowed claims and potential distributions to holders of Equity Interests and Subordinated Claims.

The following is a summary of the Plan:

## A. DEBT AND CAPITAL STRUCTURE

1. The Senior Lender will be issued 100% of the New Common Stock in the Reorganized OCA (subject to the dilution by the Management Incentive Plan and the Doctors' Incentive Plan) and will receive ratable interests in the New Term Loan Facility in satisfaction of the Senior Lender Claims.

2. The holders of Allowed General Unsecured Claims share ratably in (i) the General Unsecured Claims Pool (consisting of $3,000,000 deposited by the

---

[2] Silver Point Capital, L.P. and funds and accounts controlled or managed by Silver Point Capital, L.P. (together, "Silver Point") are the Senior Lenders as of the date hereof.

Reorganized Debtors in the Unsecured Creditors' Trust), (ii) several potential General Unsecured Deferred Payments (consisting of possible payments by the Reorganized Debtors to the Unsecured Creditors' Trust) upon the Reorganized Debtors achieving certain financial milestones, and (iii) the Transferred Avoidance Action Proceeds (consisting of the net proceeds from the Transferred Avoidance Actions).  Depending on the amount of General Unsecured Claims that are ultimately Allowed, and the Reorganized Debtors' performance, Holders of Allowed General Unsecured Claims could conceivably receive as much as 100% of the amount of their Allowed General Unsecured Claims over time, but shall in no instance receive more than a full recovery on account of the ir Allowed General Unsecured Claims, exclusive of interest accruing after the Petition Date.

3.     The existing common (and preferred) stock and any options thereon (the "Equity Interests") in OCA will be canceled.  However, if the classes comprising Equity Interests and Subordinated Claims vote to accept the Plan, the existing stockholders, together with the holders of allowed Subordinated Claims (Class 5) will receive Equity and Subordinated Claims Deferred Payments, which are potential payments (not securities) based on the Reorganized OCA achieving certain milestones in the future including the payment in full of Allowed General Unsecured Claims.   The Reorganized Debtors will make Equity and Subordinated Claims Deferred Payments, if any, to the Equity and Subordinated Claims Trust.

## B.     EXIT FINANCING

The Senior Lenders will provide up to $10 million of exit financing on the Effective Date of the Plan to repay  the DIP Facility incurred during the bankruptcy case, and to pay administrative claims due to professionals and others, trade creditors and other general unsecured creditors, as well as to provide working capital for the Reorganized Debtors.

## C.     CURRENT MANAGEMENT OF OCA

1.     Bartholomew F. Palmisano, Sr. ("Palmisano") no longer serves as Chief Executive Officer ("CEO") or in any position he held with the Debtors. In addition, Palmisano has resigned as a member of the board of OCA. Palmisano's cessation of service occurred after the Plan Support Agreement executed by the Senior Lenders, the Official Committee of Unsecured Creditors and the Debtors was approved by the Bankruptcy Court[3].  The Plan Support Agreement provides that the Senior Lenders, the Official Committee of Unsecured Creditors and the Debtors will support the confirmation of the Plan.  At this time neither Palmisano

---

[3]    The Plan Support Agreement was approved by the Bankruptcy Court by Order entered on May 11, 2006 (Docket No. 480).

nor any member of his family serves as an officer or member of the board of OCA.

2. Michael Gries ("Gries") of Conway, Del Genio, Gries & Co., LLC, who is presently Chief Restructuring Officer of the Debtor, has been appointed as the interim CEO of OCA until a new permanent CEO is selected. OCA has received Bankruptcy Court approval to retain Spencer Stuart to commence an executive search for a new CEO (Docket Nos. 479 and 481).

## D.  DOCTORS' INCENTIVE PLAN

The Doctors' Incentive Plan will allow doctors of Affiliated Practices to obtain certain options or restricted stock grants in Reorganized OCA totaling an aggregate of up to 10% of the New Common Stock (on a fully-diluted basis and assuming all shares eligible for issuance under the Management Incentive Plan have been issued and are outstanding), with the terms and conditions to be determined by the creditors that will receive New Common Stock under the Plan. The effect of the Doctors' Incentive Plan will be to dilute the equity interests of the Senior Lenders in Reorganized OCA for all purposes. Detailed terms of the Doctors' Incentive Plan will be filed with the Plan Supplement (as defined below). For avoidance of doubt, equity securities shall be issued under the Doctors' Incentive Plan only pursuant to applicable exemptions from registration of securities, provided, however, the Debtors are not relying on §1145 of the Bankruptcy Code for the basis of such exemption from registration.

## E.  MANAGEMENT INCENTIVE PLAN

The Management Incentive Plan will allow the members of the management of Reorganized OCA to obtain certain options in Reorganized OCA totaling an aggregate of up to 10% of the New Common Stock (on a fully-diluted basis and assuming all shares eligible for issuance under the Doctors' Incentive Plan have been issued and are outstanding) with the terms and conditions to be determined by the creditors that will receive New Common Stock under the Plan. The effect of the Management Incentive Plan will be to dilute the equity interests of the

Senior Lenders in Reorganized OCA for all purposes. Detailed terms of the Management Plan will be filed with the Plan Supplement. For avoidance of doubt, equity securities shall be issued under the Management Incentive Plan only pursuant to applicable exemptions from registration of securities, provided, however, the Debtors are not relying on §1145 of the Bankruptcy Code for the basis of such exemption from registration.

**F.** **GENERAL UNSECURED DEFERRED PAYMENTS**

As part of the treatment afforded to members of Class 4, as described below, the Reorganized Debtors may make payments for the benefit of general unsecured claimants to the Unsecured Creditors' Trust (the "General Unsecured Deferred Payments"). There are two types of potential General Unsecured Deferred Payments, the "First General Unsecured Deferred Payment" and "Subsequent General Unsecured Deferred Payments." In each case, the Reorganized Debtors obligation to make the General Unsecured Deferred Payments is dependent on the recovery of the Senior Lenders hitting certain "Reference Amounts" as defined in the Plan. The First General Unsecured Deferred Payment, if paid, will be in an amount between $5 million and $7.5 million, and will be due to the Unsecured Creditors' Trust when the Reference Amount reaches $96 million. The precise amount of the First General Unsecured Deferred Payment depends on the amount of certain types of General Unsecured Claims (defined in the Plan as "Additional Amount Claims") that are ultimately Allowed. Subsequent General Unsecured Deferred Payments will become due when the Reference Amount hits $115 million, $150 million, and for each additional $25 million thereafter. All General Unsecured Payments will be solely the obligations of the Reorganized Debtors and shall be payable solely out of "legally available funds" as specified in the Plan. The Debtors do not believe that interests in the Unsecured Creditors Trust constitute securities.

## G.     SUBORDINATED CLAIMS

Pursuant to section 510(b) of the Bankruptcy Code, claims arising from the "rescission of a purchase or sale of a security of the debtor . . . for damages arising from the purchase or sale of such security, or for reimbursement or contribution . . . on account of such claim shall be subordinated to all claims that are senior to . . . the equity interest represented by such security" ("Subordinated Claims").  The Debtors expect that claims based upon the purported securities class actions against the Debtors, consolidated under the title of In *re OCA Inc. Securities and Derivative Litigation*, being No. 05-2165-SSV-DEK on the docket of the District Court for the Eastern District of Louisiana, will be classified as Subordinated Claims under the Plan.  The Debtors further believe that any claims or interests (including options and warrants) arising from the Debtors' prepetition stock option, warrant, and incentive programs will be classified as Subordinated Claims.[4]  The Plan provides that holders of Subordinated Claims will be afforded the same treatment as holders of Equity Interests in OCA.

## H.     EQUITY AND SUBORDINATED CLAIM DEFERRED PAYMENT

In the event that either Class 5 or Class 6 does not vote to accept the Plan, the Plan provides that members of Class 5 and Class 6 will receive no distributions and the payments described below will not be made.

As part of the treatment afforded to members of Classes 5 and 6, as described below, the Reorganized Debtors may make conditional payments for the benefit of holders of Equity Interests in OCA, Inc. and holders of Subordinated Claims  (the 'Equity and Subordinated

---

[4] These programs include, but are not limited to, the Orthodontic Centers of America, Inc. 1994 Incentive Stock Plan; Orthodontic Centers of America, Inc. 1994 Non-Qualified Stock Option Plan for Non-Employee Directors; Orthodontic Centers of America, Inc. 1995 Restricted Stock Option Plan; OrthAlliance's 1999 Orthodontist Stock Option Plan; OrthAlliance's 1997 Orthodontist Stock Option Plan; OCA's Stock Pool Program; OCA's Target Stock Program; the OrthAlliance Stockholder Value Program; OCA's Stock Pool II Program; OCA's Target Stock II Program; the Orthodontist Stock Purchase Plan; and the Employee Stock Purchase Plan.

Claim Deferred Payments"). The Equity and Subordinated Claims Deferred Payments shall only be payable if the Reorganized Debtors have met certain financial milestones and after all Allowed General Unsecured Claims have been paid in full. Generally, and as more completely described below and in the Plan, once the Senior Lenders' recoveries have hit certain "Reference Amounts", the Reorganized Debtors will make subject to the limitations described herein and in the Plan, one or more Equity and Subordinated Claims Deferred Payments. As previously mentioned, these payments will be made only after all Allowed General Unsecured Claims have been paid in full. Moreover, to the extent that one or more Subsequent General Unsecured Deferred Payments are made, the potential aggregate amount of the Equity and Subordinated Deferred Payments will be further limited.

Specifically, the Equity and Subordinated Claims Deferred Payments shall be determined as follows based on the thresholds set forth below:

(a)     At such time as the Reference Amount is $115,000,000, an Equity and Subordinated Claims Deferred Payment shall be due and payable in Cash in an amount equal to $1,150,000.

(b)     At such time as the Reference Amount is $150,000,000, an Equity and Subordinated Claims Deferred Payment shall be due and payable in Cash in an amount equal to $3,500,000.

(c)     Thereafter, for each additional $25,000,000 added to the Reference Amount, an Equity and Subordinated Claims Deferred Payment shall be due and payable in Cash in an amount equal to $2,500,000.

However the Reorganized Debtors shall not be obligated to make any Equity and Subordinated Claims Deferred Payment that would otherwise become due and payable at any Reference Amount threshold specified in (a), (b) or (c) above if any such Reference Amount threshold is less than or equal to the Full Payment Reference Amount (as that term is defined in the Plan). Furthermore, and notwithstanding anything to the contrary, the first Equity and

Subordinated Claims Payment payable by the Reorganized Debtors shall be equal to 10.00% of the difference between (X) the lowest of the aforementioned Reference Amount thresholds that is greater than the Full Payment Reference Amount and (Y) the Full Payment Reference Amount.  After the first Equity and Subordinated Claims Payment is made by the Reorganized Debtors, all subsequent Equity and Subordinated Claims Payments shall be made in accordance with the terms specified above.

*Example:  Assume that the Full Payment Reference Amount is $135,000,000.  In such a scenario, the Reorganized Debtors shall never be obligated to make the Equity and Subordinated Claims Deferred Payment otherwise payable at the Reference Amount threshold of $115,000,000 and, shall, after the Reference Amount is $150,000,000, make their first Equity and Subordinated Claims Deferred Payment, which will be in an amount equal to 10.00% of the difference between $150,000,000 and $135,000,000 or $1,5000,000.  The next Equity and Subordinated Claims Deferred Payment payable by the Reorganized Debtors will be equal to $2,500,000 as specified above in (c) and would be payable at such time as the Reference Amount is $175,000,000 and so on.*

There is no guarantee that the Reorganized Debtors will ever meet financial milestones and make the Equity and Subordinated Claims Deferred Payments.  Moreover, all Equity and Subordinated Claims Deferred Payments will be solely the obligations of the Reorganized Debtors and shall be payable solely out of "legally available funds" as specified in the Plan. Distributions to holders of New Common Stock of Reorganized OCA other than the Senior Lenders do not count towards the "Reference Amounts" set forth above.  The vehicle for making the Equity and Subordinated Claims Deferred Payments will be the Equity and

Subordinated Claims Trust.  The Debtors do not believe that the Equity and Subordinated Claims Trust interests constitute securities.

The trustee of the Equity and Subordinated Claims Trust shall, within 90 days of the Effective Date, move for an order under section 502(c) of the Bankruptcy Code estimating the total amount of Allowed Subordinated Claims and the total amount of Allowed Equity Interests in OCA, which estimations shall determine the relative interests of the holders of Allowed Subordinated Claims and Allowed Equity Interests in OCA in the Equity and Subordinated Claims Trust.

## I.   DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS

Following the termination of Palmisano as CEO and his resignation as a member of the board of directors of OCA, Michael Gries was appointed to serve as interim CEO of OCA. The Debtors retained Spencer Stuart, an executive search firm, to identify, with the assistance of Greis, suitable candidates to serve as OCA's permanent CEO.  It is expected that the current board of directors of OCA will appoint a new CEO, who shall be satisfactory to the Senior Lenders, before the Effective Date of the Plan.  The permanent CEO will sit as a member of Reorganized OCA's board of directors.  If no permanent CEO is appointed prior to the Effective Date, the search for a suitable candidate will continue, however the interim CEO will not sit on the board of directors of Reorganized OCA.  If a permanent CEO has been identified prior to the date of the Plan Supplement, his or her identity will be disclosed therein.  The remaining members of the board of directors of Reorganized OCA will be chosen by the Senior Lenders and disclosed in the Plan Supplement.  The composition and members of the boards of directors of the subsidiaries of OCA shall be determined by the Senior Lenders in their sole discretion and identified in the Plan Supplement.    The Chief Executive Officer of OCA, shall, with the

approval of the Lenders, appoint such other officers of the Reorganized Debtors as he or she deems appropriate; such persons shall be identified in the Plan Supplement.

**J.**      **DEEMED CONSOLIDATION OF  DEBTORS FOR PLAN PURPOSES ONLY**

1.      Standards for Consolidation.

Under the Plan, the Debtors will be deemed consolidated for the purposes of the Plan.  Among these purposes are (a) a Claim filed against one Debtor will be deemed filed against the deemed consolidated Debtors, (b) any obligation of any Debtor will be deemed the obligation of the deemed consolidated Debtors and (c) for the purposes of set-off, the debt due to a particular Debtor may be offset against the Claims filed against any Debtor. The effect of this consolidation is the pooling of assets of, and claims against, the deemed consolidated Debtors; satisfying Claims from a common fund, and combining the Claimants of the deemed consolidated debtors for the purpose of receiving distributions under the Plan.

The authority of a Bankruptcy Court to order substantive consolidation is found by most courts to be derived from their general equitable powers under Section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code.  In addition, courts have found that statutory authority exists for the approval of substantive consolidation as part of a plan of reorganization under the terms of Section 1123(a)(5)(C) of the Bankruptcy Code.  However, there are no statutorily prescribed standards setting forth the parameters for when a deemed consolidation, such as is set out in the Plan, is appropriate. Instead, judicially developed standards control whether such a deemed consolidation should be granted in any given case.

Thus, the propriety of a deemed consolidation must be evaluated on a case-by-case basis based upon the particular facts and circumstances of the estates in question.  The extensive list of

elements and factors frequently cited and relied upon by courts in determining the propriety of consolidation may be viewed as variants on two critical factors, namely, (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

2.      Applying Consolidation Principles in these Cases.

Most creditors dealt with the Debtors as a single economic unit and did not extend credit in reliance upon their separate corporate identities.  The Debtors operate their operations under the name "OCA", and are in actual fact in the same line of business, or conduct operations, or hold assets that support such line of business.  While that single business has operated through many different legal entities for various business purposes, they are part of one integrated enterprise, the value of which cannot realistically be apportioned to any one entity. For example, the value of the various BSA's were subsumed at the level of OCA, even though a Debtor, other than OCA was a party thereto.

It is conceivable that certain unsecured creditors could assert that the deemed consolidation of this case could prejudice them.  However, this presumes that there is a separate going concern value allocable to each Debtor, an assumption that the Debtors do not believe is realistic in light of the fact the Debtors carry on a unitary business enterprise that happens to operate through multiple entities, all of which are integrated in their operations and dependent upon one another in furtherance of the business.  Moreover, the creditors most likely to be able to make such a claim are trade creditors of the individual practices and, given that the First Day Orders permitted such creditors to be paid in full, those creditors will not be prejudiced by the deemed consolidation.

Further, deemed consolidation was an integral part of the resolution reflected in the Plan Support Agreement, which, among other things, allows for the payment to the holders of (x) Allowed General Unsecured Claims from the General Unsecured Claims Pool, the General Unsecured Deferred Payments, and the Transferred Avoidance Action Proceeds, and (y) Allowed Subordinated Claims and Allowed Equity Interests from the Equity and Subordinated Claims Deferred Payments while maintaining the Debtors' existing legal corporate structure.

Additionally, the affairs of the Debtors are so administered that, for the purposes set out in the Plan, they should be treated as a single entity for the benefit of all creditors.   OCA provides services to all of the other Debtors, including accounting and bookkeeping, legal, tax, information systems, administrative, lease management, office planning, construction and design, human resources administration, and similar "back office" corporate services.

The separate legal identity of each Debtor will be maintained.

**K.      PLAN SUPPLEMENT**

The Debtors will file with the Court a supplement of additional documents and information (the "Plan Supplement").  The Debtors will file the Plan Supplement, containing information to the extent then known and documents and term sheets to the extent then available, no later than seven (7) business days before the Voting Deadline (as defined in the Motion of Debtors for Entry of an Order Approving (I) the Confirmation Hearing Notice, the manner of Mailing and Service of the Solicitation Package and Confirmation Notice and Publication of the Confirmation Hearing Date, (II) the Voting Agent and Procedures for Voting and Tabulation of Ballots, (III) the Forms of Ballots, and (IV) the Procedures for Allowing Claims for Voting Purposes [Docket No. 624]).  The Plan Supplement will also be made available on the Internet at www.orthodon.com.  If you wish to receive a paper copy of the Plan Supplement at no cost, you

may contact the Debtors' Voting Agent, Kurtzman Carson Consultants, LLC at (866) 381-9100.

To the extent documents or information become available subsequently, they will be filed as

additional Plan Supplements and posted on the website above.

## II.    SUMMARY OF CLASSIFICATION AND

## TREATMENT OF CLAIMANTS

The following is a Summary of Classification and Treatment of Claimants:

| CLASSES OF CLAIMS AND EQUITY INTERESTS | TREATMENT OF CLASSES |
|---|---|
| Unclassified. Allowed Administrative Expense Claims.<br><br>The total estimate of outstanding unpaid Claims as of Effective Date is $2 million. | Unimpaired. Not entitled to vote. Allowed Administrative Expense Claims will be paid in full by the Reorganized Debtors, in cash, on the later of: (a) the Effective Date, or as soon as practicable thereafter; (b) the date upon which an Administrative Expense Claim is Allowed, or as soon as practicable thereafter; (c) upon such other terms as may be agreed upon between the holder of an Allowed Administrative Expense Claim and the Reorganized Debtors; or (d) otherwise upon order of the Bankruptcy Court; provided, however, that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors or assumed by the Debtors pursuant to the Plan will be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transaction and any agreements relating thereto. (The vast majority of these claims represent ordinary course of business expenses which should be paid in the ordinary course of business or fees and expenses due Professionals, which will be paid as soon as practicable after either the Effective Date or the date of allowance.)<br><br>Estimated percentage recovery: 100% |
| Unclassified: Allowed Priority Tax Claims<br><br>The total estimate of Allowed Priority Tax Claims is zero. | Unimpaired. Not entitled to vote. Allowed Priority Tax Claims will be paid at the option of the Reorganized Debtors, either (a) in full, in cash, on the Effective Date, or as soon as practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Priority Tax Claim and the Reorganized Debtors, or (c) in equal quarterly cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest. |

| | Estimated percentage recovery: 100% |
|---|---|
| **Class 1**. Allowed Priority Claims[5].<br><br>The total estimate of Allowed Priority Claims is zero. | Unimpaired. Not entitled to vote. Allowed Priority Claims will be paid in full by the Reorganized Debtors, in cash on the later of: (a) the Effective Date, or as soon as practicable thereafter; (b) the date upon which a Priority Claim is Allowed by Final Order, or as soon as practicable thereafter; or (c) upon such other terms as may be mutually agreed upon between the holder of an Allowed Priority Claim and the Reorganized Debtors.<br><br>Estimated percentage recovery: 100% |
| **Class 2**. Allowed Other Secured Claims[6].<br><br>The total estimate of Allowed Other Secured Claims is zero. | Unimpaired. Not entitled to vote. Allowed Other Secured Claims will be paid in full by the Reorganized Debtors, in cash, together with interest on such Allowed Other Secured Claim required to be paid pursuant to Section 506(b) of the Bankruptcy Code on the later of: (a) the Effective Date; (b) the date upon which an Other Secured Claim is Allowed, or as soon as practicable thereafter; or (c) upon such other terms as may be mutually agreed upon between the holder of a Non-Priority Secured Claim and the Reorganized Debtors; or (d) in accordance with the provisions of section 1124(2) of the Bankruptcy Code.<br><br>Each holder of an Allowed Other Secured Claim will retain its security interest until full and final payment of such Allowed Secured Claim is made as provided in the Plan, at which time such security interest will be deemed null and void, and will be unenforceable for all purposes.<br><br>Estimated percentage recovery: 100% |
| **Class 3**. Allowed Senior Lenders Claims.<br><br>The total estimate of Senior Lender Claims, including the DIP obligations, as of the Effective Date is $99 million. | Impaired. Entitled to vote. The Senior Lender Claims shall be deemed to constitute Allowed Claims upon the Effective Date of the Plan and:<br><br>(a) all fees, expenses, costs and other charges of the Senior Lenders and the DIP and Pre-petition Agents (including those of the Senior Lenders' and the DIP and Pre-petition Agents' counsel and advisors) shall be paid in full in Cash on the Effective Date of the Plan;<br><br>(b) all DIP Obligations shall be repaid in full in Cash on the Effective Date;<br><br>(c) $50,000,000 of the Senior Lender Indebtedness shall be converted into the principal amount of the New Term Loan Facility. The Senior Lenders will participate ratably in the New Term Loan Facility and will share in all payments on account of the New Term Loan Facility on a Pro Rata basis; and |

---

[5] The Internal Revenue Service has filed a proof of claim for approximately $2.5 million. The debtors believe this is a protective proof of claim and that there will be no Allowed Priority Claim for the Internal Revenue Service.
[6] Dr. Hobson alleges he is an "Other Secured Claim." The Debtors do not believe that Dr. Hobson holds any property of the Debtors as security for his judgment, and to the extent that he has an Allowed Claim, his Claim would be a General Unsecured Claim.

| | |
|---|---|
| | (d) all remaining Senior Lender Indebtedness (but, for avoidance of doubt, not any Senior Lender existing Equity Interest), shall be converted into 100.00% of the New Common Stock of Reorganized OCA, which New Common Stock shall be distributed ratably to the Senior Lenders and which shall constitute 100.00% of all of the New Common Stock issued or issuable by Reorganized OCA under the Plan, subject to dilution by the Management Incentive Plan and the Doctors' Incentive Plan.<br><br>Estimated percentage recovery: 100% |
| **Class 4**. Allowed General Unsecured Claims.<br><br>The total estimate of Allowed General Unsecured Claims is $9 - 11 million[7]. | Impaired. Entitled to vote. The Allowed General Unsecured Claims shall:<br><br>(a) share ratably in the General Unsecured Claims Pool;<br><br>(b) share ratably in the First General Unsecured Deferred Payment, if any;<br><br>(c) share ratably in any Subsequent General Unsecured Deferred Payments; and<br><br>(d) share ratably in the Transferred Avoidance Action Proceeds.<br><br>To the extent that all Allowed General Unsecured Claims have been paid in full at any time, then the Unsecured Creditors' Trust will wind down and transfer any remaining Transferred Avoidance Actions and any additional Transferred Avoidance Action Proceeds (after payment of all reasonable wind-down expenses and other obligations of the Unsecured Creditors' Trust) to Reorganized OCA. For avoidance of doubt, holders of Allowed General Unsecured Claims shall in no instance receive more than a full recovery on account of their Allowed General Unsecured Claims, exclusive of interest accruing after the Petition Date<br><br>Estimated percentage recovery: Approximately 30% and up to 100% if sufficient General Unsecured Deferred Payments are made. |
| **Class 5.** Subordinated Claims | Impaired. Entitled to vote. These are all Claims subject to subordination under Section 510(b) of the Bankruptcy Code.<br><br>(a) In the event that both this Class 5 and Class 6, the Class of Equity Interests, vote to accept the Plan, each holder of an allowed Subordinated Claim shall participate ratably in each Equity and Subordinated Claims Deferred Payment made by Reorganized OCA to the Plan Administrator for the benefit of such holders. For the avoidance of doubt, all existing Equity Interests of the Senior Lenders on the Effective Date, including all shares of equity obtained on |

---

[7] This estimate is based upon a review of the Debtors' accounts payable for which the Debtors have received invoices for services rendered pre-petition plus the potential liability for the subordinated $3 million note due to Palmisano. It does not include any possible rejection damages or any alleged liability to Affiliated Practices.

|  | account of OCA's obligation to issue warrants, shall participate ratably in each Equity and Subordinated Claims Deferred Payment; |
|---|---|
| (b) | Rights to the Equity and Subordinated Claims Deferred Payments shall neither be assignable nor transferable. Notwithstanding anything to the contrary herein, no payments shall be made on account of the Equity and Subordinated Claims Deferred Payments except as described in this Plan, and no such payments shall be made unless Allowed General Unsecured Claims have been paid in full; and |
| (c) | Rights to the Equity and Subordinated Claims Deferred Payments shall have such other terms and conditions as may be satisfactory to the creditors that will receive New Common Stock under the Plan and OCA and shall be structured so that they are not deemed to be "securities". |

| | |
|---|---|
| **Class 6**. Equity Interests in OCA, Inc., (including the Senior Lender Equity Interests) | Impaired. Entitled to vote. Class *6* consists of the holders of Equity Interests in OCA, Inc. |
| | (a) The Equity Interests in OCA, Inc. shall be canceled and extinguished. The holders of Equity Interests in OCA, Inc. shall receive a Pro Rata Share of the Equity and Subordinated Claims Deferred Payment if the Class of Equity Interests votes to accept the Plan; otherwise, the holders of Equity Interests will receive nothing under the Plan; |
| | (b) In the event that both this Class 6 and Class 5, the Class of Subordinated Claims, vote to accept the Plan, each holder of an Allowed Equity Interest shall participate ratably in each Equity and Subordinated Claims Deferred Payment made by Reorganized OCA to the Plan Administrator for the benefit of such holders. For the avoidance of doubt, all existing Equity Interests of the Senior Lenders on the Effective Date, including all shares of equity obtained on account of OCA's obligation to issue warrants, shall participate ratably in each Equity and Subordinated Claims Deferred Payment; |
| | (d) Rights to the Equity and Subordinated Deferred Payments shall neither be assignable nor transferable. Notwithstanding anything to the contrary herein, no payments shall be made on account of the Equity and Subordinated Claims Deferred Payments except as described in this Plan, and no such payments shall be made unless Allowed General Unsecured Claims have been paid in full; and |
| | (e) Rights to the Equity and Subordinated Claims Deferred Payments shall have such other terms and conditions as may be satisfactory to the creditors that will receive New Common Stock under the Plan and OCA and shall be structured so that they are not deemed to be "securities." |
| **Class 7**. Equity Interests in Debtor Subsidiaries. | Unimpaired. Not entitled to vote. The holders of the Equity Interests in the Debtor Subsidiaries shall retain their Equity Interests in the Debtor Subsidiaries. |

## III. GENERAL OVERVIEW AND BACKGROUND INFORMATION

## A. BACKGROUND AND GENERAL INFORMATION

OCA, a Delaware corporation, is a public company whose common stock had traded on the New York Stock Exchange under the symbol OCA. The common stock of OCA currently

trades on the pink sheets under the symbol "OCAI." In 1989, OCA was formed and is the direct parent of each of the Debtor Subsidiaries, all of which are also Delaware corporations. The Debtors maintain their corporate headquarters in Metairie, Louisiana.

OCA was formed to pursue a strategy of developing, consolidating and providing start-up capital, furniture, fixtures, equipment, locations and business services to orthodontic practices on a national basis.  While orthodontic practices have been the main focus of the Debtors, over the years the Debtors have expanded their client base to include other dental providers, including general dentistry practitioners and pediatric specialists. In addition, the Debtors, through other nondebtor subsidiaries, have expanded the scope of their operations to include international opportunities that have led to affiliating practices in other countries.

As a result, the Debtors are the largest providers of business services to orthodontic and dental practices worldwide.  The Debtors provide a full range of capital, operational, purchasing, financial, marketing, administrative and other business services, as well as proprietary information systems, to approximately 200 orthodontic and dental practices representing approximately 400 offices throughout the United States.

Through long-term contracts, typically business services agreements ("Business Service Agreements" or "BSA's") with affiliated orthodontic or dental practices ("Affiliated Practices"), the Debtors provide capital for the development and growth, and manage the business aspects of the Affiliated Practices, thereby allowing practitioners to focus on delivering quality patient care. Although the BSA's vary, under the BSA's, the Debtors typically make capital investments in the Affiliated Practices by purchasing substantially all of the furniture, fixtures and equipment used by the Affiliated Practices, and making leasehold improvements to the offices operated by

them.  For the most part, the furniture, fixtures and equipment are owned by the Debtors, and the Debtors execute the leases for the offices used by the Affiliated Practices.

The Debtors estimate that the Affiliated Practices are indebted to the Debtors in the amount of approximately $72,000.000[8].  This debt, which is evidenced in some instances by promissory notes and in most instances by book entries, represents the loans and advances made to Affiliated Practices for relocations and remodeling, equipment purchases, development and construction of new offices, including start-up costs, personal loans, over-advances of doctor compensation, or to cover operating losses.  The Debtors cannot state with certainty how much of the above debt will be collectible by the Debtors from the Affiliated Practices.  Specifically, the Debtors note that in litigation Affiliated Practices have challenged the validity of this type of debt and have alleged that it gives rise to certain counter-claims against the Debtors.  Additionally, proving this debt is difficult in cases where no separate written documentation evidences the debt and litigating this issue to collection will likely be costly and time consuming as it represents debt owed by a range of Affiliated Practices, will be fact-specific, and may have to be litigated in a variety of forums.  Finally, the Debtors note that even upon obtaining a successful judgment, there is no guaranty that the Debtors will be able to collect from the various Affiliated Practices.

---

[8]      For purposes of this estimate, the Debtors have allocated amounts owed between Affiliated Practices currently performing under their BSA's and the Inactive and Litigating Practices.  With respect to amounts owed by Affiliated Practices currently performing, the value is included in the Enterprise Value of OCA, as described in Exhibit D-2, within the category of Capital Accounts (estimated at $12 million).  With respect to the amounts owed by Inactive and Litigating Practices, the estimated value is included in the category of value to be realized from litigating or settling with those practices (estimated at between $10 million and $20 million).  These estimated values are subject to challenge and negotiation and are not specifically distinguishable from the value of the related assets, the new SSA's and the litigation itself. The estimated recovery from the litigation with defaulting practices is net of litigation cost, but prior to discounting for time value.

The Business Services Agreements generally provide that the Affiliated Practices will pay the Debtors monthly service fees based upon a percentage of the practices' operating profit or practice revenue and reimbursement of practice-related expenses. The BSA's represent the primary operating assets of the Debtors and substantially all of the Debtors' revenue is generated through the BSA's. These revenues are critical to the Debtors' operations and are necessary to fund the expenses of the Affiliated Practices.

The posture of the BSA's with Affiliated Practices can generally be described as follows[9]:

(1)     Some BSA's are presently performing;

(2)     Some BSA's sent notices of termination based on alleged defaults by the Debtors and the alleged cure period had expired prior to the Petition Date;

(3)     Some BSA's sent notices of termination based on alleged defaults by the Debtors and the cure period had not expired prior to the Petition Date; and

(4)     Some BSA's were terminated prior to the Petition Date, and the termination has been judicially recognized by a final court order or agreed to by the Debtors.

## B.     DEFAULTS BY AND LITIGATION WITH AFFILIATED PRACTICES

Beginning in late 2004, certain Affiliated Practices began to default and/or cease performing under the BSA's, resulting in significant litigation between the Debtors and these Affiliated Practices. The number of Affiliated Practices defaulting and/or not performing under the BSA's steadily increased through 2005 and into 2006. As a result of defections by certain Affiliated Practices, the Debtors' revenues substantially decreased. The largest part of this problem commenced on and after June 2005. Comparing the twelve-month period ending March

---

[9] Under the Plan, BSA's described in (1) above (i.e. performing BSA's) are considered "Current BSA's". BSA's described in (2) above (i.e. notice of default given and cure period expired prior to the Petition Date) are considered Defaulted BSA's. BSA's described in (3) above (i.e. notice of default given but cure period had not expired prior to the Petition Date) are also considered Defaulted BSA's under the Plan. BSA's described in (4) above (i.e. BSA's terminated by Final Order or agreement by the Debtor) are not defined as either Current BSA's or Defaulted BSA's under the Plan, as they terminated prior to the bankruptcy.

1, 2006 with the same period ending on March 1, 2005, there is an approximate decrease of revenues of $54,000,000

## C.   <u>FAILURE TO FILE FORM 10-K FOR THE YEARS 2004 AND 2005</u>

OCA has not yet had a completed audit for 2004 and 2005[10].  The Debtors believe that the failure to complete these audits is a result of certain accounting issues that have yet to be resolved.  These issues which require resolution include (i) calculation of patient receivables reported during 2004; (ii) certain journal entries recorded in 2000 and 2001 that it believes were entered into the revenue, fixed assets and intangible asset accounts in the Company's general ledger; (iii) the capitalization of certain startup costs by its Japanese subsidiary during the period from 1999 through 2003, (iv) the capitalization of certain repairs and maintenance and other costs as fixed assets in the periods from 1995 through 2004, and whether the Debtor should write off certain assets associated with closed or disaffiliated offices; and (v) depreciation of certain leasehold improvements and certain fixed assets.

On June 6, 2005, the Audit Committee of OCA's Board of Directors raised a question as to whether the financial statements included in OCA's Quarterly Reports on Form 10-Q for each of the first, second and third quarters of 2004, should be restated.  For additional background information refer to OCA's web site,  www.orthodon.com.  [Click first on "Investors Center", then on "News/SEC Filings".]

The Debtors, due to a variety of factors, were unable to complete their audit in time to complete and file their 2004 10-K filing on or before the deadline of March 20, 2005.

Due to a number of accounting issues that surfaced based upon various reviews of the Debtors' books and records, the Audit Committee of the Board of OCA decided to conduct a

---

[10]    Initially  the Debtors were told informally that an audit for 2004 and 2005 could cost as much as $3-4 million. The Debtors  have recently attempted to get a firm estimate for such audits, but have been told by the proposed auditors that they are unable to give any estimate at this time.

special investigation. This investigation was to be made by a special committee appointed by OCA's Board ("Special Committee"). The Special Committee is composed of two (2) outside directors who are also members of the Audit Committee of the Board.

The Special Committee reviewed certain journal entries that were made in 2005 on an electronic copy of OCA's general ledger, the circumstances in which they originated and their impact on OCA's financial statements. OCA identified certain journal entries that it believed were improperly entered into the revenue, fixed assets and intangible asset accounts in an electronic copy of the Company's general ledger for the years 2000 and 2001. The Special Committee appointed Fulbright & Jaworski L.L.P. as its independent counsel, however on October 10, 2005 Fulbright & Jaworski LLP resigned as counsel to the Special Committee and was subsequently replaced by Phelps Dunbar LLP.

PWC who had been selected to conduct an audit of the Debtors for 2005 ceased performing their audit work pending the results of issues they had raised. Unsatisfied with the Debtors' response to the issues raised by PWC, PWC resigned from OCA's engagement in October 2005. OCA still has not finalized its 2004 and 2005 audit as it is awaiting resolution of the issues raised by the Board to the Special Committee. It is unknown at this point whether either audit will be completed due to the cost and expense involved.

Without the 2004 audit there can be no 2005 audit, and without these audits OCA is unable to file 10-Ks for the years 2004 and 2005. In addition, no Form 10Q has been filed for any period subsequent to September 30, 2004. Further, the Debtors have not yet filed income tax returns for the 2004 and 2005 tax years.

As a result of a portion of the investigation by the Special Committee, Bartholomew Palmisano, Jr. ("Bart Palmisano, Jr.") was put on administrative leave as the Chief Operating Officer of OCA and subsequently separated from the Debtors.

**D.      OCA IS DELISTED FROM THE NYSE**

On November 8, 2005, the New York Stock Exchange ("NYSE") suspended the trading of OCA stock. This action resulted from, among other things, the failure of OCA to file or update certain financial statements, including the Form 10-K for 2004. OCA objected to the decision to the NYSE. Since the suspension of trading on the NYSE, the stock of OCA has been quoted on the Pink Sheets Electronic Quotation Service.

On November 1, 2005, PricewaterhouseCoopers LLP ("PWC") resigned from its engagement to audit the 2004 financial statements of OCA. By letter to the Securities and Exchange Commission ("SEC") dated November 22, 2005, PWC notified the SEC that PWC had advised OCA that OCA had "additional reportable events" that should be included on OCA's Form 8-K. OCA notified the SEC that OCA had serious issues with the propriety of PWC's letter.

**E.      HURRICANES ADVERSELY IMPACT THE DEBTORS**

The hurricanes that ravaged the Gulf Coast had an adverse impact on the Debtors' businesses. In August 2005, as a result of Hurricane Katrina, the Debtors were forced to evacuate and temporarily relocate their corporate offices to Florida. The Debtors were then again forced to evacuate due to Hurricane Wilma in Florida. Hurricane Rita further hindered the Debtors' return to normal operations. The Debtors returned to their corporate headquarters in Metairie, Louisiana in November 2005. As a result of Hurricanes Katrina, Rita and Wilma, the Debtors incurred significant additional expenses. The Debtors are in the process of pursuing

claims under their business interruption insurance policy in order to recover the Debtors' additional expenses and lost income as a result of the 2005 hurricanes. There can be no assurance as to the amount that may be so collected or that there will be any collection. The company expects to receive payments from its insurance company for out-of-pocket expenses of approximately $1.6 million and may be able to receive payments from "business interruption" insurance of between $0.9 million and $3.3 million as a result of Hurricanes Katrina, Rita and Wilma. See Exhibit "D-2" for a further discussion of this issue. In addition, it is difficult at this time to project a time within which these insurance issues will be resolved. It is likely that any recovery on these insurance claims would only be available following litigation between the debtors and their insurers over the claims,

F.     **DEBTORS' DEBT STRUCTURE**

On January 2, 2003, the Debtors entered into a $125.0 million credit facility (as defined in the Plan, the "Senior Credit Agreement") with a syndicate of lenders (the "Prepetition Lenders") and Bank of America, N.A., as Administrative Agent (the "Administrative Agent"), Bank One, N.A., as Syndication Agent, and U.S. Bank National Association, as Documentation Agent. The credit facility comprises a $100.0 million revolving line of credit and a $25.0 million term loan. Amounts borrowed under the Senior Credit Agreement were secured by a security interest in the capital stock of the Debtors' operating subsidiaries. The term loan was fully amortizing over three years with level, quarterly principal payments of $2.1 million, plus interest.

On June 30, 2003, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the First Amendment to the Credit Agreement to restate certain provisions.

On March 31, 2005, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the Second Amendment to the Credit Agreement and Waiver whereby the Prepetition Lenders waived certain events of default asserted by the Prepetition Lenders to have occurred arising from the Debtors' failure to timely file their annual 10-K report with the United States Securities and Exchange Commission (the "S.E.C.") and to deliver audited annual financial information to the Prepetition Lenders in return for, among other things, a temporary limitation of availability under the revolving line of credit.

On May 10, 2005, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the Third Amendment to the Credit Agreement and Waiver whereby the Prepetition Lenders waived certain events of default asserted by the Prepetition Lenders to have occurred arising from the Debtors' failure to timely file their quarterly 10-Q report with the S.E.C. and to deliver audited quarterly financial information to the Prepetition Lenders in return for, among other things, a temporary limitation of availability under the revolving line of credit.

On May 31, 2005, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the Fourth Amendment to the Credit Agreement and Waiver whereby the Prepetition Lenders waived certain events of default asserted by the Prepetition Lenders to have occurred arising from the Debtors' failure to timely file their annual 10-K and quarterly 10-Q reports with the S.E.C. and to deliver audited annual and quarterly financial information to the Prepetition Lenders in return for, among other things, a temporary limitation of availability under the revolving line of credit and a requirement of the Debtors to provide the Administrative Agent with weekly cash flow forecast and other management reports.

On June 30, 2005, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the Fifth Amendment to Credit Agreement and Waiver whereby the Prepetition

Lenders waived certain events of default asserted by the Prepetition Lenders to have occurred arising from the Debtors' failure to timely file their annual 10-K and quarterly 10-Q reports with the S.E.C. and to deliver audited annual and quarterly financial information to the Prepetition Lenders in return for, among other things, a temporary limitation of availability under the revolving line of credit, a requirement that OCA employ an individual acceptable to the Administrative Agent as Executive Vice President and Chief Administrative Officer, and provide certain documents.

On August 19, 2005, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the Sixth Amendment to Credit Agreement and Forbearance whereby the Prepetition Lenders forbore from exercising remedies with respect to certain events of default asserted by the Prepetition Lenders to have occurred arising from the Debtors' failure to timely file their annual 10-K and quarterly 10-Q reports with the S.E.C. and to deliver audited annual and quarterly financial information to the Prepetition Lenders in return for, among other things, a permanent limitation of availability under the revolving line of credit, a restatement of other material terms of the Credit Agreement, and the execution of an amended and restated pledge and security agreement.

On December 13, 2005, OCA executed an agreement with Jefferies & Company, Inc. ("Jefferies"), pursuant to which OCA engaged Jefferies, on an exclusive basis, as its financial advisor and investment banker to act as sole manager, bookrunner, placement agent, arranger or initial purchaser, as the case may be, in connection with: (i) the restructuring of OCA's debt obligations, and (ii) the structuring, issuance, sale or placement on behalf of OCA of new capital raised from any party, in the form of debt, equity or equity- linked securities, whether in a public

or private transaction, including a refinancing of the amounts outstanding under the Credit Agreement.

The revolving line of credit expired and the term loan matured on January 2, 2006.

On January 30, 2006, the Debtors, the Administrative Agent and the Prepetition Lenders entered into the Seventh Amendment to Credit Agreement and Forbearance whereby the Prepetition Lenders forbore from exercising remedies with respect to certain events of default in return for, among other things, a restatement of other material terms of the Credit Agreement, a requirement that the Debtors attempt to negotiate and document a refinancing of the amounts outstanding under the Credit Agreement, and an agreement to issue warrants to the Prepetition Lenders entitling the same to purchase 2.3 million shares of common stock of OCA. Documentation evidencing the warrants to purchase 2.3 million shares of common stock of OCA to the Prepetition Lenders was not executed prior to the Petition Date. As part of the Chapter 11 Cases, the Final DIP Order, and this Plan, the Senior Lenders will receive distributions under the Plan as if they were, immediately prior to the Effective Date, the holders of 5% of the Existing Equity Interests in OCA.

As of the Petition Date, the Debtors had $91,723,234 in principal amount of senior secured debt outstanding under the Senior Credit Agreement, plus accrued and unpaid interest of at least $501,688.57, plus fees, costs, and expenses incurred in connection therewith as provided under the Senior Credit Agreement, including, without limitation, the cash portion of the forbearance fee owing under that certain Seventh Amendment to the Senior Credit Agreement equal to $458,616.67 ("Senior Debt") to the lenders under the Senior Credit Agreement (referred to collectively in the Plan as the "Senior Lenders"). In the Interim Order (as defined below) and the Final DIP Order (as defined below) the Debtors stipulated that the Senior Debt is secured by

perfected liens on all or substantially all of the property of the Debtors.  The UCC (as defined below) has retained the right to investigate the validity, priority and extent of the liens asserted by the Senior Lenders and to challenge such liens in certain circumstances.

As of the Petition Date, the Debtors owed trade debt associated with the BSA's in the amount in the range of $6-7 million, and corporate expenses of the home office of approximately $1 million.  The trade debt associated with the BSA's has largely been paid pursuant to orders entered by the Bankruptcy Court.  As of the Petition Date, the Debtors also believed they owed General Unsecured Claims in the range of $ 6-10 million (including some disputed claims).  The current estimate is in the $9-11 million range.  These Claims are mostly associated with the fees and expenses of the Debtors in enforcing the rights under the BSA's and the Special Committee investigation.  In June and August 2005, Palmisano loaned OCA an aggregate amount of $3 million dollars on an unsecured basis.  The repayment of Palmisano's loans is contractually subordinated to the repayment in full of the Senior Debt to the Senior Lenders, however, the Debtors do not believe it is contractually subordinate to the claims of any other unsecured creditors of the Debtors.  The UCC believes Palmisano's claims may be subject to equitable subordination, recharacterization, or other defenses.  In addition, it should be noted that in excess of $248,000,000  in unsecured claims were filed prior to the bar date.  Neither the Debtors nor the UCC has completed their reconciliation of these claims, but both believe this figure will be substantially reduced through the claims reconciliation  and objection process.  No guaranty can be given, however, as to the ultimate amount of General Unsecured Claims that will be allowed.

## G.      **CHANGES TO PREPETITION OFFICERS**

Since 1998, the following have served as the CFO of OCA:

BPJ  1998 to 2001 (when promoted to COO)

John Glover 2001 to 2002

Tom Sanderman 2003 to 2004

David Verrett from 2004 to May 2005

Cathy Green, Interim CFO May 2005 to present; Ms. Green is also the Chief Accounting Officer of OCA

BPJ served as COO from 2001 until June 1, 2005 when he was placed on administrative leave pending the completion of the investigation of the Special Committee. BPJ is no longer employed by the Debtors.

**H.     PRE-PETITION DATE TRANSFER OF OCA'S INTERNATIONAL ENTITIES**

Prior to December 1, 2005, (i) OCA owned all or substantially all of the stock or ownership interests in the following international entities (collectively, the "International Companies"): (1) Servicios Administrativos OCA, SA de CV (Mexico); (2) OCA International, Inc. (Brazil); (3) OCA China; (4) OCA Japan; and (5) Orthodontic Centers of America Europe, S.A.

The Debtors in 2005 faced issues with respect to their liquidity and were advised by their financial advisor that the financial advisor did not support a cash infusion in the Debtors' international operations at that time.  As a result of the International Companies' purported need for capital and their purported inability to obtain cash generated by the operations of the Debtor, OCA formed OCA International, LLC, a Florida limited liability company ("OCAI"), to own, control and operate the International Companies.

Because of the alleged need for additional funding to be placed into the International Companies, an agreement was purportedly reached with Gimili, LLC ("Gimili"), a Louisiana limited liability company owned by the family of Palmisano, to create a structure that would allow additional funding of the International Companies by Gimili, rather than OCA. On

December 1, 2005, OCA contributed its ownership interests in the International Companies to OCAI in exchange for: (x) promissory notes from each of the International Companies aggregating the principal amount of $12,500,000 ("International Companies' Notes"); and (y) a 53.57% equity/ownership membership interest in OCAI. In exchange for alleged prior or future contributions made to the International Companies totaling $1,300,000 by the end of calendar year 2005, Gimili received a 46.43% equity/ownership membership interest in OCAI.   It is unknown how much money was paid by Gimili before or subsequent to December 1, 2005. However, OCA has not yet determined whether the International Companies' Notes were executed and delivered. The board of OCA approved the transaction. However, the Senior Lenders contend that the Debtor did not conduct a sales process for the sale of its International Operations, did not receive an independent valuation, or a fairness opinion in connection with OCAI's transaction with Gimili. Gimili provides management, administrative and investment services to OCAI (and the International Companies) but receives no management fee. Gimili is reimbursed by OCAI for its costs incurred.

OCA and Gimili entered into multiple agreements concerning their relationship which governed, among other things, the manner in which additional capital contributions from the members of OCAI would be requested and the manner in which such capital calls would be met by the parties.  Special Counsel for the Debtors and the Senior Lenders contend that under the agreements, the consent of both OCA and Gimili was required for each additional capital call made by OCAI.   Gimili disputes this contention and contends that OCA's consent is not required.  Additionally, OCA and Gimili agreed that if one member (i.e., either Gimili, on the one hand, or OCA, on the other hand) does not meet a capital call properly made by OCAI, then the other member might provide the additional capital as an additional capital contribution. The

effect of this process would be to increase the contributing member's equity interest in OCAI while diluting the interest of the non-contributing member.

Prior to the Petition Date, capital calls in the amount of $600,000 were allegedly made to OCA and Gimili. Notice of such capital calls was not provided to the Senior Lenders. OCA did not conduct an independent investigation of the basis for such alleged capital calls and did not contribute toward these alleged capital calls. There is no record that OCA approved of the issuance of these capital calls. Gimili asserts that it contributed the full amount of these capital calls and that, therefore, Gimili's membership interest in OCAI increased to 55.88% and OCA's membership interest decreased to 44.12%.

Gimili now asserts that in order to meet the working capital needs of the International Companies and the financial requirements for OCAI for the remainder of 2006 there will be additional capital calls this year in the amount of $1,280,000. There is no evidence that OCA agreed to these capital calls as required under the agreements. On May 4, 2006, Gimili filed a Motion for Relief from the Automatic Stay ("Gimili Relief Motion")(Docket No. 366). The Gimili Relief Motion seeks relief from the automatic stay of Section 362 of the Bankruptcy Code to permit these anticipated capital calls to be made to OCA. Gimili has indicated in the Gimili Relief Motion that it is prepared to meet the entirety of these anticipated capital calls, if OCA is unwilling to put up all or part of its share. Under these circumstances, OCA's membership interest in OCAI may further decrease if it does not match Gimili's contribution. OCA is conducting due diligence on the assertions made in the Gimili Relief Motion and reserves all rights to file a response.

In connection with the December 2005 transaction, (i) OCAI asserts that it was granted a perpetual license, access and use of all of OCA's computer software, and OCA, if requested by

Gimili, is to maintain network administration of the International Companies and OCAI and (ii) Gimili also asserts that it was granted the use of "Penny Lane", a proprietary Internet computer program of OCA, for pricing and vendor discounts for purchases to be made for OCAI and the International Companies. OCA is conducting due diligence to determine if in fact these grants were made by any of the Debtors.

The Senior Lenders have raised questions about, and the Special Counsel is investigating, the propriety of the December 2005 transactions with OCAI and Gimili and believe that the Debtors may possess causes of action against OCAI, Gimili, Palmisano and other affiliates of Palmisano arising out of such transactions, including, without limitation, diversion or usurpation of a corporate opportunity, fraud, negligence, breach of contract, recharacterization as an equity investment in OCA and avoidable transfer under the Bankruptcy Code or other applicable law. Such causes of action shall vest with the Reorganized Debtors and may later be pursued by them. All claims (and defenses) with respect to that transaction are being reserved under the Plan.

The Debtors and the Senior Lenders have recently requested that the Special Counsel investigate, among other things, the original capitalization of OCAI, the expenditures of OCAI, whether OCAI needs additional capital at this time and other similar matters involving OCAI. There has been no report or findings by the Special Counsel with respect to such matters at the present time. However, the Special Counsel has filed an objection to the Gimili Relief Motion (Docket No. 682), which objection is for the benefit of OCA. An evidentiary hearing on the Gimili Relief Motion is set for July 6, 2006.

## I. EVENTS LEADING TO CHAPTER 11 FILINGS OF DEBTORS

### 1. AFFILIATED PRACTICE LITIGATION

As noted above, commencing in late 2004, through 2005, and continuing into 2006, OCA has been party to considerable litigation with Affiliated Practices[11]. This litigation arises out of the increasing number of Affiliated Practices that have ceased performing and or defaulted under the BSA's. As a result, the Debtors have been forced to expend significant resources pursuing litigation with the Affiliated Practices.

In connection with the litigation over the BSA's, some doctors have raised an issue concerning the legality and/or the enforceability of the BSA's under the laws of some states.[12] Many of the Affiliated Practices have alleged that the Debtors have breached their obligations under the BSA's and, accordingly have defaulted under their BSA's.

To date, there have been eight determinations[13] confirming the legality of the BSA's– eight rulings by federal and state courts (involving six states: Connecticut, Florida, California,

---

[11]     Prior to the Petition Date, the Debtors were parties to thirty-one (31) such lawsuits.

[12]     For example, most of these disputes center around certain laws relating to the prohibition against the corporate practice of dentistry. Each state has enacted its own dental practices act, along with regulations promulgated by the state dental board, which govern the practice of dentistry and aim to prevent the practice of dentistry by unlicensed persons or entities.

[13] A summary of these court rulings is as follows:

(a)     *Orthodontic Affiliates, PC v. OrthAlliance, Inc.*, 210 F.Supp.2d 1054 (N.D. Ind.2002)

In *Orthodontic Affiliates*, the Indiana district court concluded that under both the terms of the BSA and the conduct of the parties, the orthodontists retained control of their practice and held the applicable BSA to be legal and enforceable under Indiana law.

(b)     *Mark Yaffey v. Orthalliance, Inc.,*  Case No. 01-3715-CIV, United States District Court, Southern District of Florida (Feb. 13, 2003) (unpublished opinion).

In *Yaffey*, the issue was which party was in control of the practice, the doctor or OrthAlliance.  The Florida district court found that the doctor was and, therefore, the BSA was in compliance with Florida law.  In so finding, the court cited the deposition testimony of the doctor that OrthAlliance "...did not control any of his 'practice management decisions'".

(c)     *Clower v. OrthAlliance, Inc.,* 337 F.Supp.2d 1322 (N.D. Ga. 2004)

The Georgia district court found, after a review of the applicable service agreement's terms and conditions, that "the terms of the agreement governing the relationship between the parties make it very clear that defendant did not intend, and in fact did not, employ plaintiffs to carry out its own corporate practice of orthodontics." Accordingly, the court found that the BSA was enforceable under Georgia Law.

(d)     *Ronald A. Cohen, D.D.S., M.S.D., et al. v. OrthAlliance New Image, Inc.,* 252 F.Supp.2d 761 (N.D. Ind. 2003)

In reviewing the BSA between Cohen and New Image, Inc., a management services organization that was purchased by OrthAlliance, to determine whether it was legal and enforceable, the Indiana district court ruled that the orthodontist retained control over his practice and thus the contract was legal under the laws of Indiana.

(e)     *Gerald F. Moore, P.C., v. OCA, Inc., et al.,* Case No. D035808, Court of Appeal, Fourth District, California (Jan. 11, 2002) (unpublished decision).

In *Moore,* the only case on the issue of legality that has been reviewed by an appellate court, the trial court found the BSA between Dr. Moore and the Debtors to be legal and enforceable under California law. The appellate court affirmed the state court finding:

> *The BSA reflects, and the evidence shows, OCA carefully drafted the BSA with the intent to comply with California's ban on an unlicensed entity managing a dental business. The BSA's first operative paragraph states, "it is expressly agreed that the Orthodontic Entity [doctor] shall retain ultimate responsibility for the management of its orthodontic practice at the Center [orthodontic office] (including all business aspects of the practice), and nothing in the Agreement [BSA] is intended to transfer such ultimate responsibility from the Orthodontic Entity to [OCA]."*

The appellate court concluded that the BSA Agreement was consistent with California law because it reflected OCA's right to provide expert advice rather than to manage or control the business office. Though, the court objected to the requirement in the BSA, which had long since been eliminated from the BSA, that the doctor work full time at the practice, and severed out that requirement, leaving the balance of the BSA intact.

(f)     *Kenneth Brehnan, DMD, et al. v. OrthAlliance, Inc. et al.,* Case No. CV 015205, Marin County Superior Court, State of California (June 10, 2005) (unpublished decision).

In *Brehnan,* the court denied Plaintiffs' motion for summary judgment seeking a ruling that the OrthAlliance BSA was illegal and void. "Plaintiffs have not demonstrated that the agreements are facially void and unenforceable as authorizing defendant to engage in the unlawful practice of dentistry. Many of the services express[ly] included in the contract, and which plaintiffs challenge, grant the ultimate authority, supervisory and/or discretion over these services to plaintiffs."

(g)     *Robert R. Namay, DDS v. Orthodontic Centers of Ohio, Inc., et al.,* Case No. 3:03-cv-722, in the United States District Court for the Northern District of Ohio, Western Division.

Stating that the Attorney General of Ohio's opinion was persuasive, the court held that "[t]he evidence is clear that Dr. Namay did no more than hire an independent business to pay his bills and handle certain financial affairs of his practice. This is a sensible way of relieving a professional of the administrative burdens of operating a practice."

(h)     *OCA, Inc. et al v Christie, et al.,* Case No. 3:04cv1517, United States District Court, District of Connecticut (Feb. 16, 2006) (unpublished opinion).

In *Christie,* the most recent case where a court ruled on the issue of legality of the contract, the Connecticut district court denied the defendants' motion for summary judgment. The Connecticut district court found that: "it seems that Plaintiff's activities furthered the innocuous purpose of assisting Dr. Christie with the day-to-day operations of his practice, leaving the professional practice of dentistry firmly in his hands. It is difficult to imagine that the legislature, when enacting the Connecticut dental statutes intended to prohibit the sorts of practices at issue here."

Indiana, Ohio and Georgia), as well as attorney generals' opinions from four additional states, namely, Ohio, Maryland, North Carolina and Oregon. [14]

The BSA's represent the core of the Debtors' operational asset value. Without the BSA's, the Debtors would have no cash flow from operations and no business to reorganize. The BSA's provide the sole source of the Debtors' operating revenue.

---

Conversely, there have been six decisions (in four states: Texas, Washington, Colorado and Illinois) where the courts found the agreements to be unenforceable under such states' respective laws and the specific facts of those individual cases. A summary of these court rulings is set forth below:

(i)      *Penny v. OrthAlliance, Inc.,* 255 F. Supp.2d 579 (N.D. Tex. 2003)

The Penny court concluded that the express purpose of BSA, here at issue, was to allow the defendant to control the functioning of or to manage the orthodontic offices, and accordingly, violated the Texas law.

(ii)     *Ronald C. Perkins, et al v. OrthAlliance, Inc.,* 2004 WL 839656 (N.D. Tex. 2004)

The judge in this case was the same judge who decided Penny. Accordingly, the result was the same.

(iii)    *David Becka v. OCA, Inc., et al.,* Case No. 4:03CV80 in the United States District Court, Eastern District of Texas, Sherman Division

The court concluded that, by virtue of the BSA, the defendant owned, operated, and maintained the orthodontic practice and employed or engaged the plaintiff, Dr. Becka in violation of the Texas law.

(iv)     *Orthodontic Centers of Illinois, Inc. v. Christine Michaels, D.D.S., P.C., et al.,* Case No. 04 C 6852 in the United States District Court, Northern District of Illinois

The court here premised its ruling on what the court perceived to be plaintiff's ownership interest in the revenues generated by Dr. Michaels' Illinois Affiliated Practice.

(v)      *Kirk J. Nielson, D.D.S., et al. v. OrthAlliance, Inc.,* Case No. 02-Z-455 (BNB) in the United States District Court for the District of Colorado

This court determined that the BSA involved what the court characterized as (x) fee sharing with a business corporation, (y) the practice of dentistry by a business corporation and (z) the acquisition of an ownership interest in a dental practice by a corporation, all of which was in violation of the Colorado law.

(vi)     *Engst v. OrthAlliance, Inc.,* C01-1469C in the United States District Court, Western District of Washington at Seattle (March 1, 2004)

In this case there was in addition to a BSA, a stock purchase agreement and an employment agreement, which contained a non-competition provision. Here the court concluded that the defendant through these contractual relationships was so involved in the orthodontic practice of the plaintiff that the defendant was practicing dentistry in violation of the Washington law.

[14] Ohio Opinion No. 95-045, December 22, 1995; Maryland Opinion No. 96-015, 1996 Md. AG LEXIS 19; May 9, 1996; North Carolina, 1996 N.C. AG LEXIS 50, August 23, 1996; Oregon, Opinion No. OP-2001-1, 2001 Ore. AG LEXIS 5, September 21, 2001.

2.     **SECURITIES ACTIONS**

The S.E.C. has commenced a formal investigation relating to OCA, and has issued subpoenas to the Special Committee, OCA itself, and various current and former OCA officials (Brandon Aucoin, Palmisano, BPJ, Michael Cusimano and Hong Messina). The subpoenas to the Special Committee and OCA seek documents relating primarily to the Special Committee's internal investigation. The subpoena to OCA and those to the individuals also seek documents relating to the accounting issues discussed in the OCA's June 7, 2005 8-K. The Special Committee and OCA have produced responsive documents, and OCA continues to produce responsive documents. Although various current and former OCA officials have been subpoenaed to both produce documents and provide testimony, and many have produced documents, it is the OCA's understanding that only one former non-officer employee has provided testimony at this point.

OCA began experiencing severe and well-publicized financial difficulty in early 2005 (if not before). As a result, and prior to the Petition Dates, numerous putative class action securities and derivative suits were filed in the United States District Court for the Eastern District of Louisiana ("District Court") by mid-2005. The first appears to have been *Santopietro v OCA, Inc., et al*, Case No. 2:05-cv-02165, ("Main Case") filed on June 7, 2005, an assigned to Judge Sarah Vance. More than 20 additional putative class action suits followed over the next several weeks. On July 1, 2005, Judge Vance ordered all of the pending securities and derivative suits against OCA consolidated under the *Santopietro* suit, the Main Case. There were several additional securities and derivative suits filed after entry of that Order and each was consolidated into the Main case shortly after filing. At present, <u>all</u> securities and derivative actions against OCA filed in the District Court remain consolidated into the Main Case.

Because of Hurricane Katrina and the disruption of the legal system it caused in the District Court, little occurred in the OCA securities or derivative actions for the next several months. However, after conducting a hearing and receiving extensive briefing from various proposed lead plaintiffs and their counsel, Judge Vance issued a written opinion and order on November 18, 2005, appointing separate lead plaintiffs in the derivative actions and for the putative classes in the securities cases. Judge Vance conditionally appointed Samuel Boodman as lead plaintiff in the securities litigation with Kaplan Fox & Kilsheimer as lead counsel and Neblett, Beard & Arsenault as liaison counsel. Judge Vance appointed Eric Nagel as lead derivative plaintiff and Brodsky & Smith and Federman & Sherwood as lead counsel and Barasso Usdin Kupperman Freeman & Sarver as liaison counsel.

On February 1, 2006, Samuel Boodman, for himself and the putative class, filed a consolidated class action complaint in the securities litigation. On February 21, 2006, Eric Nagel, on behalf of OCA, filed an amended derivative complaint against the officers and directors. The following summaries are derived from those recently filed complaints.

<u>Summary of the Securities Suit Allegations</u>

The Securities suit alleges liability under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10(b)(5). Named defendants are:

OCA

Palmisano (Chairman and President)

Bart Palmisano Jr. (CFO and then COO through June 7, 2005)

David E. Verret (CFO through May 2005)

The complaint alleges, generally, that OCA had weak internal controls since at least 2003, that Ernst & Young ("E&Y") reported those weaknesses in early 2004, that OCA dismissed E&Y,

hired Price Waterhouse ("PWC") as auditors, "played down" the change in auditors and the substance of E&Y's findings. The Complaint alleges that the Class Period begins on May 18, 2004 with an OCA press release regarding the company's adoption of FIN 46R. The Complaint alleges that the Company's public filings were materially false and misleading.

The Complaint requests a jury trial. The Company and the other defendants have denied any liability. If you are interested in further details about the Class Action, please see Case Number 05-2165 pending in the United States District Court for the Eastern District of Louisiana. The release of the Contributing Officers and Directors described in Section VIII of this Disclosure Statement would include the Class Action. Defense counsel contend there is no liability because plaintiffs cannot demonstrate with particularity that any defendant made false or misleading statements with scienter regarding OCA's financial statements or changes to OCA's internal controls during the purported class period. Lead Plaintiff maintains that the allegations of the consolidated amended Class Action are much broader than described herein.

Summary of the Derivative Suit Allegations

The Derivative suit alleges liability of certain current and past officers and directors to OCA based upon their permitting OCA to issue the materially false financial statements and information described in the Securities Litigation in alleged reckless disregard of their duties to OCA. The Complaint alleges that OCA has suffered millions of dollars in damage to loss of goodwill, reputation, costs of investigation and defense. Named defendants in the Derivative complaint are:

OCA (nominal defendant)

Palmisano (former Chairman and President)

Dennis Buchman (Director)

Hector Bush (former Director)

Jack Devereux, Jr. (Director)

Dennis Summers (former Director)

Linda Girard (Director)

Ashton Ryan (Director)

Kevin Dolan (Director)

David Vignes (Director)

Edward Walters Jr. (Director)

Bart Palmisano, Jr. (former CFO and then COO through June 7, 2005)

David E. Verret (CFO through May 2005)

The basic factual allegations of the Derivative action track those of the Securities Complaint and seek damages based on the alleged failure of the officers and directors, in particular, Palmisano, Buchman, and the members of the audit committee (Dolan, Ryan, and Vignes) are condemned for their failures and/or intentional acts.  Eight counts of liability are alleged.  A jury trial is demanded.  The Company and the other defendants have denied any liability.  If you are interested in further details about the Derivative Action, please see Case Number 05-2165 pending in the United States District Court for the Eastern District of Louisiana. The release of the Contributing Officers and Directors described in Section VIII of this Disclosure Statement would include the Derivative Action.

Lead counsel in the Derivative Action claims that the value of the Derivative Action is between $5-8 million before fees and costs.  Defense counsel to the individual defendants believes the Derivative Action has little if any value to the estate.

Debtors filed a notice of automatic stay in both suits on March 20, 2006. The Class Action is proceeding against the individual defendants, but a Motion to Extend the Motion to Dismiss Briefing Schedule for the Shareholder Derivative Complaint has been filed in the Derivative Action, effectively staying the Derivative Action. The Derivative Action is property of OCA's estate and will revert to Reorganized OCA upon the Effective Date of the Plan, and may be prosecuted or settled by Reorganized OCA.

As a result of the defection of Affiliated Practices and other factors, the Debtors were forced to file for relief under chapter 11 of the Bankruptcy Code in order to (a) stabilize their business operations, (b) streamline and consolidate the burgeoning litigation with the Affiliated Practices, (c) restructure the Senior Lender Indebtedness, and (d) obtain additional financing and working capital.

## J.  DISTRIBUTIONS TO DOCTORS

In accordance with the BSA's, at the end of each calendar quarter, a reconciliation is made of the biweekly cash withdrawals received by an Affiliated Practice during that quarter to the correct amount of the Affiliated Practice's net revenues for the quarter, based on the Affiliated Practices actual results. To the extent that such reconciliation reflects that additional amounts are due for that quarter to an Affiliated Practice, a distribution is made to the Affiliated Practice. Despite the adversity noted above, the fourth quarter 2005 reconciliation and the first quarter 2006 reconciliation, and corresponding distributions by the Debtors to its Affiliated Practices have been made.

## K.  FILING OF CHAPTER 11 PETITION BY DEBTORS

On March 14, 2006, OCA and a majority of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Subsequently, additional Debtors filed for

relief on March 17, 2006 ("March 17 Debtors"[15]); three (3) more Debtors filed for relief on June 1, 2006 ("June 1 Debtors"[16]) Heller, Draper, Hayden, Patrick & Horn, L.L.C. ("Heller Draper") (Docket No. 30) is serving as bankruptcy counsel for all of the Debtors.  All of the Debtors' Chapter 11 cases have been consolidated for procedural purposes and are being jointly administered.  An order doing the same for the June 1 Debtors is awaiting the signature of the Bankruptcy Court.

**L.      SIGNIFICANT POST-PETITION EVENTS**

     1.      **SIGNIFICANT PLEADINGS**

Following the filing of the Petitions, the Debtors filed, among other pleadings, the following with the Bankruptcy Court:

    a.      Application to Employ Correro Fishman Haygood Phelps Walmsley & Casteix, L.L.P. as Special Counsel (Docket No. 4)[17];

    b.      Motion for Authority to Continue Engagement of Conway, Del Genio, Gries & Co., LLC to Provide Restructuring Management Services to the Debtors (Docket No. 5)[18];

    c.      Application to Employ KPMG LLP as Tax Accountants and Advisors (Docket No. 6)[19];

    d.      Application to Employ Kramer Weisman and Associates, LLP as Accountants (Docket No. 7)[20];

    e.      Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits and Taxes (Docket No. 10)[21];

    f.      Motion for Authority to Pay Certain Prepetition Taxes (Docket No. 11)[22];

---

[15]   OrthAlliance, Inc. (06-10229); OrthAlliance New Image, Inc. (06-10230); OCA Outsource, Inc. (06-10231); and PedoAlliance, Inc. (06-10232).

[16]   Orthodontic Centers of Hawaii, Inc. (06-10503); Orthodontic Centers of Iowa, Inc. (06-10504); and Orthodontic Centers of Idaho, Inc. (06-10505).

[17]   This Application was granted by Order of the Bankruptcy Court entered on March 16, 2006 (Docket No. 31).

[18]   This Motion was granted by Order of the Bankruptcy Court entered on March 16, 2006 (Docket No. 32).

[19]   This Application was granted by Order of the Bankruptcy Court entered on March 16, 2006 (Docket No. 33).

[20]   This Application was granted by Order entered by the Bankruptcy Court on March 16, 2006 (Docket No. 34).

[21]    This Motion was granted by Order entered by the Bankruptcy Court on March 15, 2006 (Docket No. 27).

[22]    This Motion was granted by Order entered by the Bankruptcy Court on March 16, 2006 (Docket No. 37).

g.   Motion for Interim and Final Orders: (A) Prohibiting Utilities From Altering, Refusing or Discontinuing Services to, or Discriminating Against the Debtors on Account of Prepetition Invoices; (B) Determining that the Utilities are Adequately Assured of Future Payment; (C) Establishing Procedures for Determing Requests for Additional Assurance; and (D) Permitting Utility Companies to Opt Out of the Procedures Established Herein (Docket No. 12)[23];

h.   Motion of the Debtors Pursuant to Section 105(a) of the Bankruptcy Code for order (1) Authorizing the Debtors to Continue to Operate under and Provided Services Pursuant to Business Service Agreements, (2) Authorizing the Debtors to Pay Certain Prepetition Obligations in Connection therewith and 93) Directing the Affiliated Parties to Continue to Operate under the Business Service Agreements, Including, Without Limitation, Making Timely Deposits and Payments to the Debtors (Docket No. 13)[24];

i.   Motion Pursuant to Section 105(a) of the Bankruptcy Code for Entry of Order Establishing Expedited Procedures for (I) Enforcement of the Automatic Stay with Respect to the Debtors' Business Service Agreements and (II) Adversary Proceedings Seeking to Compel other Contracting Parties to Comply with their Obligations Pursuant to the Business Service Agreements (Docket No. 14)[25];

j.   Motion for Authority to (I) Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens, Security Interests and Superpriority Claims, and (III) Granting Adequate Protection, and Entry of an Interim Order Scheduling a Final Hearing Pursuant to Federal Rule of Bankruptcy Procedure 4001 ("DIP Financing Motion")(Docket No. 16)[26]; and

k.   Ex parte Motion to Confirm Authority under the Interim DIP Order and the First Order (Docket No. 78)[27]

l.   Ex Parte Motion for Authority to Engage Callaway Partners, LLC to Provide Consulting Services to the Debtors Including the Preparation and Filing of the Debtors' schedules and Statements of Financial Affairs (Docket No. 256)[28].

---

[23]   An Interim Order granting this Motion was entered by the Bankruptcy Court on March 16, 2006 (Docket No. 44).  A Final Order granting this Motion was entered by the Bankruptcy Court on April 11, 2006 (Docket No. 206).

[24]   This Motion was granted by (a) First Order (Docket No. 45) and Second Order (Docket No. 46), both entered by the Bankruptcy Court on March 16, 2006 and (b) Order entered by the Bankruptcy Court on April 11, 2006 (Docket No. 200).

[25]   This Motion was granted by Order entered by the Bankruptcy Court on March 16, 2006

[26]   An Interim Order granting the relief sought by this motion (the "Interim Order") was entered on March 17, 2006 (Docket No. 48). A Consent Bridge Order extending the effectiveness of this Interim Order was entered on April 7, 2006 (Docket No. 187).   The final order granting the relief sought by this motion (the "Final DIP Order") was entered on May 12, 2006 (Docket No.487).

[27]   This Motion was granted by Order entered by the Bankruptcy Court on March 23, 2006 (Docket No. 91).

[28]   This Motion was granted by Order entered by the Bankruptcy Court on April 26, 2006 (Docket No. 301).

m.    Motion for Order Under 11 U.S.C. §§105 and 363(b) Authorizing the retention of Spencer Stuart as Executive Search Consultants for OCA (Docket No. 283)[29].

n.    Motion for Order Approving Plan Support Agreement Pursuant to 11 U.S.C. §105 (Docket No. 387)[30].

o.    Motion for Authority to Engage Special Counsel to the Debtors (Docket No. 504)[31].

p.    Application by the Debtors for Entry of an order Authorizing the Employment and Retention of Kingsmill Riess L.L.C. as Supplemental Litigation Counsel (Docket No. 527)[32].

2.    **RETENTION OF ALVAREZ & MARSAL and CONWAY, DELGENIO GRIES & CO.**

In 2005, as a result of financial distress and as a condition to a waiver of default by the Senior Lenders, the Debtors retained advisors experienced in the reorganization and restructuring of companies in financial distress that were acceptable to the Prepetition Lenders.

The Debtors initially retained Alvarez & Marsal, LLC ("A&M").  On September 6, 2005 A&M resigned its engagement.

Thereafter, the Debtors then retained the firm of Conway Delgenio Gries & Co. LLC. ("CDG").  The name of CDG was one of several reorganization consultant possibilities provided by Bank of America, as Agent for the Senior Credit Facility to the Debtors  prior to the bankruptcy filing at the time the parties were negotiating a loan forbearance agreement, to replace the Debtors' previous financial consultants, Alvarez and Marsal, who had been terminated by the Debtors.  Bank of America selected the names of the prospective consultants provided to the Debtors.  CDG and Michael Gries, now the interim chief executive officer of the Debtors have not to its, nor his knowledge previously worked in a case in which Silver Point or

---

[29]  This Motion was granted by Order entered by the Bankruptcy Court on May 11, 2006 (Docket No. 479).
[30]  This Motion was granted by Order entered by the Bankruptcy Court on May 11, 2006 (Docket No. 480).
[31]  This Motion was granted by Order entered by the Bankruptcy Court on May 31, 2006 (Docket No. 569).
[32]  This Application was granted by Order entered by the Bankruptcy Court on May 22, 2006 (Docket No. 538).

affiliated entities, were the principal or majority creditor, although they have been involved in three cases in which Silver Point was a minority creditor (Silver Point was not involved in retaining CDG in these instances, however). Moreover, there has been no business transactions or other relationships between CDG and Silver Point or any entities or funds controlled by Silver Point. The terms of the engagement agreed to by CDG and the Debtors prior to the bankruptcy filing, which is a matter of public record, specifically references that a success fee would be negotiated and agreed to by the Debtors and CDG. CDG has advised Bank of America and Silver Point that CDG intends to file an application with the Bankruptcy Court for a success fee at the conclusion of the case. No success fee has been negotiated and no amount of a possible success fee has been discussed with Bank of America, Silverpoint or the Debtors and there have been no subsequent discussions on this topic. Any success fee will be subject to approval of the Bankruptcy Court.

Pursuant to agreement, OCA engaged CDG to assist and advise OCA and to provide restructuring management and turnaround management services, including providing Michael F. Gries as OCA's Chief Restructuring Officer, in connection with a refinancing or restructuring of the debt obligations of OCA and its subsidiaries. Following the engagement of CDG, the Senior Lenders and OCA entered into the Seventh Amendment to Credit Agreement and Forbearance.

Mr. Gries of CDG has acted as Chief Restructuring Officer (CRO) of OCA since January 11, 2006. Palmisano was terminated from all of his positions with OCA (except as a member of the Board of Directors of OCA) on the Palmisano Exit Date.[33] A consensual Term Sheet could not have been achieved unless these features were included. Upon this termination of Palmisano, Mr. Gries replaced Palmisano by becoming the interim Chief Executive Officer of OCA. He will so serve until a new permanent CEO is appointed.

---

[33] Following the Palmisano Exit Date, Palmisano resigned as a member of the Board of Directors of OCA.

3.      **RETENTION OF SPENCER STUART**

Pursuant to the Term Sheet setting forth the terms and conditions on which the parties

thereto will support a plan of reorganization in this case (described hereinafter) agreed between

the Senior Lenders, the Unsecured Creditors Committee and the Debtors, OCA has retained

Spencer Stuart (an international executive search firm) to search for a new permanent Chief

Executive Officer (CEO).   Under the Term Sheet, the new CEO must be satisfactory to the

Senior Lenders.   The permanent Chief Executive Officer of Reorganized OCA, Inc. will be

selected by the Board of Reorganized OCA, Inc., with the prior consent of the Senior Lenders

who (assuming the Plan is implemented) will, subject to dilution by the Management Incentive

Plan and the Doctors' Incentive Plan, hold all of the New Common Stock in the Reorganized

OCA under the Plan after the Effective Date.   The Bankruptcy Court has approved the retention

of Spencer Stuart and the executive search is underway.   No candidates have been presented to

the board of OCA as of the present time.

4.      **UNSECURED CREDITORS COMMITTEE**

As provided under the Bankruptcy Code, the United States Trustee filed a Notice of

Appointment of the Unsecured Creditors Committee on March 24, 2006 (Docket No. 95).   The

Unsecured Creditors Committee as presently constituted consists of Applied Discovery, Inc.,

Adorno & Yoss LLP, Buckley King, Meckler Bulger & Tilson, LLP and Navigant Consulting,

Inc.   The Unsecured Creditors Committee  (the "UCC") received Bankruptcy Court authority to

employ (a) Jenner & Block, LLP and Mark K. Thomas as general bankruptcy counsel (Docket

No. 152); (b) William E. Steffes and Steffes, Vingiello & McKenzie, LLC as Louisiana counsel

(Docket No. 161) and (c) Mohsin Y. Meghji and Laughlin Meghji + Company as financial

advisors (Docket No. 174).

5.     **DIP FINANCING**

In the DIP Financing Motion, the Debtors sought authority to enter into an agreement with the Senior Lenders that agree to provide debtor in possession financing to the Debtors (collectively, the "DIP Lenders") pursuant to which Debtors were to: (i) incur secured indebtedness consisting of a term loan facility in the approximate amount of $91.7 million and a revolving loan facility in the amount of $15 million (the "Postpetition Indebtedness"), (ii) grant liens, security interests and superpriority claims, (iii) use cash which may constitute "cash collateral" as defined in 11 U.S.C. §363(a) and provide adequate protection therefor, and (iv) grant adequate protection for the benefit of existing Senior Lenders and their collateral agents. The DIP Financing Motion sought the entry of interim and a final order.

The Interim Order was entered on March 17, 2006 (Docket No. 48), allowing the Debtors to incur revolving indebtedness not to exceed $7 million pending entry of a final order on the DIP Financing Motion, authorizing the use of cash collateral, and authorizing the Debtors to enter into a loan agreement with the DIP Lenders.  The Interim Order granted the DIP Lenders a superpriority administrative claim status, a fully perfected first priority security interest in all assets of the Debtors, including a first priority priming lien on all prepetition collateral and a junior lien on certain other collateral (the "DIP Lender Superpriority Security Interest") to secure the loans made pursuant thereto, subject and subordinate only to the fees of the United States Trustee and the administrative fees of certain professionals including law firms representing the Debtors and the Unsecured Creditors Committee, subject to a limitation for professional fees in the amount of $500,000 in the event of a default (collectively, the "Administrative Carve-Out"). The Senior Lenders and the Senior Lenders' collateral agents were granted junior replacement liens on all assets of the Debtors and a superpriority administrative expense claim in the amount

of the diminution in the value of their collateral, subject and subordinate only to the DIP Lender Superpriority Security Interest and the Administrative Carve-Out.

After the Interim Order was entered, the Debtors and the DIP Lenders extensively negotiated the loan agreement (the "DIP Loan Agreement") contemplated by the DIP Financing Motion.  The DIP Loan Agreement provides for the DIP Lenders to make the following loans to the Debtors: (i) a term loan in the amount of $75 million to pay down the pre-petition claims of existing Senior Lenders and their collateral agents ("DIP Term Loan"); (ii) a delay drawdown term loan in the amount of $16,723,334; and (iii) an increase in the availability of the revolving credit facility to a total amount of $15 million, subject to reserves.  The term of the loans expire no later than September 14, 2006.  The DIP Loan Agreement provides that the loans are to be secured by the DIP Lender Superpriority Security Interest, subject and subordinate only to the Administrative Carve-Out and certain permitted priority liens as described therein.

The final hearing on the DIP Financing Motion was held May 10, 2006, and pursuant to the Final DIP Order, the Bankruptcy Court approved the DIP Financing Motion and the transactions contemplated thereby.

As of June 23, 2006, $3.5 million has been borrowed by the Debtors under the revolving loan facility under the orders entered pursuant to the DIP Financing Motion.  In addition the Debtors drew the initial DIP Term Loan of $75 million and a delayed drawdown term loan of $8.97 million.  Thus, the total borrowings under the DIP Facility as of June 23, 2006 total $87.47 million.

6.      **BAR DATE FOR FILING PROOFS OF CLAIM**

On the Motion of the Debtors (Docket No. 134), the Bankruptcy Court entered an order on April 11, 2006 setting May 15, 2006 as the bar date for the filing of proofs of claim, except

that proofs of claim by Governmental Entities must be filed by September 13, 2006 (Docket No. 205). That order was amended on April 28, 2006 (Docket No. 319), and the general bar date for filing proofs of claim as to all of the Debtors other than the June 1 Debtors was extended to **June 2, 2006 at 4:30 p.m. (CDT).** The general bar date for filing proofs of claim as to the June 1 Debtors has been set for **June 28, 2006 at 4:30 o'clock p.m. (CDT)** and proofs of claim by Governmental Entities as to the June 1 Debtors must be filed by November 12, 2006 (Docket No. 620).

7. **OCA LITIGATION AGAINST AFFILIATED PRACTICES WHO DEFAULTED/TERMINATED PERFORMANCE UNDER BSA's**

There are over 50 Affiliated Practices that, prior to the Petition Date, unilaterally sent notices of default to OCA, and/ or simply stopped performing under their BSA's. OCA has invested millions of dollars in purchasing assets, financing leasehold improvements, acquiring furniture, fixtures, equipment and providing management services for these defaulted/terminating Affiliated Practices. In addition, the actions of these Affiliated Practices prevent OCA from achieving operating revenue from the BSA's with these Affiliated Practices. The usual procedure is for defaulting Affiliated Practices to immediately stop depositing funds and otherwise performing under the BSA's. The defaulting or terminating Affiliated Practices continue to use the Debtors' furniture, fixtures, equipment, leasehold improvements and other assets, however. The Debtors are in the process of filing adversary proceedings (lawsuits filed in the bankruptcy court) against all of the Affiliated Practices that have defaulted and/or stopped performing under the BSA's.

On April 21, 2006, OCA and Orthodontic Centers of Georgia, Inc. filed an adversary complaint in the Bankruptcy Court against Hector M. Bush, D.M.D and Hector M. Bush, P.C., a Georgia Professional Corporation ("Bush Complaint"). The Bush Complaint bears Adversary

No. 06-01113 (Docket No. 1 in the Adversary Proceeding and Docket No. 279 in the Bankruptcy Case).   The Bush Complaint asserts numerous causes of action such as  breach of contract, specific performance, conversion, unjust enrichment, quantum meruit, promissory estoppel, account stated, declaratory judgment and attorneys' fee and costs.   Among other things, the debtors who are the plaintiffs in  this adversary proceeding allege a material breach by Dr. Bush and his professional corporation of the BSA they entered into with the plaintiffs, and, accordingly, the plaintiffs seek (i) damages for such breach, (ii) damages for the defendants' conversion of the plaintiffs' personal property, (iii) an order enforcing the promises made by the defendants upon which the plaintiffs relied to the plaintiffs' detriment, (iv) an order requiring the defendants to restore to plaintiffs all money and property heretofore received by the defendants from the plaintiffs, (v) the repayment of the defendants' debt of $4,482,131 to plaintiffs, (vi) a declaratory judgment that the BSA is valid, legal, and enforceable and that the BSA does not violate Georgia law, regulation, or public policy, (vii) an order requiring the defendants to perform their obligations under the BSA, (viii) reasonable attorneys' fees and costs, and (ix) interest.

Complaints similar to the Bush Complaint have been filed as follows:

a.     On May 10, 2006, OCA and Orthodontic Centers of Florida, Inc. v. Jan Simon, D.D.S. and Simon Orthodontic Centers, P.A., a Florida Professional Corporation, being Adversary No. 06-01123.

b.     On May 23, 2006, OCA and Orthodontic Centers of Tennessee, Inc. v. Ralph G. Grant and Ralph G. Grant Orthodontics, P.C., being Adversary No. 06-01135.

c.     On May 23, 2006, OCA and Orthodontic Centers of Georgia, Inc. v. Kevin Eatmon and Kevin Eatmon, D.D.S., LLC, being Adversary No. 06-01137.

d.     On May 23, 2006, OCA and Orthodontic Centers of Pennsylvania, Inc. v. Kellyn W. Hodges, D.M.D., M.S. and Kellyn W. Hodges, D.M.D., M.S., P.C., being Adversary No. 06-01138.

e.      On June 23, 2006, OCA and Orthodontic Centers of Nebraska, Inc. v. Timothy A. Adams, D.D.S., and Timothy A. Adams, D.D.S., P.C., being Adversary No. 06-01175.

f.      On June 23, 2006, OCA and Orthodontic Centers of Ohio, Inc. v. Lucy S. DeGuzman, D.D.S., M.S. and DeGuzman Orthodontics, Inc., being Adversary No. 06-01158.

g.      On June 23, 2006, OCA and Orthodontic Centers of Georgia, Inc.  v. Damien Grant, D.D.S. and Damien Grant, D.D.S., L.L.C., being Adversary No. 06-01166.

h.      On June 23, 2006, OCA and Orthodontic Centers of Florida, Inc. v. Nigel Grandison, D.M.D., being Adversary No. 06-01178.

i.      On June 25, 2006, OCA and Orthodontic Centers of Pennsylvania, Inc. v. Joe M. Keller, D.D.S., M.S., and Joe M. Keller,  D.D.S., M.S., P.C., being Adversary No. 06-01186.

j.      On June 23, 2006, OCA and Orthodontic Centers of Alabama, Inc. and Orthodontic Centers of Tennessee, Inc. v. Ronald E. Brown, D.D.S. and Ronald E. Brown, D.D.S., P.C., being Adversary No. 06-01154.

k.      On June 25, 2006, OCA and Orthodontic Centers of Florida, Inc.  v. Austin F. Smith, D.D.S. and Austin F. Smith, D.D.S., P.A., being Adversary No. 06-01191.

l.      On June 23, 2006, OCA and Orthodontic Centers of South Carolina, Inc.  v. Ford S. Cooper, D.D.S. and Orthodontic Care of Carolina, P.C., f/k/a Ford S. Cooper, D.D.S., P.C., being Adversary No. 06-01159.

m.      On June 25, 2006, OCA and Orthodontic Centers of Massachusetts, Inc. v. Stanley Starr, D.D.S., and Stanley Starr, D.D.S., P.C., being Adversary No. 06-01190.

n.      On June 25, 2006, OCA and Orthodontic Centers of Oklahoma, Inc. v. Raymond P. Krob, D.D.S. and Raymond P. Krob, D.D.S., Inc., being Adversary No. 06-01189.

o.      On June 23, 2006, OCA and Orthodontic Centers of Tennessee, Inc. v. Don F. Flanagan, D.D.S, M.S. and Associates in Orthodontics, Inc., P.C., being Adversary No. 06-01164.

p.      On June 23, 2006, OCA and Orthodontic Centers of Texas, Inc.  v. Dudley M. Hodgkins, D.D.S, M.S.D., and Dudley M. Hodgkins, D.D.S, M.D., P.C., being Adversary No. 06-06-01167.

q.      On June 25, 2006, OCA and Orthodontic Centers of North Carolina, Inc.  v. W. David White, D.D.S., being Adversary No. 06-01185.

r.      On June 25, 2006, OCA and Orthodontic Centers of Minnesota, Inc. v. Nicole Peters, D.D.S., being Adversary No. 06-01183.

s.      On June 25, 2006, OCA Orthodontic Centers of Texas, Inc. v. Eugene Stevenson, D.D.S., and Eugene Stevenson, D.D.S., P.C., being Adversary No. 06-01184.

t.      On June 25, 2006, OCA and Orthodontic Centers of Tennessee, Inc. v. Leighton Wood, D.D.S., M.S., and Leighton Wood, D.D.S., M.S., P.C., being Adversary No. 06-01181.

u.      On June 23, 2006, OCA and Orthodontic Centers of Connecticut, Inc. v. Lance R. Kiss, D.M.D., A.B.O., being Adversary No. 06-01172.

v.      On June 25, 2006, OCA and Orthodontic Centers of Tennessee, Inc. v. David L. Wyatt, D.M.D., and David L. Wyatt, D.M.D., P.C., being Adversary No. 06-01182.

w.      On June 23, 2006, OCA and Orthodontic Centers of Washington, Inc. v. Brent T. Hassel, D.D.S., and Brent Hassel, D.D.S., P.S., being Adversary No. 06-01162.

x.      On June 25, 2006, OCA and Orthodontic Centers of Texas, Inc. v. J. Garland Watson, Jr., D.D.S., and Garland Watson, L.L.C. f/k/a J. Garland Watson, Jr., D.D.S., M.S.D., Inc., being Adversary No. 06-01188.

y.      On June 23, 2006, OCA and Orthodontic Centers of Tennessee, Inc. and Orthodontic Centers of Arkansas, Inc. v. Samuel L. Watts, D.D.S., M.S. and Samuel L. Watts, D.D.S., M.S., P.A., being Adversary No. 06-01179.

z.      On June 23, 2006, OCA and Orthodontic Centers of Alabama, Inc. v. Michael F. McCarthy, D.M.D., and Michael F. McCarthy, D.M.D., P.C., being Adversary No. 06-01180.

aa.     On June 23, 2006, OCA, Inc. and Orthodontic Centers of Ohio, Inc. v. Kevin J. Ison, D.M.D., and Kevin J. Ison, D.M.D., P.S.C., being Adversary No. 06-01169.

bb.     On June 23, 2006, OCA, Inc. and Orthodontic Centers of Minnesota, Inc. v. Peter W. Kuipers, D.D.S., and Kuipers Orthodontics, P.A., being Adversary No. 06-01174.

cc.     On June 25, 2006, OCA, Inc. and Orthodontic Centers of New Jersey, Inc. v. Alan S. Cutler, D.D.S., and ALAN S. CUTLER, D.D.S., P.A., being Adversary No. 06-01187.

dd.     On June 25, 2006, OCA, Inc. and Orthodontic Centers of California, Inc. v. Robert E. Cater, D.D.S., M.S., being Adversary No. 06-01192.

ee.    On June 25, 2006, OCA, Inc. and Orthodontic Centers of South Carolina, Inc. v. Bradley Nirenblatt, D.M.D., and Bradley Nirenblatt, D.M.D., P.A. a South Carolina Association, being Adversary No. 06-01193.

ff.    On June 23, 2006, OCA, Inc. and Orthodontic Centers of South Texas, Inc. v. Lisa Kern, D.D.S., and Lisa Loomis Kerns, D.D.S., P.C. a Texas Professional Corporation, being Adversary No. 06-01171.

gg.    On June 23, 2006, OCA, Inc. and Orthodontic Centers of Texas, Inc. v. William Terhune, D.M.D., and William Terhune, D.M.D., P.C. a Texas Professional Corporation, being Adversary No. 06-01176.

hh.    On June 30, 2006, OCA, Inc. and Orthodontic Centers of Arkansas, Inc. v. Billy Harris, D.D.S., being Adversary No. 06-01211.

ii.    On June 27, 2006, OCA, Inc. and Orthodontic Centers of Maryland, Inc. v. Stuart Scott, D.D.S., and Stuart Scott, D.D.S., P.A., a Maryland Dental Professional Corp., being Adversary 06-01196.

jj.    On June 30, 2006, OCA, Inc. and Orthalliance, Inc. v. Bryan Fryar, D.D.S., M.S., and Bryan Fryar, D.D.S., M.S., P.C., and Indiana Dental Professional Corporation, bearing Adversary No. 06-0125.

kk.    On June 30, 2006, OCA, Inc. and Orthalliance, Inc. v. Dennis R. Brenkert, D.D.S., M.S., and Brenkert Orthodonthics Professional, L.L.C., a Colorado Corporation, bearing Adversary No. 06-01210.

ll.    On June 30, 2006, OCA and Orthalliance, Inc. v. Bradley K. Hook, D.D.S., M.S., bearing Adversary No. 06-01200.

mm.    On June 30, 2006, OCA, Inc. and Orthalliance, Inc. v. John Boice, D.D.S., M.S., and John K. Boice, D.D.S. M.S., Ltd, a New Mexico Professional Corporation, bearing Adversary No. 06-01204.

nn.    On June 30, 2006, OCA, Inc. and Orthalliance, Inc. v. William Plikerd, D.D.S., and Orthondontic Concepts Inc. – William D. Plikerd, D.D.S., an Ohio Corp., bearing Adversary No. 06-01203.

oo.    On June 30, 2006, OCA, Inc. and Orthalliance, Inc. v. Robert A. Thacker, D.M.D., and Orthodontics West. P.C., an Alabama Professional Corp. f/k/a R.A. Thacker, D.M.D., P.C., bearing Adversary No. 06-01212.

pp.    On June 30, 2006, OCA, Inc. and Orthalliance, Inc. v. Daniel J. Enger, Jr., D.D.S., and Daniel J. Enger, Jr., D.D.S., P.A., a Mississippi Professional Association, bearing Adversary No. 06-01202.

qq.     On June 30, 2006, OCA, Inc. and Pedoalliance, Inc. v.  William R. Izzard, D.D.S., and Rudy Izzard, D.D.S., P.C., a Texas Professional Corporation, bearing Adversary No. 06-01201.

rr.     On June 30, 2006, OCA, Inc. and Pedoalliance, Inc. v. J. Keith Roberts, D.D.S., and J. Keith Roberts, Inc., an Indiana Corporation, bearing Adversary No. 06-1213.

ss.     On June 30, 2006, OCA, Inc. and Pedoalliance, Inc. v.  James L. Bevans, D.D.S., and Bevans Pediatric Dental Center, P.A., an Arkansas Corporation, bearing Adversary No. 06-01206.

tt.     On June 30, 2006, OCA, Inc. and Orthoalliance, Inc. v. Halliburton Orthodontics, P.C, a Tennessee Professional Corporation, bearing Adversary No. 06-01207.

uu.     On June 30, 2006, OCA, Inc. and Orthoalliance, Inc. v. Rober L. Bandeen, D.D.S., M.S., and Roger L. Bandeen, D.D.S., M.S., P.L.L.C., a Michigan Profess. Limited Liability Comp, bearing Adversary No. 06-01208.

vv.     On June 30, 2006, OCA, Inc. and Pedoalliance, Inc. v. Jefferson L. Newbern, D.D.S., Jeanne Newbern, D.D.S., Newbern Dental Center, Inc., a Georgia Corp., f/k/a a Newbern & Newbern, L.L.P., bearing Adversary No. 06-01209.

ww.     On July 5, 2006, OCA, Inc. and Orthoalliance, Inc. v. A. Paul Serrano, D.D.S., A. Paul Serrano, D.D.S., P.C., an Arizona Professional Corporation, bearing Adversary No. 06-01217.

xx.     On July 5, 2006, OCA, Inc. and Pedoalliance, Inc. v. Michael M. Etessami, D.D.S., Michael M. Etessami, D.D.S., P.A., a Maryland Professional Corporation, Wayne B. Hickory, D.D.S., Ronald M. Starr, D.D.S.,  Etessami, Hickory, and Starr, P.C., a Maryland Professional Corporation, bearing Adversary No. 06-01216.

yy.     On July 5, 2006, OCA, Inc. and Orthoalliance New Image, Inc., a Delaware Corporation v. Roland K. Fulcher, D.M.D., and Roland K. Fulcher, D.M.D., P.A, a South Carolina Professional Corporation, bearing Adversary No. 06-01215.

zz.     On June 30, 2006, OCA, Inc. and Orthoalliance, Inc. v. John K. Boice, D.D.S., M.S., and John K. Boice, D.D.S., M.S., Ltd, a New Mexico Professional Corporation, bearing Adversary No. 06-01204.

aaa.     On July 5, 2006, OCA, Inc. and Orthoalliance, Inc. v. Gene M. Fryar, D.D.S., and Fryar Orthodontics, P.C., an Indiana Dental Professional Corporation, bearing Adversary No. 06-01214.

bbb.    On July 6, 2006, OCA, Inc. and Pedoalliance, Inc. v. Ronald A. Eichel, D.D.S., M.S.D., and The Children's Dental Center of Atlanta, P.C., f/k/a Comprehensive Dentistry for Children & Teens, P.C., a Georgia Professional Corporation, bearing Adversary No. 06-01219.

ccc.    On July 6, 2006, OCA, Inc. and Outsource, Inc. v. Carlos Suadi, D.D.S., bearing Adversary No. 06-01218.

ddd.    On July 7 2006, OCA, Inc. and OCA Orthoalliance, Inc. v. Thomas J. Eberhardt, D.D.S., Eberhardt Orthodontics, P.C., a Georgia Professional Corporation, bearing Adversary No. 06-01222.

eee.    On July 7, 2006, OCA, Inc. and Outsource, Inc. v. Jimmy Blount, D.D.S., and Blount Family Dental Center, P.C., a Georgia Professional Corporation, bearing Adversary No. 06-01221.

fff.    On July 7, 2006, OCA, Inc. and Outsource, Inc. v. Angela Goodman, D.D.S., bearing Adversary No. 06-01220.

ggg.    On July 10, 2006, OCA, Inc. and Outsource, Inc.. v. Bradley W. Wilkinson, D.D.S., M.S., and Bradley W. Wilkinson, D.D.S., M.S., P.C., a Tennessee Professional Corporation, bearing Adversary No. 06-01226.

hhh.    On July 10, 2006, OCA, Inc. and OCA Orthoalliance, Inc. v. James A. Evans, D.D.S., Bruce A. Evans, D.D.S., and Evans Orthodontics, P.C., a South Dakota Professional Corporation, bearing Adversary No. 06-01225.

iii.    On July 10, 2006, OCA, Inc. and OCA Orthoalliance, Inc. v. Robert P. Lorentz, D.D.S., M.S. and Robert P. Lorentz, D.D.S., M.S.P.C., a Mississippi Professional Corporation,  bearing Adversary No. 06-01224.

jjj.    On July 10, 2006, OCA, Inc. and Pedoalliance, Inc. v. Larry D. Dormois, D.D.S., Steven J. Fuson, D.D.S.,  Pediatirc Dental Group, P.L.L.C., f/k/a Dormois and Fuson, P.L.L.C., a Tennessee Professional Limited Liability Company and John A. Acosta, D.D.S., individually and d/b/a East Pediatric Dentistry, P.C.,  bearing Adversary No. 06-01223.

Other adversary actions against the defaulting Affiliated Practices will continue to be filed during the course of the bankruptcy case.

In addition, adversary cases have been filed against some of the Debtors.   Generally, these adversary cases are for breach and termination of BSA's and for damages. These actions are as follows:

i.      Jason D. Parker, DDS and Pediatric Dentists, a Professional Dental Corporation v. Orthodontic Centers of Louisiana, Inc., being Adversary No. 06-01120.

ii.     Robert M. Amason, D.D.S., P.C. and Robert M. Amason, D.D.S. v. OCA and Orthodontic Centers of Alabama, Inc., being Adversary No. 06-01128.

iii.    Alexander M. Waitkus, D.D.S., P.C. and Alexander M. Waitkus v. OCA and Orthodontic Centers of Louisiana, Inc., being Adversary No. 06-01129.

iv.    Rachel M. Hamilton, D.D.S., M.S.D., P.C. and Rachel M. Hamilton v. OCA and Orthodontic Centers of South Carolina, Inc., being Adversary No. 06-01130.

v.     Kerry White Brown, D.D.S., P.C. and Kerry White Brown v. OCA and Orthodontic Centers of South Carolina, Inc., being Adversary No. 06-01131.

vi.    Warren J. Apollon, D.M.D., P.C. and Warren J. Apollon v. OCA and Orthodontic Centers of Pennsylvania, Inc., being Adversary No. 06-01132.

vii.   Doug Crosby, D.D.S. v. OrthAlliance New Image, Inc., being Adversary No. 06-01142.

viii.  Theodora Bonney v. Orthodontic Centers of Pennsylvania, Inc., being Adversary No. 06-01143.

ix.    Donald B. Doan, D.D.S. v. Orthodontic Centers of Texas, Inc., being Adversary No. 06-01144.

x.     Glenwood Jordan v. Orthodontic Centers of Texas, Inc., being Adversary No. 06-01145.

xi.    Terry Scotese v. Orthodontic Centers of Ohio, Inc., being Adversary No. 06-01146.

xii.   Elgin E. Wells v. Orthodontic Centers of Texas, Inc., being Adversary No. 06-01147.

xiii.  Gary D. Sexson, II and Sexson Orthodontics, Ltd. v. OCA Orthodontic Centers of Illinois, Inc., being Adversary No. 06-01126.

xiv.  Jennifer A. Meador, D.M.D., P.C. and Jennifer A. Meador, D.M.D. v. OCA and Orthodontic Centers of Washington, Inc., being Adversary No. 06-01179.

           

8.    **PLAN TERM SHEET**

After extensive negotiations, the Debtors and the Senior Lenders agreed to a non-binding Term Sheet dated as of April 23, 2006, detailing the terms of a plan of reorganization which the Debtors would file and which the UCC and the Senior Lenders would support. In connection with the Term Sheet, the Debtors and the Senior Lenders agreed to enter into a Plan Support Agreement, in which they would jointly agree to support a plan of reorganization, on the terms and conditions provided in such Plan Support Agreement and the Term Sheet. The Debtors and the Senior Lenders then engaged in extensive negotiations with the UCC.  Ultimately, a term sheet detailing the treatment of General Unsecured Creditors was agreed to with the UCC and its terms were incorporated into the Term Sheet.  The Senior Lenders, the UCC and the Debtors then entered into the Plan Support Agreement, reflecting the terms of a plan that could be filed by the Debtors that would enjoy the support of the Senior Lenders and the UCC.  Pursuant to a motion of the Debtors, the Plan Support Agreement was approved by the Bankruptcy Court on May 11, 2006 (Docket No. 480).  Thereafter, at the request of the Senior Lenders, the terms of the Plan Support Agreement were modified with the consent of the Debtors and the UCC as of July 19, 2006.  The Plan reflects the terms of the Plan Support Agreement as so modified.

The purpose of the Plan Support Agreement is two fold: (a) it memorializes how the parties envision implementing the plan of reorganization process; and (b) it provides assurances to the Debtors that, subject to the limitations imposed by the Plan Support Agreement and the Term Sheet, the Senior Lenders and the  Unsecured Creditors Committee will support the reorganization of the Debtors.  The Plan Support Agreement is only binding on the Debtors, the UCC and the Senior Lenders.  It binds no other person.

The Term Sheet includes a provision for the appointment of a Special Counsel to the Board, approved by OCA and Senior Lenders. The Special Counsel will be vested with authority to investigate matters arising out of any action or omission by Palmisano or any entity related to or controlled by Palmisano and bring any claims or causes of actions that the Special Counsel deems appropriate and in the best interest of the Debtors' estates. The Special Counsel is also vested with the authority to (i) investigate and prosecute any and all claims or causes of action related to software used by OCA, (ii) transactions among OCA, OCAI, Gimili and/or Palmisano, (iii) claims and interests of Palmisano, (iv) Palmisano's employment agreement and (v) actions or omissions by Palmisano and related entities after the Palmisano Exit Date. The Special Counsel will not begin an investigation unless the Special Counsel has received written instruction from the Board to begin such investigation. The Special Counsel will serve through the Effective Date of the Plan. At that point, the Reorganized Debtors will be vested with rights to pursue any claims that may be in the process of being investigated by the Special Counsel. Neither Palmisano nor any member of his family (x) had any role in the selection of the Special Counsel and (y) have no decision-making powers relative to the Special Counsel.

As noted, in 2005, Palmisano loaned $3 million to OCA[34]. The funds so borrowed were used for general corporate purposes. Pursuant to a Subordination Agreement made as of August 18, 2005, any indebtedness due to Palmisano was subordinated to all of the indebtedness due to the Senior Lenders. Under this Subordination Agreement, there can be no repayment to Palmisano until the indebtedness due to the Senior Lenders is paid in full. This $3 million claim of Palmisano is unsecured and if Allowed and not subordinated to General Unsecured Claims or recharacterized, will be a Class 4 Claim under the Plan, and may affect the estimated recovery

---

[34] These loans were evidenced by two (2) promissory notes made by OCA payable to the order of Palmisano ("Palmisano Notes"). The first note is dated as of June 9, 2005 and is in the original principal amount of $2,000,000. The second note is dated August 18, 2005 and is in the original principal amount of $1,000,000.

by other holders of Class 4 Claims.  The UCC contends that the $3 million claim of Palmisano based on the Palmisano Notes should be subject to subordination or recharacterization, or otherwise disallowed, such that such claim is not entitled to receive or retain any distribution it might otherwise obtain from the Unsecured Creditors' Trust.

Under the Term Sheet, the Senior Lenders, Palmisano and the Debtors reserved their rights and claims *vis a vis* one another, and the Plan excludes Palmisano, BPJ and Hector Bush from the releases and the Contributing Officers and Directors Channeling Injunction, and all of the rights of Palmisano, BPJ, Hector Bush and the Debtors *vis a vis* one another are reserved.  A consensual Term Sheet could not have been achieved unless these features were included.

9.    **KATRINA CARRY-BACKS AND OTHER TAX REFUNDS**

The Debtors are in the process of preparing their 2004 and 2005 income tax returns. As part of that process, the Debtors believe that they may be able to claim Katrina-related tax losses that can be carried back to partially offset prior years' income on which taxes have already been paid.  This arises out of the Gulf Opportunity Zone Act (Go Zone Legislation) enacted by the Congress as a result of Hurricane Katrina. The Debtors are in the process of finalizing their calculations in this area.  Additionally, the Debtors are waiting to receive notification from the Audit Committee as to whether any adjustments are required to their 2001 and prior year financial statements.  As an indirect result of the Go Zone Legislation, the 2001 tax year has remained open through August 2006 to allow the Debtor to amend its 2001 tax return to restate its taxable income.  As yet, the Debtors are unable to determine the exact amount of tax refunds that will ultimately be received.  Because the Debtors have not yet determined whether they must restate their 2001 income tax returns and because the Debtors 2004 and 2005 tax returns have not yet been filed, the Debtors are currently unable to determine what, if any, tax refunds they may

be able to claim. See Exhibit "D-2" for a further discussion of this issue.  Both Cathy Green, the

CFO of OCA, and KPMG have been involved in the process of determining the availability, if

any, of these tax refunds.

10.     **THE 341 MEETING**

Commencing on May 16, 2006 the United States Trustee conducted the 341 Meeting in

these cases.  The 341 Meeting was concluded.

11.     **APPOINTMENT OF EQUITY COMMITTEE**

Previously, the United States Trustee announced that a Committee of Equity Security

Holders ("Equity Committee") would be appointed.  Prior to the official appointment of the

Equity Committee, an ad hoc committee apparently was formed and was representing the holders

of Equity Interests.  The Debtors, Senior Lenders and the Unsecured Creditors Committee all

opposed in writing the creation of an Equity Committee on various grounds. The basis of the

objections by the Debtors and the Senior Lenders was that the valuations reflect that there is no

value in the Debtors beyond the debt due to the Senior Lenders and that the appointment of an

Equity Committee could delay the consummation of these cases and increase the administrative

costs by more than $1,500,000 per month.  On June 13, 2006, and despite these objections, the

United States Trustee appointed a Committee of Equity Security Holders ("Equity Committee").

In accordance with the Notice of Appointment of Equity Security Holders Committee (Docket

No. 666), Amended Notice of Appointment of Equity Security Holders Committee (Docket No.

671) and Notice of Appointment of Reconstituted Equity Security Holders' Committee (Docket

No. 744) the United States Trustee gave notice of the appointment of NightWatch Capital

Management, Robotti & Company, Inc, Xerion Capital Partners LLC, Adrian J. Costanza, DDS

and Charles Stewart, P.A. to the Equity Committee.  The Equity Committee has retained Carmen

Lonstein and the firm of Bell Boyd & Lloyd and Robin Cheatham and the firm of Adams & Reese as counsel.

## IV.     THE PLAN

The Plan Proponents have proposed a Plan and believe that the classification and treatment of Claims provided by the Plan are consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, only holders of Allowed Claims that are impaired and that receive distributions under the Plan are entitled to vote on the Plan. A copy of the Plan accompanies this Disclosure Statement. A Summary of the Classification and Treatment of Claims and Equity Interests is set forth above in this Disclosure Statement.

### 1.     BUSINESS MODEL (SSA'S) UNDER PLAN

In order to seek a business accommodation with the Affiliated Practices to help alleviate the disputes with the Affiliated Practices, and facilitate the reorganization and stability of the Debtors' business, the Debtors have proposed amended agreements to the Affiliated Practices ("SSA's"). The SSA's change the pricing and terms of the existing BSA's. Essentially, the SSA's bring the pricing for services in line with current market prices and conditions, providing a service fee structure on a sliding scale formula tied to patient revenues. This differs from the BSA's, in which the Debtors are paid based on a formula tied to net profitability. The SSA's have been proposed after numerous lengthy conferences, meetings, telephone calls and negotiations with many Affiliated Practices, and after consideration of the impact of the SSA's on the Debtors' anticipated revenues. Further information is contained at Exhibit "D-4" – Financial Projections, at B1, B3 and B4.

### V.     DESCRIPTION OF PROBABLE ADMINISTRATIVE CLAIMS AND PROVISIONS FOR PAYMENT OF ADMINISTRATIVE CLAIMS

The principal administrative claims known to the Plan Proponents at the present time are the fees and expenses, as allowed by the Bankruptcy Court and payable by the Debtors, of the Debtors' attorneys, Heller Draper, the Debtors' Special Counsel, Correro Fishman Haygood Phelps Walmsley & Casteix, L.L.P., the Debtors' restructuring manager, Conway, Del Genio, Gries & Co., LLC, the Debtors' tax accountants and advisors, KPMG LLP, the Debtors' accountants, Kramer Weisman and Associates, LLP, and the attorneys and other professionals engaged by the Unsecured Creditors Committee and the Equity Committee. In addition, pursuant to the DIP Order, the Debtors are required to pay the fees and expenses of counsel and financial advisors to the Senior Lenders and their agent.  The fees and expenses due to these professionals (except for those of the professionals of the Senior Lenders and the Senior Lenders' agent) are subject to Bankruptcy Court approval and/or review. Unpaid fees and expenses due as of the Effective Date of the Plan are to be paid in full from the Debtors' Cash and loan proceeds of the Working Capital Facility.

## VI.  VESTING OF ASSETS AND RIGHTS OF ACTIONS

Except as otherwise provided in the Plan or by order of the Bankruptcy Court, all property of the Debtors as of the Effective Date and, any rights, claims or causes of action pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any and all Avoidance Claims, in favor of the Debtors and against any and all persons, including, but not limited to, Palmisano, BPJ and Jan Simon, Hector Bush and non-debtor affiliates of OCA, are reserved and are to be retained by the Reorganized Debtors as the duly appointed representatives of the Debtors.  Subject to the terms of the Plan, the Transferred Avoidance Actions will be assigned to the Unsecured Creditors' Trust.

As noted above, there is considerable continuing litigation against Affiliated Practices that have defaulted/attempted to terminate their BSA's. Notwithstanding Sections 5.1.2.1 and 5.2.2.2 of the Plan, the Debtors and the Reorganized Debtors shall retain any and all Causes of Action against any Affiliated Practice in connection with or related to any assumed or rejected BSA, including, without limitation, improper terminations of contracts, breaches or non-performance under the contracts, specific performance, conversion, unjust enrichment, quantum meruit, promissory estoppel and avoidable transfer under the Bankruptcy Code or other applicable law.  Such causes of action shall vest in the Reorganized Debtors and may later be pursued by them.

Also, the Debtors and the Reorganized Debtors shall retain any and all Causes of Action against any Person who has personal liability to any one of more of the Debtors arising from any contract or agreement with any Debtor in which such Person is an obligor (e.g., notes, loans, BSA's, asset purchase agreements).

### Retention of Causes of Action

Except to the extent such rights, claims, causes of action, defenses and counterclaims are expressly and specifically waived, released or abandoned in connection with the Plan or a confirmation order, or in any contract, instrument, release or other agreement entered into in connection with the Plan: (i) any and all rights, claims, causes of action, suits, defenses, counterclaims and proceedings, whether in law or in equity, whether known or unknown, of or accruing to the Debtors or their estates against any entity, including, without limitation, actions under sections 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (except for and subject to the terms of the Plan, the Transferred Avoidance Actions), actions for breach of fiduciary duties, fraud, negligence, breach of contract or other actions resulting from

acts or omissions of any current or former officer or director, including, without limitation, actions channeled to the directors' and officers' insurance policies pursuant to the Contributing Officers and Directors Channeling Injunction (as defined below), shall remain assets of and vest in the Reorganized Debtors (who may, in their sole discretion, decline to exercise any of the foregoing), whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, causes of action, defenses and counterclaims have been listed or referred to in the Plan, or any other document filed with the Bankruptcy Court and (ii) neither the Debtors nor the Reorganized Debtors waive, relinquish or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, claim, cause of action, defense or counterclaim that constitutes property of the Debtors' estates.   The foregoing retention and vesting of rights, claims, causes of action, suits, defenses, counterclaims and proceedings shall occur (i) whether or not such right, claim, cause of action, suit, defense, counterclaim or proceeding has been listed or referred to in the Plan, or any other document filed with the Bankruptcy Court, (ii) whether or not such right, claim, cause of action, suit, defense, counterclaim or proceeding is currently known to the Debtors and (iii) whether or not a defendant in any litigation relating to such right, claim, cause of action, suit, defense, counterclaim or proceeding filed with the Bankruptcy Court a proof of Claim in the chapter 11 cases, filed with the Bankruptcy Court a notice of appearance or any other pleading or notice in the chapter 11 case, voted for or against the Plan or received or retained any consideration under the Plan.   Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion or any similar doctrine, the failure to list, disclose, describe, identify or refer to a right, claim, cause of action, suit, defense,

counterclaim or proceeding, or potential right, claim, cause of action, suit, defense, counterclaim or proceeding, in the Plan or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle and realize upon any rights, claims, causes of action, suits, defenses, counterclaims or proceedings that the Debtors or the Reorganized Debtors have, or may have, as of the confirmation date.  The Reorganized Debtors may commence, prosecute, defend against, settle, and realize upon any of the above rights, claims, causes of action, suits, defenses, counterclaims or proceedings, in their sole discretion, in accordance with what is in the best interests, and for the benefit, of the Reorganized Debtors as if the chapter 11 case had not been filed in the first instance.

The Senior Lenders believe that the Debtors may possess causes of action against certain of their current and former directors and officers, and Gimili and other entities affiliated with such directors and officers, arising out of acts and omissions undertaken by such parties, including, without limitation, for breach of fiduciary duty, fraud, aiding and abetting, negligence misrepresentation and civil conspiracy. Such causes of action shall vest in the Reorganized Debtors and may later be pursued by them.

The retained Claims and Causes of Action include, but are not limited to, those noted on the attached Exhibit "D-1"

**<u>Injunction on Actions</u>**

Except as provided in the Plan, as of the Effective Date, all non-Debtor entities will be permanently enjoined from commencing or continuing in any manner, any action or proceeding (except for the Transferred Avoidance Actions, which are subject to the terms of the Plan), whether directly, derivatively, on account of or respecting any claim, debt, right or cause of

action of the Debtors or the Reorganized Debtors which the Debtors or the Reorganized Debtors, as the case may be, retain sole and exclusive authority to pursue in accordance with the Plan or which has been released pursuant to the Plan.

### Shareholder Litigants

Those shareholders of OCA stock who are plaintiffs in the Class Action and/or the Derivative Action (collectively, the "Shareholder Litigants") following the confirmation of the Plan and as of the Effective Date will, to the extent of any claim that they have or may have or that has been asserted in those actions (collectively the Shareholder Litigants' Claims"), be permanently enjoined from commencing or continuing in any manner, any action or proceeding (including the Class Action and the Derivative Action), whether directly, derivatively, on account of or respecting any claim, debt, right or cause of action against the Debtors, including any Shareholder Litigants' Claim. Any such claim, including any Shareholder Litigants' Claim, will be discharged following the confirmation of the Plan and as of the Effective Date. Under the treatment afforded by the Plan, the claims of the Shareholder Litigants to the extent that they are derived from the ownership of the common stock of OCA are subordinated to the claims of all other claimants of the Debtors pursuant to section 510(b) of the Bankruptcy Code[35] and will be treated the same as Equity Interests of OCA. Further, the current common stock held by existing equity holders, including the Shareholder Litigants, will be canceled, and be worthless but for the Equity and Subordinated Claims Deferred Payment under the Plan if this class accepts the Plan.

### VII.   EXCULPATION

---

[35]    Section 510(b) provides in pertinent part that " a claim arising from rescission of a purchase or sale of a security of the debtor . . . for damages arising from the purchase or sale of such security, or for reimbursement or contribution . . . on account of such a claim, shall be subordinated to all claims or interests that are senior to . . . the claim or interest represented by such security . . . ."

The Plan provides for the exculpation of various persons, including the Unsecured Creditors Committee, for their actions, except for willful misconduct and/or gross negligence, following the Petition Date.  This exculpation is being granted in view of the efforts of all parties so exculpated that resulted in the filing of the Plan, considering the complexities of this case, in a relatively short period of time.  The nature of the business of the Debtors required such speed so that all who deal with the Debtors, including the doctors, could enjoy certainty.  Certainty was required to maintain the value of the Debtors as a going concern and to maintain the relationships created by the BSA's and to save as many jobs of the employees of the Debtors as is consistent with the Plan.  To the extent that portions of the exculpations granted are deemed to be extraordinary, then they may be subject to challenge at confirmation.  Similar exculpation clauses are approved in many bankruptcy cases.

## VIII.  RELEASE OF CONTRIBUTING OFFICERS AND DIRECTORS

In consideration of the assignment of by the Contributing Officers and Directors of their rights under the existing directors' and officers' insurance policies all claims and Causes of Action against the Contributing Officers and Directors arising from or related to their services as present or former officers or directors of the Debtors on or prior to the Effective Date shall be released by the Debtors, the Senior Lenders and the holders of all Claims and Equity Interests. All Released Claims shall be channeled to the directors' and officers' insurance policies pursuant to the Contributing Officers and Directors Channeling Injunction, and all judgments or other payments relative to the Released Claims shall be made only from proceeds available from such directors' and officers' insurance policies and shall not be recoverable from the Contributing Officers and Directors, or their assets or properties.

Notwithstanding the assignment noted in the previous paragraph, the Contributing Officers and Directors shall retain their rights to payment or reimbursement of defense costs from the existing or prior directors' and officers' insurance policies in accordance with the provisions of such policies.

There are two directors' and officers' insurance policies, a primary layer of $10 million issued by AIG and an excess layer of $10 million issued by XL Specialty Insurance Company. The policies are "claims made policies" with a policy period from November 9, 2004 to November 9, 2006. The retention amount under the policies is $2.5 million.  According to the terms of the policies, assignment is permitted only with the written consent of the insurers.

The insurers are cooperating in the defense of the Class Action and Derivative Action. They required the retention of panel counsel and have reserved their rights under the policies (which, according to defense counsel for the Debtors, is typical).

The policies pay for defense costs (over the retention) as they are incurred.  To date, the Debtors have not exhausted the $2.5 million retention.  However, the policies provide no retention amount applies to non-indemnifiable losses.  After the Debtors filed for bankruptcy, they were unable to continue indemnifying the individual defendants, so no retention should apply to their defense costs going forward.  The insurance carriers have not paid any defense costs to date and are waiting for resolution of the motion that the class-action and derivative defendants recently filed in the bankruptcy court requesting payment of the policy proceeds for defense costs.  Prior to the Petition Date, the Debtors had paid $891,560 towards the $2.5 million retention.

As is typical for directors' and officers' insurance policies, the policies provide coverage for securities claims, employment practices claims, and other claims for monetary, non-

monetary, or injunctive relief, and for civil, criminal, administrative, or regulatory investigations of insured persons. The policies exclude coverage for various environmental claims, professional errors & omissions, medical malpractice, among other things. The policies provide Entity Coverage for the Debtors, meaning that the policies cover securities claims made against the company. There is an insured versus insured exclusion in the policies.

The Directors and Officers who may become Contributing Officers and Directors are the current officers and directors of OCA as of May 12, 2006 (excluding Palmisano who was then a director but has since resigned) and the former officers and directors of the Debtors to be agreed by the Senior Lenders and the Debtors, and identified on the D&O Schedule. The current directors and officers as of May 12, 2006 who may be Contributing Officers and Directors are Linda Girard, David Vignes, Kevin Dolan, Ashton Ryan, Dennis Buchman, Jack Devereux, and Edward Walters, Jr.  The former officers and directors who may also be released include Tom Sandeman, John Glover, Gasper Lazzara, Jr., Gordon Tunstall, Mike Johnsen, Jack Sheridan, Nancy Schneid, David Verret, and Dennis Summers. There is no agreement yet by the Debtors and the Lenders on which former officers and directors will be on the D&O Schedule, and therefore will also entitled to become Contributing Officers and Directors. Of the current and former officers and directors who may become Contributing Officers and Directors, Dennis Buchman, Jack Devereaux, Kevin Dolan, Linda Girard, Ashton Ryan, Dennis Summers, David Verret, David Vignes and Edward Walters, Jr. have been named as defendants in the class action or derivative litigation.

The consideration provided to the estate in connection with the Officers and Directors Channeling Injunction consists of, among other consideration to be established at the confirmation hearing, the agreement of the Contributing Officers and Directors to assign rights

under the policies to the Reorganized Debtors, the release of the indemnity claims of the Contributing Officers and Directors against the Debtors and Reorganized Debtors, the continued service by the current Contributing Officers and Directors during the bankruptcy cases under adverse circumstances and the facilitation of the reorganization of the Debtors, and the agreements and consideration provided by the Senior Lenders in connection with the Plan to facilitate a prompt and successful resolution of the case, including the conversion of a portion of their debt to equity, the providing of exit financing to pay the costs of administration, the initial payment to the unsecured creditors, and the agreements to make deferred payments to unsecured creditors, existing equity and subordinated creditors, in each case, when the Senior Lenders believe that such payments are not required to be made under the absolute priority rule.   The Debtors believe that the insurance coverage will be sufficient to satisfy or settle all claims of third parties when channeled to the proceeds of the insurance, in view of the defenses to the claims.

Reorganized OCA will pay any and all reasonable and documented out of pocket fees, costs and other expenses incurred in the defense of the Contributing Officers and Directors to enforce the provisions of Section 6.1 of the Plan, with respect to the Released Claims up to an aggregate amount of $100,000.

Neither Palmisano, Bart Palmisano, Jr., nor Hector Bush will be a Contributing Officer and Director, as all claims are being reserved against them.

Notwithstanding the above, no Contributing Officers and Directors will be released from personal liability to any one or more of the Debtors under any contract or agreement with any Debtor under which the Contributing Officers and Director is an obligor (e.g., notes, loans, BSA's, asset purchase agreements.

In connection with the Contributing Officers and Directors Channeling Injunction, Palmisano asserts that there are risks that (i) the director's and officer's liability insurer may contend that it is not bound by the assignments and/or that it is relieved from its insuring obligations because its risk has been materially increased; (ii) there may not be coverage for some claims subject to the contributing officers and directors channeling injunction (including potential claims by Palmisano for contribution and/or indemnity against the Contributing Officers and Directors) by reason of various policy exclusions, including the insured vs. insured exclusion; and (iii) the policy limits may be inadequate to cover all of the claims subject to the Contributing Officers and Directors Channeling Injunction.

## IX. EXECUTORY CONTRACTS

Except for executory contracts and unexpired leases (excluding BSA's and Related Contracts, which are addressed below) that are (i) rejected prior to the Effective Date or (ii) scheduled by the Debtors for rejection prior to the Confirmation Hearing or as otherwise ordered by the Bankruptcy Court, all executory contracts and unexpired leases under 11 U.S.C. Section 365 will be deemed assumed by the Debtors on the Effective Date.

The Current BSA's shall be treated as provided in Section 5.1.2.1 of the Plan.

The Defaulted BSA's shall be treated as provided in Section 5.1.2.2 of the Plan.

The intention of the Debtors is to assume all Current BSA's and all Defaulted BSA's, except for specific BSA's which the Debtors identify as BSA's not to be assumed[36]. If the Debtors determine to reject any BSA's at any time, the Debtors will file a notice of same.

The Debtors have sent proposed revisions to the Affiliated Practices outlining changes and revisions to the structure of the existing BSA's. The Debtors anticipate that a large number of the Affiliated Practices with Current BSA's will agree to the revised BSA's ("SSA's"), and

---

[36]     See Exhibit D-5, which indicates Debtors approach to the various BSA's.

that those SSA's will be assumed under the Plan. As part of the process to determine which Affiliated Practices will agree to SSA's, and which Affiliated Practices will oppose assumption of their existing BSA's, the Debtors have filed motions in the Bankruptcy Court to establish timetables and procedures to establish and identify: (1) which Affiliated Practices will enter SSA's (and therefore the SSA's will be assumed); (2) which Affiliated Practices will not object to the assumption of their present BSA's and  (3) which Affiliated Practices will object to the assumption of their present BSA's. The legal issues related to the assumption of the BSA's of the Affiliated Practices who object to the assumption of their present BSA's and do not agree to enter SSA's  ((3) above)  will addressed and determined at the confirmation hearing. At the confirmation hearing, the court can determine which of the BSA's of Affiliated Practices who object to the assumption of their present BSA's and do not agree to enter SSA's the Debtor may assume over the objections of the Affiliated Practices, and on what terms and conditions any such assumption will be allowed. Upon considering the terms and conditions established by the Court for the assumption thereof, the Debtors will then determine with the consent of the Senior Lenders whether to assume the BSA's of those Affiliated Practices on the terms and conditions established by the Court or agreed to by the parties. The Debtor will immediately file a notice of rejection (or notice that it does not intend to assume such BSA) of any such BSA's that it elects not to assume on those terms and conditions.

The Debtors intend to assume all real estate leases for (1) any Affiliated Practice that signs a new SSA that is approved by the court and (2) any Affiliated Practice with an existing BSA, which BSA is assumed at confirmation. The Debtors intend to reject real estate leases for any other Affiliated Practice (i.e., real estate leases for Affiliated Practices who do not agree to SSA's and whose BSA's the Debtors do not assume) although the Debtors reserve the right to

assume such real estate leases and assign them. The Debtors do not believe any significant cure amounts will be due with respect to any assumed real estate leases. The Debtors have endeavored to pay all pre-petition rent due on all real estate leases for Affiliated Practices with Current BSA's pursuant to First Day orders of the Court. In addition, the Debtors are presently paying all post- petition rent on the real estate leases for Affiliated Practices with Current BSA's during the case. With respect to the real estate leases for Affiliated Practices with Defaulted BSA's, which are assumed by the Debtors, the Debtors understand that the Affiliated Practices with Defaulted BSA's are generally paying rent on those real estate leases. Accordingly, the Debtors do not believe that there will be any material cure payments due on any real estate leases that will be assumed under the Plan. Obviously, the Debtors can not identify at the present time which specific real estate leases will be assumed or rejected, as that is totally dependent on (1) which Affiliated Practices sign SSA's that are approved by the court and (2) which BSA's are assumed at confirmation. The Debtors will provide notice of which real estate leases will be assumed or rejected as soon as it is known which Affiliated Practices sign new SSA's that are approved by the court and which BSA's are assumed at confirmation.

The Debtors will notify the landlords as soon as possible about the proposed disposition of any real estate leases, including the proposed cure amounts for any such leases that the Debtors intend to assume.

Notwithstanding any provision of the Plan to the contrary, the Debtors may assume and assign any real estate lease.  This "savings" provision is intended to allow the Debtors to assume any real estate lease and assign it to a third party, presumably an Affiliated Practice, even if the Affiliated Practice does not enter an SSA or have an assumed BSA.

Further procedures for the assumption, assumption and assignment, or rejection of real estate leases, and the mechanism for the setting of cure amounts, will be established by order of the Bankruptcy Court in connection with or prior to the Confirmation Hearing.

The procedures for the assumptions and rejections of executory contracts are described in the Plan and as noted, further procedures for the assumption, assumption and assignment and rejection of real estate leases related to BSA's will be established by the Court.

## X.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain U.S. holders of Claims and Interests. The following summary does not address the U.S federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan (*e.g.,* Allowed Administrative Expense Claims, Allowed Tax Claims, Allowed Priority Claims and Allowed Non-Priority Secured Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section.  Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent.  The Debtors have not requested a ruling from

the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.

This summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to the particular circumstances of any holder or to holders subject to special income tax rules (such as S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations).  In addition, the discussion does not apply to holders of Claims and Interests that are not "U.S. Persons" (as such phrase is defined in the Tax Code).  The use of the terms "holder" or "U.S. holder" herein shall refer to a "holder of a Claim or Interest that is a U.S. Person."

The following discussion is a general summary of certain federal income tax aspects of the Plan to U.S. holders, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.

**EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN SHOULD CONSULT HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST.  THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH ANY OFFERING FOR SALE OF SECURITIES.**

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (i) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND**

**CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (ii) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.**

### Tax Consequences To The Debtors

The Debtors are members of an affiliated group of corporations for U.S. federal income tax purposes and file a single consolidated federal income tax return. As discussed below, in connection with the implementation of the Plan, the amount of the Debtor group's consolidated net operating loss ("NOL") carryforwards and current year losses may be significantly reduced and, possibly, eliminated. In addition, the Debtor group's tax basis in its assets may be reduced and the group's subsequent utilization of any NOL carryforwards remaining and certain other tax attributes (particularly, the deduction for depreciation and amortization) may be substantially restricted following the Effective Date. For U.S. federal income tax purposes, the Debtors and the Senior Lenders agree that as of the Effective Date, Reorganized OCA's enterprise value will be $73,000,000.

### Cancellation Of Indebtedness

Under the Tax Code, taxpayers in bankruptcy do not recognize income on account of cancellation of indebtedness ("COD") but are generally required to reduce certain tax attributes---such as NOL carryforwards and current year losses, tax credits, and the tax basis in assets---by the amount of COD. In general, COD is the amount by which the indebtedness discharged exceeds the amount of cash and the fair market value of any other consideration given in exchange therefor. Special statutory rules and Treasury Regulations may apply to limit the amount of COD and attribute reduction in certain circumstances.

The required reduction in tax attributes occurs after the determination of tax for the taxable year that includes the COD. Thus, COD that arises in bankruptcy generally does not limit the debtor's ability to use its tax attributes to reduce tax liabilities relating to the tax year of the debtor that includes the Effective Date as well as prior tax years. While a debtor is generally required to reduce its NOLs first, the debtor may elect to reduce the tax basis of its depreciable assets (including the tax basis in the stock of its subsidiaries) prior to any reduction in its NOL carryforwards or other tax attributes. In general, reduction in the tax basis of any subsidiary stock requires a corresponding reduction in that subsidiary's tax basis in its assets.

The Debtors expect to realize some COD as a result of the discharge of Claims pursuant to the Plan. As a result, the Debtors will be required to reduce their tax attributes by the amount of the COD.

### Limitations on the Use of NOLs and other Tax Attributes

In addition to attribute reduction, the implementation of the Plan is expected to cause the Debtors to undergo an ownership change for purposes of Section 382 of the Tax Code, which generally limits a corporation's ability to use NOL carryforwards and other tax attributes such as built-in losses following an ownership change. These limitations apply from and after the Effective Date, in addition to the attribute reduction discussed above on account of COD.

### Tax Consequences To Certain Holders Of Claims And Interests

### Class 5 Holders of Claims and Class 6 Holders of Equity Interests in OCA, Inc.

The holders of Allowed Claims in Class 5 and Allowed Equity Interests in Class 6 are required, for all federal income tax purposes, to treat the direct transfer of assets to the Equity and Subordinated Claims Trust (excluding any assets transferred to and held by the Disputed Equity and Subordinated Claims Reserve), as a transfer of such assets from the Debtors to such

holders (with each holder receiving an undivided interest in the assets of the Equity and Subordinated Claims Trust), followed by a transfer of such assets to the Equity and Subordinated Claims Trust in exchange for the beneficial interests therein. Thus, for federal income tax purposes, each holder of an Allowed Claim in Class 5 and an Allowed Equity Interest in Class 6 will be treated as transferring its Claim or Equity Interest, as the case may be, to the Debtors in exchange for a right to a pro rata share of the Equity and Subordinated Trust assets, including by way of a distribution out of the Disputed Equity and Subordinated Claims Reserve. Each holder of an Allowed Claim in Class 5 or Allowed Equity Interest in Class 6 is treated for federal income tax purposes as a direct owner of its pro rata share of the assets of the Equity and Subordinated Claims Trust (excluding any assets held by the Disputed Equity and Subordinated Claims Reserve).

The tax treatment of the deemed receipt of the assets transferred to the Equity and Subordinated Claims Trust is uncertain. The receipt of such rights by holders of Allowed Class 5 Claims or Allowed Class 6 Equity Interests may cause the exchange of their claims or equity interests on the Effective Date to be treated as a currently taxable transaction or potentially as an "open" transaction for tax purposes, and each such holder's loss, if any, to be deferred for tax purposes. If a holder has already taken a worthlessness deduction with respect to its Claim or Equity Interest the fair market value, if any, of the right to future payments may be fully taxable on the Effective Date as income to such holder. Also, a holder of Claims in Class 5 or Equity Interests in Class 6 that has not claimed a deduction or loss with respect to their claim or equity interest may be prevented from claiming a deduction or loss due to the fact that such person may receive additional payments as a result of their rights with respect to the Equity and Subordinated Claims Deferred Payment.

Holders of Disputed Class 5 Claims and Disputed Class 6 Equity Interests should not be treated as having received any property in exchange for their Claims or Equity Interests until such Claims or Equity Interests are Allowed and payment (or deemed payment by way of transfer to the Equity and Subordinated Claims Trust of a portion of the assets held by the Disputed Equity and Subordinated Claims Reserve) is made out of the Disputed Equity and Subordinated Claims Reserve.   A payment out of the Disputed Equity and Subordinated Claims Reserve to a holder of a Class 5 Claim or Class 6 Equity Interest on account of that holder's claim or interest having become Allowed (including the allowance of a disputed claim or disputed equity interest without any actual payment to the holder), is expected to be treated for U.S. federal income tax purposes as a transfer of property from the Disputed Equity and Subordinated Claims Reserve to the holder of such claim or interest in exchange for such claim or interest as of the date such payment is made (which transfer will be treated as followed by a transfer of such property by the holder to the Equity and Subordinated Claims Trust of such property in a situation where the holder does not actually receive any property by reason of their claim or equity interest being allowed).  A holder of a Class 5 Claim or Class 6 Equity Interest that receives an interest in the Equity and Subordinated Claims Trust following allowance of their claim or equity interest will, for U.S. federal income tax purposes be treated as a direct owner of its pro rata share of the assets of the Equity and Subordinated Claims Trust and a grantor of such trust from the time of allowance of its Disputed Claim or Equity Interest.

Due to the possibility that the holders of certain Allowed Claims and Equity Interests may receive additional distributions with respect to the Equity and Subordinated Claims Deferred Payment and resolution of certain Disputed Claims or Disputed Equity Interests, such

holders could be prevented from recognizing any loss until the time at which such holder cannot receive future distributions under the Plan.

The Debtors have not yet determined what tax reporting to holders may be required with respect to the Equity and Subordinated Claims Deferred Payment.

EACH HOLDER OF CLAIMS IN CLASS 5 AND EQUITY INTERESTS CLASS 6 SHOULD CONSULT ITS OWN TAX ADVISOR TO DETERMINE THE AMOUNT AND TIMING OF ANY INCOME OR LOSS SUFFERED AS A RESULT OF THE CANCELLATION OF THE CLAIMS OR COMMON STOCK HELD BY SUCH PERSON, WHETHER SUCH INCOME OR LOSS IS ORDINARY OR CAPITAL AND THE TAX EFFECT OF ANY RIGHT TO, AND RECEIPT OF, THE EQUITY AND SUBORDINATED CLAIMS DEFERRED PAYMENT.

**Class 4 Holders of Allowed General Unsecured Claims.**

The holders of Allowed Claims in Class 4, are required, for all federal income tax purposes, to treat the direct transfer of assets to the Unsecured Creditors' Trust (excluding any assets transferred to and held by the Disputed Unsecured Creditors Reserve), as a transfer of such assets from the Debtors to such holders (with each holder receiving an undivided interest in the assets of the Unsecured Creditors' Trust), followed by a transfer of such assets to the Unsecured Creditors' Trust in exchange for the beneficial interests therein. Thus, for federal income tax purposes, each holder of an Allowed Claim in Class 4 will be treated as transferring its Claim to the Debtors in exchange for cash and the right to a pro rata share of additional amounts transferred to the Unsecured Creditors' Trust, including by way of a distribution out of the Disputed Unsecured Creditors' Reserve. Each holder of an Allowed Claim in Class 4 is treated for federal income tax purposes as a direct owner of its pro rata share of the assets of the

Unsecured Creditors' Trust (excluding any assets held by the Disputed Unsecured Creditors Reserve).

The tax treatment of the right to potential additional amounts out of the Unsecured Creditors' Trust and to the General Unsecured Deferred Payments is uncertain. The receipt of such rights by holders of Allowed Class 4 Claims may cause the exchange of the claims on the Effective Date to be treated as "open" for tax purposes, and such holders' loss, if any, to be deferred for tax purposes. If a holder has already taken a worthlessness deduction with respect to its Claim, the receipt of cash as well as the fair market value, if any, of the right to future payments may be fully taxable on the Effective Date as income to such holder.

Holders of Disputed Class 4 Claims should not be treated as having received any property in exchange for their Claims until such Claims are Allowed and payment is made out of the Disputed Unsecured Creditors Reserve. A payment out of the Disputed Unsecured Creditors Reserve to a holder of a Class 4 Claim on account of that holder's claim having become Allowed is expected to be treated for U.S. federal income tax purposes as (A) a transfer from the Disputed Unsecured Creditors Reserve to the Debtors or Reorganized Debtors, followed by (B) a transfer of such property to the holder of such subsequently allowed Claim. Thereafter, such holder of a Allowed Claim in Class 4 is treated for U.S. federal income tax purposes as a direct owner of its pro rata share of the assets of the Unsecured Creditors' Trust and a grantor of the Unsecured Creditors' Trust from the time of allowance of its Disputed Claim.

Due to the possibility that the holders of certain Allowed Claims may receive additional distributions with respect to resolution of certain Disputed Claims, the General Unsecured Deferred Payments, the Transferred Avoidance Action Proceeds once resolved, and on account of certain subordination agreements with Senior Lenders as described in Section 6.4.5 of the

Plan, such holders could be prevented from recognizing any loss until the time at which such holder cannot receive future distributions under the Plan.   Holders of Allowed General Unsecured Claims in Class 4 should consult their tax advisors regarding the possibility for such deferral of income recognition.

The Debtors have not yet determined what tax reporting to holders may be required with respect to the General Unsecured Deferred Payments or the Transferred Avoidance Action Proceeds on account of the cancellation of the Class 4 Claims.   Moreover, each Allowed Class 4 Claim holder will be required to include as income, gain or loss any income or gain recognized on the sale or other disposition of the Unsecured Creditors' Trust assets whether or not the Unsecured Creditors' Trust distributes the cash proceeds currently and may, as a result incur a tax liability before the holder receives a distribution from the Unsecured Creditors' Trust.

EACH HOLDER OF A CLASS 4 GENERAL UNSECURED CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR TO DETERMINE THE AMOUNT AND TIMING OF ANY INCOME OR LOSS AS A RESULT OF THE PLAN, ANY TRANSFER OF CASH, THE ESTABLISHMENT OF THE UNSECURED CREDITORS TRUST AND THE TAX EFFECT OF ANY ADDITIONAL DISTRIBUTIONS, INCLUDING BUT NOT LIMITED TO THOSE IN RESPECT OF DISPUTED CLAIMS, THE GENERAL UNSECURED DEFERRED PAYMENTS AND THE TRANSFERRED AVOIDANCE ACTION PROCEEDS.   ANY HOLDER THAT MAY BECOME ENTITLED TO DISTRIBUTIONS FROM THE DISPUTED UNSECURED CREDITORS RESERVE IS URGED TO CONSULT ITS TAX ADVISOR REGARDING THE TAX TREATMENT OF SUCH RESERVE, DISTRIBUTIONS THEREFROM AND ANY TAX CONSEQUENCES TO SUCH HOLDER RELATED THERETO.

**Classification of the Unsecured Creditors' Trust.**

The Unsecured Creditors' Trust is intended to be treated for federal income tax purposes as a "liquidating trust" for the benefit of holders of Allowed Class 4 Claims, whether Allowed on or after the Effective Date.   Generally, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes.  The IRS, in Rev. Proc. 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Unsecured Creditors' Trust has been structured with the intention of complying with such general criteria.

Pursuant to the Plan, and in conformity with the IRS revenue procedure, all parties (including Debtors, the Reorganized Debtors, the UCT Trustee, and the holders of beneficial interests in the Unsecured Creditors' Trust) are required to treat the Unsecured Creditors' Trust, as a grantor trust of which the holders of Allowed Claims in Class 4 are the owners and grantors. Accordingly, the following discussion assumes that the Unsecured Creditors' Trust would be so treated for federal income tax purposes.  However, no ruling has been requested from the IRS concerning the tax status of the Unsecured Creditors' Trust as a grantor trust.   If the Unsecured Creditors' Trust fails to qualify as a liquidating trust, it may be treated as a partnership.  If the Unsecured Creditors' Trust is treated as a partnership, but not as a publicly traded partnership, the Unsecured Creditors' Trust should not be subject to tax and each holder of a beneficial interest would be required to take into account its allocable share of each item of income, gain, deduction or loss recognized by the Unsecured Creditors' Trust.

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Reorganized Debtors, the UCT Trustee, and grantors of the Unsecured Creditors' Trust) will treat the transfer of assets (other than those transferred to the Disputed Unsecured Creditors' Reserve) to the Unsecured Creditors' Trust in accordance with the terms of the Plan, as a transfer of such assets directly to the holders of Allowed Claims in Class 4, followed by the transfer of such assets by such holders to the Unsecured Creditors' Trust.  Accordingly, all parties must treat the Unsecured Creditors' Trust as a grantor trust of which such holders are the owners and grantors.   Each holder of an interest in the Unsecured Creditors' Trust will be required to report on its federal income tax return(s) the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Unsecured Creditors' Trust.  The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The federal income tax obligations of a holder of an interest in the Unsecured Creditors' Trust are not dependent upon the Unsecured Creditors' Trust distributing any cash or other proceeds. Therefore, a holder of an interest in the Unsecured Creditors' Trust may incur a federal income tax liability regardless of the fact that the Unsecured Creditors' Trust has not made, or will not make, any concurrent or subsequent distributions to the holder.  If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it, the holder may be entitled to a subsequent or offsetting loss.

As soon as possible after the Effective Date, the UCT Trustee will apprise the holders, in writing, of the value of the assets transferred to the Unsecured Creditors' Trust.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the

Reorganized Debtors, the UCT Trustee, and owners of the Unsecured Creditors' Trust) for all federal income tax purposes.

The UCT Trustee will file with the IRS returns for the Unsecured Creditors' Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The UCT Trustee will also send to each holder of an interest in the Unsecured Creditors' Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

### Classification of the Disputed Unsecured Creditors Reserve.

The Disputed Unsecured Creditors Reserve will be treated as holding those assets in the Unsecured Creditors' Trust not owned by holders of Allowed Claims in Class 4.  In addition, the UCT Trustee will maintain in the Disputed Unsecured Creditors Reserve any distributable amounts required to be set aside on account of Disputed Claims in Class 4.  Distributions from the Disputed Unsecured Creditors Reserve, net of certain expenses, shall be made to holders of Disputed Claims in Class 4 when such Claims are subsequently Allowed in the same manner as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, together with any net earnings related thereto and to holders of Allowed Claims (whether Allowed on or after the Effective Date) when any Disputed Claims in Class 4 are subsequently disallowed.

The Debtors and UCT Trustee intend to elect to treat the Disputed Unsecured Creditors Reserve as a disputed ownership fund administered by the UCT Trustee for federal income tax purposes taxable in accordance with Treasury Regulation section 1.468B-9, and to the extent permitted by applicable law to report consistently for state and local income tax purposes.

Accordingly, the Disputed Unsecured Creditors Reserve will be treated for tax purposes as a C corporation and fully taxable on any income allocable to assets it holds.

Any income on the assets of the Disputed Unsecured Creditors Reserve will be treated as subject to tax on a current basis, and all distributions pursuant to the Plan will be made net of provisions for taxes and subject to withholding and reporting requirements set forth in the Plan.

**Classification of the Equity and Subordinated Claims Trust.**

Similar to the Unsecured Creditors' Trust, the Equity and Subordinated Claims Trust is intended to be treated for federal income tax purposes as a "liquidating trust" for the benefit of holders of Allowed Claims in Class 5 and Allowed Equity Interests in Class 6, whether Allowed on or after the Effective Date.   Generally, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes.  The IRS, in Rev. Proc. 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Equity and Subordinated Claims Trust has been structured with the intention of complying with most of those criteria.

Pursuant to the Plan, and in conformity with the IRS revenue procedure, all parties (including Debtors, the Reorganized Debtors, the Equity and Subordinated Claims Trustee, and the holders of beneficial interests in the Equity and Subordinated Claims Trust) are required to treat the Equity and Subordinated Claims Trust, as a grantor trust of which the holders of Allowed Claims in Class 5 and Allowed Equity Interests in Class 6 are the owners and grantors. Accordingly, the following discussion assumes that the Equity and Subordinated Claims Trust would be so treated for federal income tax purposes.  However, no ruling has been requested

from the IRS concerning the tax status of the Equity and Subordinated Claims Trust as a grantor trust.   If the Equity and Subordinated Claims Trust fails to qualify as a liquidating trust, it may be treated as a partnership.   If the Equity and Subordinated Claims Trust is treated as a partnership, but not as a publicly traded partnership, the Equity and Subordinated Claims Trust should not be subject to tax and each holder of a beneficial interest would be required to take into account its allocable share of each item of income, gain, deduction or loss recognized by the Equity and Subordinated Claims Trust.

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Equity and Subordinated Claims Trustee, and grantors of the Equity and Subordinated Claims Trust) will treat the transfer of assets (other than those transferred to the Disputed Equity and Subordinated Claims Reserve) to the Equity and Subordinated Claims Trust in accordance with the terms of the Plan, as a transfer of such assets directly to the holders of Allowed Claims in Class 5 and Allowed Equity Interests in Class 6, followed by the transfer of such assets by such holders to the Equity and Subordinated Claims Trust.   Accordingly, all parties must treat the Equity and Subordinated Claims Trust as a grantor trust of which such holders are the owners and grantors.   Each holder of an interest in the Equity and Subordinated Claims Trust will be required to report on its federal income tax return(s) the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Equity and Subordinated Claims Trust, which may include the holder's allocable share of Equity and Subordinated Claims Trust expenses paid by the Reorganized Debtor.   The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The federal income tax obligations of a holder of an interest in the Equity and Subordinated Claims Trust are not dependent upon the trust distributing any cash or other proceeds. Therefore, a holder of an interest in the Equity and Subordinated Claims Trust may incur a federal income tax liability regardless of the fact that the Equity and Subordinated Claims Trust has not made, or will not make, any concurrent or subsequent distributions to the holder.  If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it, the holder may be entitled to a subsequent or offsetting loss.

As soon as possible after the Effective Date, the Equity and Subordinated Claims Trustee will apprise the holders, in writing, of the value of the Equity and Subordinated Claims Deferred Payment.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Equity and Subordinated Claims Trustee, and owners of the Equity and Subordinated Claims Trust) for all federal income tax purposes.

The Equity and Subordinated Claims Trustee will file with the IRS returns for the Equity and Subordinated Claims Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The Equity and Subordinated Claims Trustee will also send to each holder of an interest in the Equity and Subordinated Claims Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

A holder of Allowed Claims in Class 5 and Allowed Equity Interests in Class 6 should consult his or her own tax advisor regarding the tax consequences of holding an interest in the Equity and Subordinated Claims Trust.

**<u>Classification of the Disputed Equity and Subordinated Claims Reserve.</u>**

The Disputed Equity and Subordinated Claims Reserve will be treated as holding those assets in the Equity and Subordinated Claims Trust not owned by holders of Allowed Claims in Class 5 and Allowed Equity Interests in Class 6. In addition, the Equity and Subordinated Claims Trustee will maintain in the Disputed Equity and Subordinated Claims Reserve any distributable amounts required to be set aside on account of Disputed Claims in Class 5 and Disputed Equity Interests in Class 6. Distributions from the Disputed Equity and Subordinated Claims Reserve, net of certain expenses, shall be made to holders of Disputed Claims in Class 5 and Disputed Equity Interests in Class 6 when such Claims or Interests are subsequently Allowed in the same manner as such amounts would have been distributable had the Disputed Claims or Equity Interests been Allowed Claims or Allowed Equity Interests as of the Effective Date, together with any net earnings related thereto and to holders of Allowed Claims or Allowed Equity Interests (whether Allowed on or after the Effective Date) when any Disputed Claims in Class 5 or Disputed Equity Interests in Class 6 are subsequently disallowed.

The Debtors and Disputed Equity and Subordinated Claims Trustee intend to elect to treat it as a "disputed ownership fund" taxable as a qualified settlement fund as described within Treasury Regulation section 1.468B-9(a), and to the extent permitted by applicable law to report consistently for state and local income tax purposes. Accordingly, the Disputed Equity and Subordinated Claims Reserve will be treated for tax purposes as fully taxable on a current basis with respect to any income allocable to assets it holds and all distributions pursuant to the Plan will be made net of provisions for taxes and subject to withholding and reporting requirements set forth in the Plan.

**Backup Withholding**.

Certain payments to a U.S. holder pursuant to the Plan may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XI. LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, in order for a plan to be confirmed, each impaired class of claims (unless each such member has accepted the Plan) must receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that each creditor would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

If these bankruptcy cases were converted to Chapter 7 cases, a trustee would be appointed to liquidate the assets of each of the Debtors. In liquidation under Chapter 7, before

creditors receive any distributions, additional administrative expenses involved in the appointment of a trustee, including the statutory fee to a chapter 7 trustee under Section 326(a), and attorneys, accountants and other professionals to assist a trustee, would cause a substantial increase in the administrative expenses of the Debtors' estates. The Debtors' assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the Chapter 7 liquidation of the Debtors.

The Liquidation Analysis is attached as Exhibit "D-3" to this Disclosure Statement.

Due to the uncertainty of the consideration to be received from the sale by a Chapter 7 trustee of the Debtors' Assets and the possibility of disputes over the distribution to be made by a Chapter 7 trustee, it is impossible at this time to predict precisely how the proceeds of the liquidation under Chapter 7 would be distributed to the respective holders of Claims against the Debtors in chapter 7 bankruptcy cases. However, it is clear that if the Debtors were forced to liquidate under chapter 7, the liquidation of the Debtors' assets would produce less value for distribution to all creditors than is recoverable under the Plan in the chapter 11 bankruptcy cases. In the opinion of the Debtors, the recoveries available in Chapter 7 liquidation would not afford holders of Claims as great a return as that in the proposed Plan. Accordingly, the Plan provides a value of at least equal to the value of the distribution that each creditor or interest holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

## XII. CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A. **VOTING AND OTHER PROCEDURES**

A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

After notice and a hearing, on _____, 2006, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject (including whether to change their acceptance or rejection of) the Plan.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims that are impaired under the terms and provisions of a Chapter 11 plan and are to receive distributions thereunder are entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims and interests will not receive or retain any property under a Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims or interests are unimpaired under a Chapter 11 plan are deemed to have accepted the Plan and also are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of:

(x)    claims as acceptance by creditors actually voting in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims; and

(y)     Equity interests (such as the shareholders) as acceptance by interest holders in that class actually voting that hold at least two-thirds in number of the shares of the common stock of a debtor.

Insofar as Class 6 is concerned, the Senior Lenders will not vote any equity interest it holds or is deemed to hold.    The current officers and directors of the Debtors and their families hold in the aggregate less than five (5%) of the outstanding stock in OCA.  Palmisano holds approximately 3.83% of the outstanding stock in OCA.  Bart Palmisano, Jr., as beneficial owner, holds approximately, 1.5% of the outstanding stock in OCA.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

Any creditor in an impaired Class (i) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of claim on or before the Bar Date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote.  Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are allowed solely for the purpose of voting pursuant to an order of the Bankruptcy Court.  The Plan Proponents believe that any class of impaired, secured claims that does not vote to accept or reject the Plan is deemed to accept the Plan, and intend to seek such a determination at the Confirmation Hearing.

If a Class of Claims rejects the Plan or is deemed to reject the Plan, the Proponent has the right to request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the nonacceptance of such plan by one or more impaired classes of claims. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

If one or more of the Classes entitled to vote on the Plan votes to reject the Plan, the Plan Proponents intend to request confirmation of the Plan over the rejection of the Plan by such Class or Classes and will demonstrate that the Plan complies with the best interest of creditors test with respect to any such Class or Classes.

After carefully reviewing this Disclosure Statement, including any Exhibits, each holder of an Allowed Claim entitled to vote may vote whether to accept or reject this Plan. A ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a ballot or ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your ballot(s) by fax, email or mail to the "Voting Agent" as follows:

> Kurtzman Carson Consultants, LLC
> Attn: OCA Ballot Processing
> 12910 Culver Blvd, Suite I
> Los Angeles, CA 90066
> Telephone: (866) 381-9100

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

ANY OBJECTIONS TO THE CONFIRMATION OF THIS PLAN MUST BE <u>FILED</u> IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please call the Voting Agent at the telephone number set forth above.

**B.**     <u>**DISCLAIMERS AND ENDORSEMENTS**</u>

This Disclosure Statement contains information about the Plan. Creditors and the holders of Equity Interest are urged to study the text of the Plan carefully to determine the Plan's impact on their claims or interests and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan shall be deemed an admission or statement against interest that can be used against the Plan Proponents in any pending or future litigation. Any reference to creditor claims in this Disclosure Statement is not an admission that such creditors hold Allowed Claims as defined in the Bankruptcy Code, or shall be an admission with respect to the validity, priority, or extent of any alleged lien, claim, priority or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

**C.**     <u>**THE CONFIRMATION HEARING**</u>

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the accompanying Plan.  The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying notice before the Honorable Jerry A. Brown, United States Bankruptcy Judge, at the United States Bankruptcy

Court for the Eastern District of Louisiana, 500 Poydras Street, 741A Hale Boggs Federal Bldg.,

New Orleans, Louisiana 70130.  The Confirmation Hearing may be adjourned from time to time

by the Bankruptcy Court without further notice, except for an announcement of the adjourned

date made at the Confirmation Hearing. Any objection to confirmation must be made in writing

and specify in detail the name and address of the objector, all grounds for the objection and the

amount of the Claim or a description of the interest in the Debtor held by the objector, and must

be made in accordance with any pre-trial or scheduling orders entered by the Bankruptcy Court.

Any such objection must be filed with the Bankruptcy Court and served so that it is received by

the Bankruptcy Court, and the following on or before the date and time set forth in the

accompanying notice:

> Counsel to the Debtors:
> **Heller, Draper, Hayden, Patrick, & Horn, LLC**
> William H. Patrick, III, La. Bar Roll No. 10359
> Tristan Manthey, La. Bar Roll No. 24539
> 650 Poydras Street, Suite 2500
> New Orleans, LA  70130-6103
> Telephone: (504) 568-1888
> Fax: (504) 522-0949
>
> Counsel to the Unsecured Creditors Committee:
> **Jenner & Block, LLP**
> Mark K. Thomas
> One IBM Plaza
> Chicago, IL  60611-7603
> Telephone: (312) 312-9350
> Fax: (312) 923-2935
>
> -and-
>
> **Steffes, Vingiello & McKenzie, LLC**
> William E. Steffes
> 13702 Coursey Boulevard, Building 3
> Baton Rouge, LA 70817
> Telephone: (225) 751-1571
> Fax: (225) 751-1998

Counsel to the Senior Lenders:
**Milbank, Tweed, Hadley & McCloy, LLP**
Dennis F. Dunne
Abhilash M. Raval
1 Chase Manhattan Plaza
New York, NY 10005-1413
Telephone: (212) 530-5123
Fax: (212) 822-5123

Counsel to the Equity Committee:
**Bell, Boyd & Lloyd LLC**
Carmen H. Lonstein
70 W. Madison St., Ste. 3100
Chicago, IL 60602-4207
Telephone. (312) 807-4397
Fax: (312) 827-7073

-and-

**Adams & Reese, LLP**
Robin B. Cheatam
701 Poydras Street
Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
Fax: (504) 585-0411

## D.     CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors that are impaired under the plan.

## E.     UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable". The Bankruptcy Code establishes "cram down" tests for secured creditors and unsecured creditors, as follows:

1. **SECURED CREDITORS**

Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments (x) totaling at least the allowed amount of the secured claim and (y) having a present value at least equal to the value of the secured creditor's collateral, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with the secured creditor's lien to attach to the proceeds of the sale and such lien on proceeds is treated in accordance with clause (i) or (ii) of this subparagraph.

2. **UNSECURED CREDITORS**

Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan, and the "best interest" test is met so that each impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a Chapter 7 case.

3. **INTEREST HOLDERS**

Either (i) each impaired interest holder receives or retains under the plan property of a value equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value

of such interest or (ii) no junior interest receives or retains any property, and the "best interest"

test is met so that each impaired interest holder recovers at least what that interest holder would

receive if the case was converted to a Chapter 7 case.

4. **NO UNFAIR DISCRIMINATION**

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair

discrimination" with respect to the claims of an impaired, nonaccepting class. While the

existence of "unfair discrimination" under a plan of reorganization depends upon the particular

facts of a case and the nature of the claims at issue, in general, courts have interpreted the

standard to mean that the impaired, nonaccepting class must receive treatment under a plan of

reorganization which allocates value to such class in a manner that is consistent with the

treatment given to other classes with similar legal claims against the debtor.

The Plan Proponents believe that the Plan and the treatment of all Classes of Claims and

Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual

confirmation of the Plan.

F.     **FEASIBILITY**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by

liquidation or the need for further financial reorganization unless the liquidation of the debtor is

provided for in the plan.  The liquidation of the Debtors is not provided for in the Plan and the

Debtors believe that following the confirmation of the Plan it is not likely that such confirmation

will be followed by liquidation or the need for further financial reorganization.

G.     **BEST INTEREST TEST**

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that

the plan is in the best interests of all classes of creditors and equity security holders impaired

under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or interest holder would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. As reflected in the discussion above, the Plan provides a value at least equal to the value of the distribution that each creditor or interest holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

**H.     POST CONFIRMATION BOARD OF DIRECTORS AND MANAGEMENT**

Upon the consummation of the Plan, the Board of Directors of the Reorganized OCA shall initially consist of seven (7) members, one of who shall be the permanent CEO of Reorganized OCA. The Senior Lenders who under the Plan will receive all of the New Common Stock of the Reorganized OCA will select the remaining six (6) members. The holders of the New Common Stock will determine the initial size and composition of the Boards of Directors of the Subsidiaries. The identities of these parties will be specified in the Plan Supplement, if available.

**I.     STATUS OF REORGANIZED OCA**

As set forth in the Plan, Reorganized OCA shall become a private (non-reporting) company.

**J.     CHARTER OF REORGANIZED DEBTORS**

The charter documents for the Reorganized Debtors, including the certificates of incorporation and by-laws, shall be in form satisfactory to the Senior Lenders and will be filed with the Plan Supplement. These documents of the Reorganized Debtors will contain such

provisions as are determined by the Senior Lenders to be necessary to maintain the private company status of the Reorganized Debtors.

## K.     CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A.     <u>General Considerations</u>

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the various Claims against and Equity Interests in the Debtors. Reorganization of the Debtors under the proposed Plan also avoids the potentially adverse impact of a liquidation on its employees, the Affiliated Practices and many of the Debtors' suppliers, and trade vendors.

B.     <u>Certain Bankruptcy Considerations</u>

1.     <u>Risk Of Liquidation Of Debtors' Estates</u>

If the Plan is not confirmed and consummated, there can be no assurance that Debtors' Chapter 11 Case will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to holders of Claims and Equity Interests as the terms of the Plan. If a liquidation or protracted reorganization were to occur, the

Distributions to holders of Allowed Claims and holders of Allowed Equity Interests under the Plan would be drastically reduced, if not completely eliminated. Debtors believe that in a liquidation under chapter 7, additional administrative expenses of a chapter 7 trustee and such trustee's attorneys, accountants, and other professionals would cause a substantial diminution in the value of Debtors' Estate. In addition, certain additional Claims would arise by reason of the liquidation under chapter 7 and from the rejection of unexpired leases and other executory contracts in connection with the cessation of the Debtors' operations. This will negatively impact on the amount of distributions, if any, to holders of Allowed Claims and holders of Allowed Equity Interests.

The Debtors have has prepared a liquidation analysis that is premised on a hypothetical liquidation in a chapter 7 case. This liquidation analysis is attached as Exhibit D-3 hereto. In the analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. Based on this analysis, it is likely that a liquidation of the operations of the Debtors would produce no distributions to holders of Claims or Equity Interest.

2. <u>Risk of Non-Confirmation of Plan; Feasibility</u>

Even if all impaired Classes of Claims and Equity interests accept or are deemed to have accepted the Plan, or, with respect to a Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under Sections 1129(a) and (b) of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code requires, among other things, a demonstration that the confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtors and that the

value of distributions to creditors and equity security holders who vote to reject the Plan not be less than the value of distributions such creditors and equity security holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although Debtors believes that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

        3.    <u>Risk of Non-Occurrence of Effective Date</u>

The occurrence of the Effective Date is conditioned upon the happening of certain events.  There can be no assurance, however, that all of these events will occur or that those that do not occur will be waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court there can be no assurance that the Effective Date will occur.

        4.    <u>Uncertainty Regarding Objections to Claims</u>

The Plan provides that certain objections to claims can be filed with the Bankruptcy Court after the Effective Date. A Claimant may not know that its claim will be objected to until after the Effective Date.

        C.    <u>Other Risk Factors</u>

        1.    <u>Uncertainty Regarding the Affiliated Practices</u>

As noted above, there is considerable litigation with, and defaults by, Affiliated Practices. The litigation hinges primarily on the enforceability of the BSA's.  As with any litigation, there can be no certainty as to the outcome thereof, and the value of OCA and the ultimate value of distributions to creditors and others may be materially affected by the results of that litigation.

        2.    <u>Variances From Projections For Reorganized Debtors</u>

The Projections accompanying this Disclosure Statement reflect the most recent data collected in connection with the Reorganized Debtors' business plan.  The business plan upon

which the Projections are based relies upon the success of a business strategy that has not been tested for the Reorganized Debtors. There can be no assurance that such strategy will be successful or, even if successful, that it will have the effects that are reflected in and anticipated by the Projections. Although the Debtors believe that the Projections are achievable if all assumptions are met, and that those assumptions are reasonable, there can be no assurance that the results set forth in such Projections will be obtained. This could result in a subsequent bankruptcy, and possible liquidation of the Reorganized Debtors.

3.    Adverse SEC Action after the Effective Date

It is possible that following the Effective Date the Securities and Exchange Commission may take adverse action relating to Reorganized OCA and /or one or both of the trusts created under the Plan. Such adverse action could have a material negative effect on any distributions to Allowed Claims and Allowed Equity Interests.

L.    **FUTURE OPERATIONS AND FEASIBILITY OF PLAN AND VALUATION**

The payments under the Plan to creditors holding Allowed Claims are to be made from the revenues generated from the future business operations of the debtors and the $10,000,000 first priority secured (revolving) working capital facility to be obtained from the Senior Lenders. Exhibit "D-2" attached hereto, entitled "Valuation" sets forth the Reorganized Value" of the Reorganized Debtors upon their emergence from bankruptcy in the estimated amount of $94 million. The Equity Committee (and perhaps other parties in interest) believes the Debtors' Reorganized Value is substantially understated due to the alleged understatement of certain assets and that the Plan is not confirmable. Financial Projections prepared by CDG on behalf of the Debtors are attached hereto as Exhibit "D-4". The assumptions for the Financial Projections

are set forth on Exhibit "D-4".  It is not a specific requirement of the Plan that a specified number of Current BSA's enter SSA's.

## XII.    CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan are preferable to any alternative because the Plan provides the best alternative for resolving the Debtors' financial difficulties. Any other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Plan Proponents urge holders of impaired Claims and Equity Interests to vote in favor of the Plan.

The Official Committee of Unsecured Creditors supports the Plan and urges all holders of Class 4 unsecured Claims to vote in favor of the Plan.

The Official Committee of Equity Holders does not support the Plan and urges all equity holders to vote against the Plan.

Dated:  July 24, 2006

**DISCLOSURE STATEMENT FILED BY:**

OCA, INC., ON BEHALF OF ITSELF AND DEBTOR
SUBSIDIARIES, AS DEBTORS IN POSSESSION


BY:    /s/ _Michael Greis_____
          MICHAEL GRIES
          CHIEF REORGANIZATION OFFICER and
          INTERIM CHIEF EXECUTIVE OFFICER

Respectfully submitted:

/s/ William H. Patrick, III
William H. Patrick III, La. Bar No. 10359
Douglas S. Draper, La. Bar No. 5073
**HELLER, DRAPER, HAYDEN,
    PATRICK & HORN, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, LA  70130-6103
Telephone: 504-568-1888
Fax: 504-522-0949
**Counsel for the Debtors
and Debtors in Possession**