# EXHIBIT "D-1"

## RETAINED CLAIMS AND CAUSES OF ACTION

(a)     Retained Claims and Causes of Action

Except as otherwise specifically provided in the Plan, the Reorganized Debtors (or the Unsecured Creditors' Trust Trustee, with respect to (and only with respect to) any Transferred Avoidance Actions) shall retain all rights to commence and pursue, as appropriate, any and all Claims and Causes of Action (as those terms are defined in the Plan), whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, and including but not limited to, the Claims and Causes of Action specified in the Plan or the Plan Supplement. Due to the size and scope of the Debtors' business operations and the multitude of business transactions therein, there may be numerous other Claims and Causes of Action that currently exist or may subsequently arise, in addition to the Claims and Causes of Action identified below. The Debtors are also continuing to investigate and assess which Claims and Causes of Action may be pursued. The Reorganized Debtors do not intend, and it should not be assumed that because any existing or potential Claims or Causes of Action have not yet been pursued by the Debtors or do not fall within the list below, that any such Claims or Causes or Action have been waived. Under the Plan, the Reorganized Debtors retain all rights to pursue any and all Claims and Causes of Action to the extent the Reorganized Debtors deem appropriate (under any theory of law or equity, including, without limitation, the Bankruptcy Code and any applicable local, state, or federal law, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases) except as otherwise specifically provided in the Plan. The Debtors' Retained Claims and Causes of Actions (which may be exercised and /or transferred to the Unsecured Creditors' Trust, and/ or the Unsecured Creditors' Trust Trustee, as provided in the Plan), include, without limitation:

i.      Causes of Action, including Transferred Avoidance Actions, as defined in the Plan;

ii.     Objections to Claims and Equity Interests under the Plan

iii.    Any and all litigation, Claims, or Causes of Action of the Debtors and any rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, relating to or arising from the acts, omissions, activities, conduct, Claims, or Causes of Action listed or described in the Plan, Plan Supplement, Disclosure Statement, this Exhibit or the Confirmation Order, and including, by way of illustration only, and not limitation, all defenses, rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law , equity, or otherwise, relating to or arising from arising from connected to or related to (x) any assumed BSA's, Current BSA's, Defaulted BSA's, as defined in the Plan, against any Affiliated Practices; (y) Palmisano; OCAI; Gimili, LLC, Gimili Enterprises, LLC, Hector Bush, BPJ or any affiliate thereof and (z) the acts omissions or conduct of any current or former director or officer of the Debtors.

iv.     Any other litigation, Claims or Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets or operations

or otherwise affecting the Debtors, including, without limitation, possible Claims or Causes of Action against the following types of parties for the following types of Claims:

- Possible Claims against vendors, customers or suppliers for warranty, indemnity, back charge, set-off issues, overpayment or duplicate payment issues and collections, accounts receivables matters;
- Possible Claims against utilities or other persons or parties for wrongful or improper termination of services to the Debtors;
- Possible Claims for any breaches or defaults arising from the failure of any persons or parties to fully perform under contracts with the Debtors before the assumption or rejection of the subject contracts;
- Mechanic's lien Claims of the Debtors;
- Possible Claims for deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, factor or other person;
- Possible Claims for damages or other relief against any party arising out of employee, management or operational matters or any acts, omissions or conduct connected thereto;
- Possible Claims for damages or other relief against any party arising out of financial reporting or any acts, omissions or conduct connected thereto;
- Possible Claims for damages or other relief against any party arising out of environmental, asbestos and product liability matters;
- Actions against insurance carriers relating to coverage, indemnity or other matters;
- Counterclaims and defenses relating to notes or other obligations;
- Possible Claims against local, state and federal taxing authorities (including, without limitation, any Claims for refunds of overpayments);
- Possible Claims against attorneys, accountants or other professionals relating to services rendered to the Debtors (whether before or after the Petition Date);
- Contract, tort, or equitable Claims which may exist or subsequently arise;
- Any Claims of the Debtors arising under section 362 of the Bankruptcy Code;
- Equitable subordination Claims arising under section 510 of the Bankruptcy Code or other applicable law;
- Claims relating to any of the Debtors' mergers or acquisitions;
- Any and all Claims against Ernst & Young arising out of Ernst & Young's audit of the financial statements of Debtors or other professional services rendered to Debtors:
- Any and all Claims arising under chapter 5 of the Bankruptcy Code and all similar actions under applicable law, including, but not limited to, preferences under section 547 of the Bankruptcy Code, turnover Claims arising under sections 542 or 543 of the Bankruptcy Code, and fraudulent transfers under section 548 of the Bankruptcy Code, including, but not limited to, fraudulent transfer claims against (collectively, the "Group of Doctors"):

       Amley & Amley Orthodontists, P.A.;
       Randall K. Bennett, D.D.S., M.S., P.C.;

Paul J. Giorgetti, Jr., D.D.S., P.A.;
Manasse Orthodontics, Ltd.;
Gerald N. Smernoff, D.D.S., P.A.;
Daniel B. Snead, D.M.D., P.A.;
Tracey Dental Corporation;
Stuart Kimmel, D.D.S., P.A.;
Mark P. Weaver, D.D.S., P.A.;
R.A. McLendon, D.D.S., P.L.L.C.;
Cary A. Williams, D.M.D., P.A.;
Thomas E. Christie, D.D.S., P.C.;
Scornavaca Orthodontics P.A.;
Barni Dental, Inc.;
Albert Lucas, D.M.D., P.A.;
Waycross Pediatric Dental Service, P.C.;
Orthodontic Team of Sumter, P.A.;
Thomas H. Cartledge, III, D.D.S., M.S., P.A.;
Eugene Humphries, D.D.D., M.S., Inc.;
Tal Jergensen, D.D.S., P.C.;
Drs. Johnston & Lawrence, P.L.L.C.;
Joel Martinez, D.D.S., Inc.;
Willis Maxwell, D.D.S., P.C.;
Kendall Miller, D.D.S., M.S., P.A.;
Birmingham Orthocare, P.C.;
Smiley Dental Associates, Inc.;'
Douglas E. Smith, D.D.S., P.C.;
Partner in "Pikes Peak Orthodontic Specialists,", f/k/a Dr. Scott T. Suter, D.D.S., M.S., P.C.;
Trawick Orthodontic Center;
David Yarbourough, D.D.S., P.C.; and
Drs. Edward Amley, Robert Amley, Randall K. Bennett, Paul J. Giorgetti, Jr., Robert J. Manasse, Gerald N. Smernoff, Daniel B. Snead, Stephen Tracey, Stuart Kimmel, Mark P. Weaver, Ray A. McLendon and Cary A. Williams, Dr. Thomas Christie, Dr. Ronald Scornavaca, Dr. Judith Mamah, Dr. Frieda Moore, Dr. Albert Lucas, Dr. William Hurst, Dr. Timothy Bridges, Dr. Thomas Cartledge, Dr. Eugene Humphries, Dr. Tal Jergensen, Dr. Michael Johnston, Dr. Timothy Lawrence, Dr. Joel Martinez, Dr. Willis Maxwell, Dr. Kendall Miller, Dr. Ronald Phillip, Dr. Kim Smiley, Dr. Douglas Smith, Dr. Scott Suter, Dr. Stephen Trawick, Dr. David Walker, Dr. David Yarbourough; Frieda Grimes Moore, D.D.S., David E. Walker, Jr., .D.D.S.

whether arising out of that certain Confidential Settlement. Agreement and General Mutual Release of All Claims dated as of December 20, 2005, by and among (x) the Group of Doctors and (y) Orthalliance, Inc., Orthalliance New Image, Inc., OCA, Inc., formerly known as Orthodontic Centers of America, Inc.,

and Pedoalliance, Inc., on behalf of themselves and for all their respective subsidiaries and affiliates, or otherwise.

(b)     Preservation of All Causes of Action Not Expressly Settled or Released

Unless a claim or cause of action against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Reorganized Debtors expressly reserve such claim or cause of action for later adjudication by the Reorganized Debtors (or the Unsecured Creditors' Trust Trustee, with respect to any Transferred Avoidance Actions) , and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Claims or causes of action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Reorganized Debtors expressly reserve the right to pursue or adopt any Claims of the Debtors or the Debtors in Possession, as trustees for or on behalf of the creditors (and any defenses) not so specifically and expressly waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or codefendants in such lawsuits.

Any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised or settled, be the subject of an action or claim or demand after the Effective Date, whether or not (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) such Entity's proof of Claim has been objected to; (iii) such Entity's Claim was included in the Debtors' Schedules; or (iv) such Entity's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

## EXHIBIT "D-2"

## VALUATION

The Debtors have been advised by CDG with respect to the value of the Reorganized Debtors. CDG has undertaken its valuation analysis for the purpose of determining the value of the Reorganized Debtors upon emergence from bankruptcy (the "Reorganization Value").

The Reorganization Value is as of an assumed Effective Date of September 30, 2006 and is based on an analysis undertaken by CDG in June 2006. The Reorganization Value includes the "going concern" or "Enterprise Value" of the Debtors' business plus estimates of the net present value of "Non-Core" assets including potential tax refunds, proceeds from insurance claims, and recoveries from pending and threatened litigation. Based upon the foregoing assumptions, and based upon advice from CDG, the Reorganization Value of the Reorganized Debtors, for purposes of the Plan, is within the range of $73 to $115 million. Based on the midpoint of that range, the Reorganization Value is estimated at $94 million.

Based upon the Reorganization Value set forth above, and the Working Capital and the Term Loan Facility, the Debtors have employed an assumed equity value of $27.7 million after giving effect to the Plan.

The foregoing valuation is based on a number of assumptions, including a successful reorganization of the Debtors' business in a timely manner, the achievement of the forecasts reflected in the financial projections (including monetizing "Non-Core" assets at the amounts currently estimated), and the Plan becoming effective in accordance with its terms. The valuation range was based upon the projected third quarter of 2006 through 2009 operating results.

The estimated Reorganization Value does not purport to be an appraisal or necessarily reflect the value that may be realized if assets are sold. Such estimate reflects the application of various valuation techniques and does not purport to reflect or constitute an appraisal, a liquidation value or an estimate of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business such as the Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. **AS A RESULT, THE ESTIMATE OF REORGANIZATION VALUE SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ANY ACTUAL OUTCOME, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THAT SET FORTH HEREIN. BECAUSE SUCH ESTIMATE IS INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, CDG, OR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR ITS ACCURACY.**

A.          **METHODOLOGY**

In preparing its valuation, CDG performed a variety of analyses and considered a number of factors including relying on other professionals employed by the Debtors. The summary of the analysis and factors contained herein does not purport to be a complete description of the analysis and factors considered.

In determining the Enterprise Value of the Reorganized Debtors, CDG primarily relied upon comparable company trading and transaction multiples and discounted cash flows. In addition, factors that were considered in determining value included but were not limited to current economic conditions, risk factors associated with the projections, and the degree of impact an individual value driver had on overall value.

CDG did not consider any one analysis or factor to the exclusion of any other analysis or factor. Accordingly, CDG believes that its valuation must be considered as a whole and that selecting portions of its analyses, without considering all such analyses, could create a misleading or incomplete view of the processes underlying the preparation of its findings and conclusions. In its analyses, CDG made numerous assumptions with respect to the Debtors' general business, economic, market and financial conditions and other matters, many of which are beyond the Debtors' control.

In determining estimated Reorganization Value which includes the value of the "Non-Core" Assets, CDG made inquiries of the Debtor's employees and Board members with responsibilities for these asset categories and participated in conversations with and reviewed analysis prepared by professionals (both financial and legal) retained by the Debtors to assist with these matters. CDG then made judgments as to the weight to be afforded to and the significance and relevance of each analysis and factor.

In addition, analyses relating to the value of the Debtors' business or "Non-Core" Assets do not purport to be appraisals or to reflect the prices at which such business or "Non-Core" Assets will trade.

**THE VALUATION REPRESENTS THE ESTIMATED REORGANIZATION VALUE OF THE REORGANIZED DEBTORS AND DOES NOT NECESSARILY REFLECT THE VALUE THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.**

*Enterprise Value of OCA Inc.*

CDG believes the Enterprise Value of OCA to be within the range $46 million to $68 million. In determining the Enterprise Value of OCA, CDG prepared a variety of analyses based on generally accepted valuation techniques and considered many factors. CDG's valuation must be considered as a whole and conclusions based on portions of the analyses would create a misleading or incomplete assessment of OCA's Enterprise Value. CDG's estimate of OCA's Enterprise Value was primarily based on the following three valuation methodologies:

- analysis of comparable trading multiples
- analysis of comparable transaction multiples
- discounted cash flow analysis

The estimate of OCA's Enterprise Value also included determining the Debtors' ability to enforce the repayment of, as well as, the individual practice's ability to satisfy repayment of the Capital Accounts. The range of value of the Capital Accounts was also factored into the Enterprise Value generated by the analysis of comparable trading multiples and comparable transaction multiples. The cash flow generated by Capital Accounts was included in the discounted cash flow analysis.

## 1.    Comparable Trading Multiples

The analysis of comparable trading multiples involves identifying a group of publicly traded companies that are representative of the industry in which OCA operates and then calculating multiples of various operating results such as revenues, EBITDA and EBIT to the Enterprise Value of these companies. Enterprise values are based on leverage and market value of equity. This analysis relies on the assumption that the value the market places on the equity and the book value of the debt of comparable companies, given certain operating statistics, is indicative of the value of the Debtors' current and future prospects. The multiples establish a benchmark for valuing comparable assets. The ranges of multiples derived are then applied to OCA's operating results to yield a range of implied enterprise values of OCA.

In selecting comparable companies, CDG searched for companies with lines of business, market size, growth prospects and operational characteristics similar to OCA. Truly comparable companies are very often difficult to obtain and such analysis are limited by sample size and availability of market values and meaningful operating data.

In estimating the Enterprise Value under this approach, CDG selected a range of EBITDA multiples ranging from 4.5x to 5.5x based on the valuation multiples of companies that operate in a similar line of business as OCA. These multiples reflect the last twelve months of their most recent 2006 operating results and forward multiples, where available, for the publicly traded comparable group. The range of multiples derived was then applied to OCA's forecasted financial results to yield a range of implied enterprise values. Since the ranges of multiples derived were applied to OCA's forecasted financial results, CDG placed more emphasis on the forward multiples. The high and low values were used to reflect OCA's relative operating performance and immediate growth prospects as compared to the comparable trading companies.

## 2.    Comparable Transaction Multiples

The analysis of comparable transaction multiples involves examining a group of acquisitions that occurred within OCA's industry and then calculating multiples of various operating statistics such as revenues and EBITDA to the actual value of the transaction. The transaction value represents the market value of comparable assets given certain operating statistics and is based on the total amount of consideration a buyer pays to attain the comparable

asset. Transaction multiples provide an indication of enterprise value given certain operating metrics. The ranges of multiples derived are then applied to OCA's operating results to yield a range of implied enterprise values of OCA.

CDG selected transactions where target companies had similar lines of business, market size, growth prospects and operational characteristics to OCA. Only acquisitions through asset sales and purchase of total or majority of equity were selected.

In estimating OCA's Enterprise Value with this approach, CDG analyzed five acquisitions in OCA's line of business and concluded that the appropriate ranges of multiples for OCA are 5.0x to 6.0x EBITDA. The ranges were then applied to OCA's forecasted financial results. The median and low values were used to reflect OCA's relative operating performance and immediate growth prospects as compared to the target companies.

3.    **Discounted Cash Flow Analysis**

Discounted cash flow analysis involves determining the present value of OCA's future debt-free operating cash flows and the terminal value at the end of the projected period. This analysis is a "forward looking" approach and relies on OCA's ability to project future cash flows accurately. The expected future cash flows are discounted by the weighted average cost of capital which is determined by using an estimated cost of debt commiserate to OCA's credit position and an estimated cost of equity calculated through the capital asset pricing model.

The projected debt-free operating cash flows were provided by OCA's management. The terminal value is calculated using two methods: EBITDA exit multiple and Gordon growth method. The EBITDA exit multiple is calculated by utilizing an estimated terminal year EBITDA multiple ranging from 4.5x to 5.5x and applying it to OCA's projected EBITDA. The Gordon growth method assumes perpetual growth of 1% to 5% in debt-free cash flows. The projected debt-free cash flows and terminal values are then discounted to the present at OCA's estimated post-restructuring weighted average cost of capital in the range of 16% to 18%.

*Value of the" Non-Core" Assets*

CDG believes the value of the "Non-Core" Assets to be within the range $27 million to $47 million. The Company expects to receive payments from its insurance company for out-of-pocket expenses of approximately $1.6 million and may be able to receive payments from "business interruption" insurance of between $0.9 million and $3.3 million as a result of Hurricanes Katrina, Rita and Wilma.

Based on discussion with professionals retain by OCA, the Company anticipates filing for and receiving a tax refund as a result of losses incurred from Hurricanes Katrina, Rita and Wilma approximating $14.0 million and a FY2005 state income tax refund of approximately $0.7 million. The Company is also considering the magnitude of adjustments, if any, that should be made to 2001 and prior year financial statements, since the 2001 tax return is still open for amending its previously filed return through August 28, 2006. The Company estimates that any

such adjustments to the 2001 return could decrease taxable income and generate a potential refund of up to $9.0 million.

The Company believes it will achieve value in connection with its litigation with the defaulting and inactive practices of $10 million to $20 million. This range of value is an estimate only. Favorable results in the litigation or in settlement may result in a greater recovery than $10 million to $20 million, and unfavorable results in litigation or in settlement may result in a smaller recovery than $10 million $20 million. For purposes of the estimate of this paragraph, the Debtors have allocated amounts owed between Affiliated Practices currently performing under their BSA's and the Inactive and Litigating Practices. With respect to amounts owed by Affiliated Practices currently performing, the value is included in the Enterprise Value of OCA, as described in this Exhibit D-2, within the category of Capital Accounts (estimated at between $12 million). With respect to the amounts owed by Inactive and Litigating Practices, the estimated value is included in the category of value to be realized from litigating or settling with those practices (estimated at between $10 million and $20 million). These estimated values are subject to challenge and negotiation and are not specifically distinguishable from the value of the related assets, the new SSA's and the litigation itself. The estimated recovery from the litigation with defaulting practices is net of litigation cost, but prior to discounting for time value.

The Debtors have also included in its Plan motions to assume the contracts with the inactive and litigating contracts, which is a component of litigation with the inactive and defaulting practices. Favorable results in connection with the efforts to assume the contracts, or favorable settlements with practices in connection with those efforts, could increase the value of the claims against the litigating and inactive practices or increase the value of the core business of the Company. At the present time, pending further results in that litigation, the Company cannot place a value on the efforts to assume the contracts in the Plan.

OCA has both a long-term receivable from as well as an equity investment in OCA International ("OCAI"). The face value of the receivable is $12.5 million and the equity interest, which is currently subject to dispute, ranges from 44% to 100%. Under terms of the receivable, payments are not due until OCAI reaches certain levels of profitability, that OCAI has never before achieved. The Company believes that it is doubtful that OCAI will achieve such a level of profitability. Accordingly, CDG has placed a value of up to $625 thousand on OCA's receivable from OCAI and no value on the equity interest in OCAI.

The Equity Committee has criticized the above valuation set out in this Exhibit "D-2" for the following reasons:

a.    Higher Collections From Affiliated Practices. The Affiliated Practices' collective debt of $72 million (as stated at p. 22 of the Amended Disclosure Statement) is allocated as follows: (i) $12 million to the Capital Accounts of Affiliated Practices under performing BSA's; and (ii) presumably, the $60 million balance to amounts owed by Inactive and Litigating Practices. The $60 million allocable to Inactive and Litigating Practices is presumed to be collected at a mere $15 million(Exhibit D-4, pp. 4, 11 ). Yet, the same Exhibit D-4 acknowledges that *favorable results in the litigation or in settlement may result in a greater recovery* than the $10-20 million. (Id. at p. 8) The Equity Committee believes higher amounts are likely to be collected from Inactive and Litigating Practices and that any judgments in favor of the Debtors would be highly collectible in view of the fact that the parties to the BSA's are revenue producing doctors likely

to continue to practice and produce an income stream from which any such judgment would be enforced. Further, to the extent doctors do not choose an SSA and the Debtors prevail in enforcing existing BSA's, *any revenues from such BSA's would increase the value of the Debtors' core business.*

b.      A Higher Go Zone Tax Refund. Whereas the Original Disclosure Statement (Docket No.. 493 at p. 39) admitted that that the Debtors' anticipated tax refund on account of Go Zone Legislation had a "midpoint of $17.5 million," they now state that they "are unable to determine what if any tax refunds they may be able to claim." (Amended Disclosure Statement at p. 60). In addition, the Debtors have lowered the recovery to $14.7 million in their proposed Pro Forma Balance Sheet (Exhibit D-4, p. 11). However, the Debtors' cannot escape their original admission that the tax refund is potentially materially higher. This asset alone could result in a substantial windfall to Silver Point on the Effective Date.

c.      Unaccounted Value of Net Operation Losses ("NOL's"). The Debtors purport to estimate the value of $100 million of NOL carryforwards as of December 31, 2005 at zero on account of alleged cancellation of indebtedness (Exhibit D-4, p. 7), yet the proposed Plan does not cancel the indebtedness of any general unsecured creditors because the Plan contemplates that the $6 to $11 million in estimated unsecured claims will be paid in full after Silver Point recovers certain "Reference Amounts" in excess of its alleged Allowed Claim. (Plan Sections 1.61, 1.103 and 1.88.) To suggest that Silver Point is canceling its indebtedness in excess of the $50 million term loan contemplated in the Plan for tax purposes ignores the express provisions of the Plan contemplating payments to Silver Point in excess of $150 million (Id.) and materially understates the value of the substantial NOL asset of the Debtors' estates.

d.      Low Ball Value for OCAI. The Debtors propose that OCA's interest in a $12.5 million receivable from OCA International ("OCAI")(the "OCAI Note") is valued at $625,000, and that its equity interest in OCAI is valued at zero. Even if payments on this receivable are not likely on account of required levels of profitability (as the Debtors' allege), the Debtors have a right to anywhere from 44% to 100% of the equity in OCAI which plain common sense indicates is likely to have a value greater than zero. Further, there is no adequate explanation of the $11.8 million write off on the OCAI Note. The Equity Committee has not yet has an opportunity to investigate the value of the OCAI related assets and causes of actions. However, even BoA has filed pleadings alleging that the Debtors invested more than $57 million in OCAI subsidiaries prior to the OCAI Transaction. See Objection of [BoA]...to Motion of Gimili, LLC For Relief From Automatic Stay (Docket No. 677) at ¶¶ 7-9. [BoA denies that its Objection alleges that Debtors' interest in OCAI is worth at least $15 Million]

e.      Unaccounted Value of Recoverable Self-Insured Retention. The Amended Disclosure Statement states that the Debtors' Directors and Officers' Liability Policy has a self-insured retention of $2.5 million (the "SIR")(Amended Disclosure Statement at p. 71). These clauses typically require the Debtors to pay defense costs or judgments up to the SIR, which is then recoverable from the insurance policies if the litigation is settled without an adjudication of liability to the Debtors' estates. In this case, the Debtors' disclose they have paid $891,560 of the SIR to date (Id.). The Debtors therefore have a potential additional asset of $891,560 that has not been disclosed on their Exhibit D-4 pro forma balance sheet.

f.      Low Ball Disclosure on Business Interruption Insurance Claims. The Debtors disclose they have business interruption insurance for claims arising from *not one but three* relocations on account of Hurricanes Rita, Wilma and Katrina from August 2005 to November 2005 and project a range of recovery from $1.6 million to $3.3 million (Amended Disclosure Statement Blackline at p. 27). The Debtors do not disclose the total dollars claimed to date from insurers on account of business interruption claims. The Equity Committee has not yet completed

its investigation of this potential asset but believes the claims are potentially higher than disclosed.

The Debtors disagree with the Equity Committee's assertions.

June 18, 2006

## OCA, INC.
## EXHIBIT "D-3"
## NOTES TO LIQUIDATION ANALYSIS

The Liquidation Analysis reflects the Debtors' estimate of the proceeds that would be realized if the Debtors were to be liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based on estimated assets of the Debtors as of April 30, 2006. In many instances, these values will differ from values in the Company's schedules filed with the court, as this analysis assumes a liquidation of the Debtors and the values in the schedules assume, with respect to many of the assets, a going concern business. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management and CDG, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, and are based upon assumptions that could be subject to change. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

Except as specifically addressed in the Notes to the Liquidation Analysis, the issues of potential recoveries from avoidance actions and final bankruptcy claims reconciliation have not been addressed in the Liquidation Analysis. Proceeds which may be recoverable from potential avoidance actions are not reflected because any such recoveries in a Chapter 7 liquidation would in all likelihood only accrue to the benefit of the Senior Lenders and would have no impact on the recovery of other creditors.

The Liquidation Analysis assumes a liquidation period of four months, starting July 28, 2006, during which the following approach to the liquidation is assumed. The Debtors assume that, upon conversion to a Chapter 7 case, the doctors affiliated with OCA will immediately disassociate themselves from OCA and immediately cease depositing funds in accounts that OCA control or sweep. Accordingly, except for the one day of cash which is "in the system" as described hereinafter, the Debtors will have no source of cash other than through the liquidation of assets. The Debtors assume the trustee will attempt to maximize the value of the Debtors' assets to which the Debtors have a claim or interest and which are being used by the doctors in their continuing practices by selling assets to the doctors, rather than attempting to re-possess these assets and selling them off to bidders at an auction.

During the first month of the liquidation, inventory would be liquidated, the process of selling fixed assets would begin and the trustee would wind down the corporate operations, phasing out almost all positions. Certain key corporate

personnel, such as those in Financial and Management Information Systems areas, would be retained as necessary to support the completion of an orderly liquidation.

Over the ensuing four-month period, the process of liquidating the remaining property and equipment and other assets of the estate in an orderly but forced-sale environment would be completed. In addition, the collection of the remaining notes receivable would take place along with the completion of the claims reconciliation process.

The following notes describe the significant assumptions reflected in the Liquidation Analysis.

### Note A – Cash & Cash Equivalents

The Liquidation Analysis assumes that the Debtors would cease to provide services to the doctors immediately upon conversion to a Chapter 7 case. However, as there is a one-day delay in cash availability in the Debtors' bank accounts, the Debtors would typically have between $700 thousand and $1.0 million, based on daily run rates, in cash available from operations immediately prior to the liquidation period. Upon conversion, the Debtors anticipate that doctors will immediately cease depositing. The Debtors anticipate that any funds received by the Debtors after conversion (other than the one-day amount "in the system") from the doctors would be returned to the doctors since the Debtors would no longer be providing services to the doctors. Accordingly, the Liquidation Analysis assumes that during the liquidation period, the Debtors would not generate any additional cash from the Business Service Agreements ("BSA's"), and the only cash available for distribution would be net proceeds from the disposition of non-cash assets.

### Note B – Patient Receivables

This line item includes a significant amount for the unbilled portions of patient contracts. The Debtors collect patient receivables on behalf of doctors and no amount would be recoverable by the Debtors for unbilled services. These receivables are included on the balance sheet only as a result of FASB Interpretation No. 46 Revised, or FIN 46R, consolidation. The Debtors anticipate the trustee will not be able to recover any amounts for the unbilled portions of patient receivables.

### Note C – Advances to Practitioners in Excess of Quarterly Profits

This line item represents amounts that have been advanced to practitioners in excess of profits due to them at the end of the quarter. The BSA's contemplate that advances to doctors are recoverable in the ordinary course of ongoing operations from future profits from doctor practices. However, as a result of the cessation of the Debtor's performance under the BSA's and upon conversion to Chapter 7, the Debtors anticipate that doctors will assert offset,

recoupment, and other defenses to any claim the Debtors would have for repayment of prior advances to the practitioners. As a result, the Debtors have estimated a recovery range of 10% to 20% for advances to practitioners.

*Note D – Out-of-Pocket Expense Insurance Claim*

As a result of damage to its corporate headquarters, the Debtors incurred extra expenses in temporarily relocating its headquarters to the Ft. Lauderdale area. Claims totaling approximately $1.9 million have been submitted to the insurance company. To date, the Debtors have received approximately $285 thousand in reimbursements. The Debtors expect to receive a full reimbursement of out-of-pocket expenses.

*Note E – Deferred Income Taxes*

The Debtors are in the process of preparing 2004 and 2005 federal tax returns. As part of that process and based upon discussions with professionals retained by the Debtors, the Debtors believe that it has Katrina-related losses that can be carried back to recover taxes paid in previous years by the Debtors. The Debtors are in the process of finalizing calculations in this area and believe that refunds of $14.0 million may be available. Additionally, the Debtors are considering the magnitude of adjustments, if any, that should be made to 2001 and subsequent financial statements, since the 2001 tax year is still open through August 28, 2006. If the Debtors adjust the financial statements for 2001, or if the trustee determines to do so, the Debtors or trustee would presumably file an amended 2001 tax return. Based upon discussions with professionals retained by the Debtors the Debtors estimate that any such adjustments, if appropriate, to the 2001 tax return could decrease taxable income and generate a potential refund up to $9.0 million.

Please note that as of this time, the Debtors have not: (i) made a determination whether or not a restatement of 2001 is necessary; (ii) completed the 2004 financial statements or 2004 tax basis of the assets; or (iii) completed the 2005 financial statements or the 2005 tax basis of the assets.

Given the open items indicated above, the estimated recoveries of the tax refunds are preliminary and subject to material change as these items are completed.

*Note F – Supplies Inventory*

In the ordinary course of business, the doctors order supplies through the Debtors' purchasing system, Penny Lane. Inventory purchases are entered into Abbey Road, the Debtors' Affiliated Doctor financial interface. Under the Debtors' arrangements with the majority of the doctors, the Debtors have an interest in the inventory supplies of those doctors. The Debtors assume the trustee will attempt to maximize the value of the Debtors' assets to which the

Debtors have a claim or interest and which are being used by the doctors in their continuing practice by selling assets back to the doctors, rather than attempting to re-possess these assets and selling them off to bidders at an auction. However, as a result of the cessation of the Debtors' performance under the BSA's upon conversion to Chapter 7, the Debtors anticipate that the doctors will assert offset, recoupment, and damage defenses to any claims the Debtors may have for the value of the supplies inventory. Because of the difficulties and impediments in obtaining recovery, the Debtors have estimated a recovery range of 10% to 20% for those supplies inventory.

### Note G – Debt due from 4 of the 5 OCA International subsidiaries

This line item represents debt due from four subsidiaries (Mexico, Brazil, Japan, and Spain) of the five subsidiaries of OCA International, LLC ("OCA Int'l"). The Debtors also have an equity interest in OCA Int'l, which is currently under dispute, of between 44% and 100%. The face value of the debt is $12.5 million. Under terms of the debt, payments on the debt are only payable to the Debtors in the event that OCA Int'l achieves certain levels of profitability, which OCA Int'l has never before achieved. The Debtors believe that it is doubtful that OCA Int'l will achieve such a level of profitability, indicating that recovery on the debt is extremely speculative. The Debtors placed a value of up to $625 thousand on the debt and no recoverable value on the equity interest in OCA Int'l.

### Note H – Prepaid Expenses & Other Assets

Prepaid expenses and other assets consist of prepaid rent, prepaid insurance, prepaid advertising, state income tax receivable, retainer fees, and other prepaid assets. For the purposes of this liquidation analysis, it is assumed that prepaid rent, retainer fees, and prepaid advertising will be consumed during the liquidation period. The recovery percentage range of 50% to 75% was used for prepaid insurance as a substantial portion of this asset will be recoverable upon cessation of operations. The Debtors expect a 0% recovery on other prepaid assets. The Debtors expect to recover 100% on the state income tax receivable as it represents overpayments in the 2004 tax year.

### Note I – Net Property and Equipment

The majority of the net property and equipment is located in the doctors' offices. Given the geographical diversity of the offices and the relatively small amount of net property and equipment in each office, the Debtors believe the cost and time spent retrieving and liquidating such equipment would significantly limit any recovery. The Debtors assume the trustee will attempt to maximize the value of the Debtors' assets to which the Debtors have a claim or interest and which are being used by the doctors in their continuing practice by selling these assets back to the doctors, rather than attempting to re-possess these assets and selling them off to bidders at an auction. Moreover, as a result

of the cessation of the Debtors' performance under the BSA's upon conversion to Chapter 7, the Debtors anticipate that the doctors will assert offset, recoupment, and damage defenses to any claims the Debtors may have for the value of the net property and equipment. In view of these factors, it is assumed that the trustee will be able to achieve a recovery in the range of 10% to 20%.

*Note J – Net Leasehold Improvements*

Given the cost to carry the leases and assuming a July 28, 2006 conversion, it is assumed that the lease payments for the following month of approximately $1.6 million will not be made. As a result, since the Debtors will not have control over the leases, they do not expect the trustee to receive any recovery for the leasehold improvements.

*Note K – Advances to Outsource Practitioners*

This line item represents advances for payments of practice-related expenses. Most of the balance represents a timing difference where OCA pays practice-related expenses before receiving reimbursement from Outsource practitioners. The Debtors expect to receive reimbursement for practice-related expenses because Outsource practitioners have signed promissory notes for a line of credit upon affiliation. As a result of the cessation of the Debtors' performance under the BSA's upon conversion to Chapter 7, the Debtors anticipate that the doctors will assert offset, recoupment, and other defenses to any claims the Debtors may have for the value of the advances to Outsource practitioners. As a result, the Debtors anticipate a 50% to 75% recovery.

*Note L – Net Assets associated with Inactive and Litigating Practices*

This line item reflects goodwill and identifiable intangible assets, property, equipment, improvements, inventory, and advances associated with practices that were parties to BSA's but which were engaged in litigation with the Debtors and/or which had ceased paying service fees to the Debtors as of March 14, 2006. The Debtors assess the recoverability of these assets on a quarterly basis based on, among other things, the status and results of pending litigation, recent settlements and buyouts, the uncertainty of these practices fulfilling their contractual obligations to the Debtors and the estimated amounts expected to be received from these practices in a buyout, settlement or under the terms of their BSA's. The Debtors estimated the amounts to be received from these practices using historical data, such as the Debtors' experience in resolving these situations and the particular practitioner's willingness to resolve the matter. As a result of the cessation of the Debtors' performance under the BSA's upon conversion to Chapter 7, the Debtors anticipate that the doctors will assert offset, recoupment, and other defenses to any claims the Debtors may have for the value of these assets. The estimated range is $10.0 million to $20.0 million for settlement values.

Please note that as of this time, the Debtors have not: (i) finalized the analysis of which defaulting doctors will be pursued through litigation; (ii) began negotiations, if any, with defaulting doctors that may agree to a monetary settlement with the Debtors; or (iii) spoken to defaulting doctors that may want to rejoin the Debtors once it emerges from bankruptcy.

Given the open items indicated above, the estimated recoveries of the net assets associated with inactive and litigating practices are preliminary and subject to material change as these items are completed.

*Note M – Goodwill and Other Intangibles*

The most significant portion of goodwill and other intangibles is the BSA's. Because of the nature of the BSA's, and in view of the litigation which exists, and the litigation that would ensue upon conversion, and since the Debtors would be unable to continue to perform under the BSA's upon conversion, the Debtors do not believe the Chapter 7 trustee will receive any recoveries for goodwill and other intangible assets.

*Note N – Other Long Term Assets*

Upon the cessation of the Debtors' performance under the BSA's upon conversion to Chapter 7, the Debtors anticipate that the doctors will assert offset, recoupment, and other defenses to any claims the Debtors may have for the value of other long term assets. Other assets include notes receivable from doctors of approximately $7.1 million, for which the Debtors have estimated a recovery range of 34% to 69%. Other assets also include retainers to professional service firms. The Debtors assume that deposits will be consumed during the liquidation period.

*Note O – Other Advances to Practitioners*

Other advances to practitioners include construction loans and other operating loans, whether or not evidenced by a promissory note. These amounts are not reported on the Debtors' balance sheet as amounts are eliminated in consolidation under the provisions of FIN 46R. Upon conversion to Chapter 7, the Debtors anticipate the doctor will assert offset, recoupment, and other defenses to any claims the Debtors may have for the value of these advances and that the trustee will be involved in litigation with doctors regarding outstanding amounts owed to the Debtors. As a result of the anticipated litigation and given the issues regarding the collectibility of items in this category, the Debtors estimate a recovery range of 8% to 16%.

*Note P – Business Interruption Insurance Claim*

The Debtors' operations were impacted by Hurricanes Katrina, Rita and Wilma which struck the U.S. Gulf Coast in 2005 and affected the Debtors' offices in Louisiana, Texas, Mississippi and Florida. The Debtors have business interruption coverage and are in the process of calculating estimated losses from operations as a result of the hurricanes. The Debtors expect to receive a full recovery on the amount of the allowed claim which is expected to be between approximately $950 thousand and approximately $3.6 million.

*Note Q – Chapter 7 Trustee Fees*

Section 326 of the U.S. Bankruptcy Code limits U.S. Trustee fees to 3% of gross liquidation proceeds. For the Liquidation Analysis, an estimate of 3% is assumed.

*Note R – Chapter 7 Professional Fees*

This amount represents estimated professional fees for legal and other professionals representing the trustee in the liquidation of the Debtors.

*Note S – Chapter 7 Wind-down Expenses*

The estimates for the wind-down costs in this Liquidation Analysis include operating expenses and other costs considered likely to be incurred during the liquidation period. Significant liquidation activities would include, but are not limited to: (i) liquidation of inventory, (ii) negotiation for sale of other tangible and intangible assets and (iii) the resolution of all employee-related issues. Corporate payroll and operating costs during the liquidation are based upon the assumption that most corporate functions would be significantly reduced during the four-month wind-down period and all remaining positions would phase out.

*Note T – Chapter 7 Severance and Retention*

This amount represents estimated severance and retention for those employees who are asked to remain during part or all of the liquidation process. For the Liquidation Analysis, it is assumed that retained employees will be paid for 4 months of service, to occur during the liquidation period, at their current salary levels and an additional 1.5 months for severance at the end of the liquidation period.

*Note U – Senior Lender Claims*

The DIP Revolving Facility balance represents the estimated amount owed to the Senior Lenders at the beginning of the liquidation period (per the updated

DIP Budget as of the week ending June 2, 2006), July 28, 2006, excluding an estimate of office lease payments in the amount of approximately $1.6 million for the month of August. The Post-Petition Term Loan balance represents an estimate of the total principal balance at the beginning of the liquidation period.

*Note V – Administrative Expense Claims, Priority Claims and Non-Priority Secured Claims*

This reflects accounts payables, severance, and other accrued expenses assumed post-petition during the Chapter 11 bankruptcy. It also includes estimates for Priority Claims, Priority Tax Claims and Non-Priority Secured Claims.

*Note W – Subordinated Note Claim*

The Debtors have $3.0 million in outstanding subordinated notes bearing PIK interest at 10%. The amount excludes accrued interest.

*Note X – Other Unsecured Claims*

This estimate is based on an April 24, 2006 analysis of accounts payable claims. The total does not include claims related to executory contract rejection damages and any other miscellaneous general unsecured claims.

# OCA, Inc.
## Hypothetical Liquidation Analysis

| | Balances as of April 30, 2006 (Unaudited) | Estimated % Recovery | | Estimated Liquidation Value | | Notes |
|---|---|---|---|---|---|---|
| Balance Sheet Assets to be Liquidated | | Low | High | Low | High | |
| Cash and Cash Equivalents (1) | - | 100% | 100% | 700,000 | 1,000,000 | A |
| Patient Receivables | 87,998,422 | 0% | 0% | - | - | B |
| Advances to Practitioners in Excess of Quarterly Profits | 7,554,887 | 10% | 20% | 755,489 | 1,510,977 | C |
| Out-of-Pocket Expense Insurance Claim | 1,640,439 | 100% | 100% | 1,649,439 | 1,649,439 | D |
| Deferred Income Taxes | 66,178,835 | 21% | 35% | 14,000,000 | 23,000,000 | E |
| Supplies Inventory | 7,491,809 | 10% | 20% | 749,181 | 1,498,362 | F |
| Debt due from 4 of the 5 OCA International subsidiaries | 12,500,000 | 0% | 5% | - | 625,000 | G |
| Prepaid Expenses & Other Assets | 4,878,923 | 18% | 19% | 858,062 | 915,860 | H |
| Net Property and Equipment | 23,637,279 | 10% | 20% | 2,363,728 | 4,727,456 | I |
| Net Leasehold Improvements | 21,829,566 | 0% | 0% | - | - | J |
| Advances to Outsource Practitioners | 759,720 | 50% | 75% | 379,860 | 569,790 | K |
| Net Assets associated with Inactive and Litigating Practices | 25,446,385 | 39% | 79% | 10,000,000 | 20,000,000 | L |
| Goodwill and Other Intangibles | 187,749,704 | 0% | 0% | - | - | M |
| Other Long Term Assets | 9,001,183 | 27% | 54% | 2,447,709 | 4,895,418 | N |
| Subtotal: Gross Proceeds from Balance Sheet Liquidation | 456,676,151 | 27% | | 33,903,848 | 60,392,302 | |
| | | | | | | |
| Other Assets to be Liquidated | | | | | | |
| Other Advances to Practitioners | 50,626,589 | 8% | 16% | 4,016,031 | 8,032,061 | O |
| Business Interruption Insurance Claim | - | 100% | 100% | 949,583 | 3,576,087 | P |
| Subtotal Gross Proceeds from Off-Balance Sheet Liquidation | 50,626,589 | | | 4,965,614 | 11,608,148 | |
| | | | | | | |
| Total Gross Proceeds from Liquidation | | | | 38,869,062 | 72,000,450 | |
| | | | | | | |
| Chapter 7 Estimated Costs | | | | | | |
| Ch. 7 Trustee Fees @ 3% of Gross Proceeds | | | | 1,166,072 | 2,160,014 | Q |
| Ch. 7 Professional Fees | | | | 2,000,000 | 1,500,000 | R |
| Ch. 7 Wind-Down Expenses | | | | 870,000 | 870,000 | S |
| Ch. 7 Severance and Retention | | | | 307,083 | 307,083 | T |
| Total Chapter 7 Estimated Costs | | | | 4,343,155 | 4,837,097 | |
| *Net Estimated Recovery for Chapter 7 Estimated Costs* | | | | | | |

| | | Recovery $ | |
|---|---|---|---|
| | | Low | High |
| Net Estimated Proceeds after Chapter 7 Estimated Costs | | 34,525,906 | 67,163,356 |
| Personal Property Taxes (2) | | (851,694) | (851,694) |
| Carve-out for Professional Fees | | (500,000) | (500,000) |
| Net Estimated Proceeds Available for Distribution to Secured Claims after Carve-out for Professional Fees | | 33,174,213 | 65,811,660 |

| | Balance | Low | High | Low | High | Notes |
|---|---|---|---|---|---|---|
| Senior Lender Claims | | | | | | U |
| Debtor-in-Possession Revolving Facility (3) | 5,032,000 | 100% | 100% | 5,032,000 | 5,032,000 | |
| Post-Petition Term Loan | 92,181,951 | 30% | 65% | 27,642,213 | 60,279,660 | |
| Total Senior Lender Claims | 97,213,951 | | | 32,674,213 | 65,311,660 | |
| *Net Estimated Recovery for Super-Priority Administrative Claims* | | | | 33.6% | 67.2% | |
| | | | | | | |
| Net Estimated Proceeds Available for Distribution to Administrative, Priority and Non-Priority Secured Claims | | | | 500,000 | 500,000 | |
| | | | | | | |
| Administrative Expense Claims, Priority Claims and Non-Priority Secured Claims | | | | | | V |
| Post-Petition Accounts Payable and Accrued Expenses (4) | 949,564 | 0% | 0% | - | - | |
| Priority Tax Claims | 1,207,960 | 0% | 0% | - | - | |
| Severance (5) | 768,115 | 0% | 0% | - | - | |
| Carve-Out for Professional Fees (6) | 1,500,000 | 33% | 33% | 500,000 | 500,000 | |
| Priority Claims | - | 0% | 0% | - | - | |
| Non-Priority Secured Claims | - | 0% | 0% | - | - | |
| Total Administrative, Priority and Non-Priority Secured Claims | 4,425,639 | | | 500,000 | 500,000 | |
| *Net Estimated Recovery for Administrative Claims, Priority Claims and Non-Priority Secured Claims* | | | | 11.3% | 11.3% | |
| | | | | | | |
| Net Estimated Proceeds Available for Distribution to General Unsecured Claims | | | | 0 | 0 | |
| | | | | | | |
| General Unsecured Claims | | | | | | |
| Subordinated Note Claim | 3,000,000 | 0% | 0% | - | - | W |
| Other Unsecured Claims | 6,107,746 | 0% | 0% | - | - | X |
| Total General Unsecured Claims | 9,107,746 | | | 0 | 0 | |
| *Net Estimated Recovery for General Unsecured Claims* | | | | 0.0% | 0.0% | |

Notes:
(1) Cash Balance equal balance in DIP Budget as of the week ending 6/2/06 plus $700 thousand to $1 million resulting from a 1-day lag in cash availability.
(2) The Debtors have $852 thousand in property taxes, which must be settled as part of the liquidation of the PR&I.
(3) DIP Balance equals balance at 7/28/06 in DIP Budget updated as of 6/2/06 less $1.58 million for office lease payments for the month of August.
(4) As of June 12, 2006.
(5) Compensation of 1.5 months of salaries and wages, as of March 2006, for all employees who are terminated and are not asked to remain as part of the liquidation process
(6) Based on run-rates of professional fees.

June 18, 2006

**Exhibit D-4**
**FINANCIAL PROJECTIONS**

## A.     Responsibility for and Purpose of the Projections.

As a condition to confirmation of a plan of reorganization, Section 1129 of the Bankruptcy Code requires, among other things, that the bankruptcy court determine that confirmation is not likely to be followed by liquidation or a need for further financial reorganization of the debtor. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors have analyzed the ability to meet their obligations under the Plan with sufficient liquidity and capital resources to conduct their businesses.

In this regard, the Debtors have prepared certain projections of their results of operations, cash flow and related balance sheets (the "Projections") for the period starting July 1, 2006 through the fiscal year ending December 31, 2009 (the "Projection Period"). The financial information included in the Projections reflects the Debtors' judgment as to the information that is material under the circumstances, including current market conditions and historical results, where relevant. See "CERTAIN RISK FACTORS TO BE CONSIDERED" for a discussion of certain factors that may affect the future financial performance of the Debtors.

The Debtors do not generally publish their business plans and strategies or make external projections or forecasts of their anticipated financial position, results of operations or cash flow. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to the holders of Claims or Interests prior to the Effective Date. The Projections should not be relied upon for any purpose other than in considering whether to accept or reject the Plan.

The historical financial statements, as presented herein, are prepared on the same basis as the financial statements last filed with the SEC as of September 30, 2004. As previously reported, the Company anticipates that there will be significant adjustments made to these financial statements for the following reasons.

**Revenue recognition.** Prior to 2004, the Company was reporting its revenue for service fees earned from its affiliated practices (the Practices) in accordance with the SEC's Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements". SAB 101 required that the service fee revenue be recognized on a straight-line basis over the term of the related patient contracts of the Practices with certain adjustments made to the revenue calculation, including the reimbursement of certain practice-related expenses to the Company.

However, in 2004, the Company and its independent auditors at the time, PricewaterhouseCoopers LLP ("PWC"), evaluated the applicability of the FASB's new pronouncement, FIN 46R, "Consolidation of Variable Interest Entities (VIE's)" on the Company's financial statements. Based on the Company's contractual and economic relationships with the Practices, the Company and PWC determined that the Company was

required to apply FIN 46R. As a result, since January 1, 2004, the Company's accounting policy for revenue recognition was to record revenue and patient receivables for the Practices' services performed for their patients rather than the services the Company performs on behalf of and for the Practices. The Company's service fees and service fees receivable are eliminated upon consolidation of the Practices.

As reported in a June 7, 2005 Form 8-K, the Company determined that there were errors in its calculation of patient receivables that were reported under the new FIN 46R treatment that results in a material overstatement of the patient receivable balance for each of the periods reported in 2004. The Company has not yet determined a correct calculation for its revenue and receivables so the amounts presented here for historical financial statements are based on the existing calculation and will require material changes once a new calculation is determined.

**Potential prior period adjustments.** In addition to the changes that the Company believes will be made to patient revenue and receivables, the Company also believes that adjustments may be made for periods prior to 2004 that were identified during the 2004 audit. To the extent adjustments need to be made, this may impact the historical financial statements presented herein. These potential adjustments relate to inventory, fixed assets and start-up costs, among other things. Finally, changes to the historical financial statements presented herein may also be required pending the outcome of the Audit Committee's review of certain journal entries recorded in 2000 and 2001.

The historical financial results as presented and the Projections were not prepared with a view toward compliance with published guidelines of the SEC or the American Institute of Certified Public Accountants regarding prospective financial statements. Independent auditors have not examined or compiled the Projections presented herein, and, accordingly, assume no responsibility for them.

**B.      Principal Assumptions for the Projections.**

The Projections are based on, and assume the successful implementation of the Debtors' Plan of Reorganization. The Projections reflect numerous assumptions, including those regarding the anticipated future performance of the Debtors, general business and economic conditions and other matters, most of which are beyond the control of the Debtors. Therefore, although the Projections are necessarily presented with numeric specificity, the actual results achieved during the Projection Period will vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Debtors or the Reorganized Debtors to achieve the projected results of operations. See "CERTAIN RISK FACTORS TO BE CONSIDERED".

Although the Debtors believe that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no assurance can be or is given that the Projections will be realized. In deciding whether to vote to accept or reject the Plan, Holders of Claims and Interests entitled to vote on the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections. See "CERTAIN RISK FACTORS TO BE CONSIDERED".

1.      **Plan of Reorganization**

The Projections assume confirmation of the Plan and that all transactions contemplated by the Plan to be consummated by the Effective Date will be consummated as of September 30, 2006. The Projections also assume that:

- The Company currently has 175 affiliated doctors that are performing pursuant to their BSA agreements. The Company plans to reject the BSA agreements of 7 affiliated doctors and maintain its business relationship with the remaining 168 affiliated doctors. The Projections assume that the 168 affiliated doctors will enter into an amended BSA (Support Service Agreement or "SSA"). The term of each SSA will be 7 years from the date upon which the affiliated doctor pays off his/her existing Capital Account (which will vary from 0 to 5 years).

- $50.0 million of the Senior Lender Indebtedness shall be converted into the principal amount of the New Term Loan Facility. The New Term Loan Facility shall be secured by all of the assets of the Reorganized Debtors, shall have a final maturity date of 4 years from the Effective Date, shall have no fixed amortization of principal and shall receive payment of quarterly cash interest at an interest rate of LIBOR + 6.00%. The Projections assume proceeds from tax refunds and insurance will be used to pay down the New Term Loan Facility and the Working Capital Revolver on a pari pasu basis. All remaining Senior Lender Indebtedness shall be converted into 100.00% of the New Common Stock of Reorganized OCA.

- The Company will pay off any outstanding amounts under the DIP Revolver from the proceeds of a new senior secured Working Capital Revolver estimated to be $10.0 million. The Working Capital facility will have a 4 year term and an interest rate of LIBOR + 6.00% and is expected to have an opening outstanding balance of $9.96 million upon emergence.

- $2.7 million in cash will be paid to the General Unsecured Claims Pool on the Effective Date. The Company will have a General Unsecured Deferred Payment liability in an amount equal to the sum of (A) the aggregate dollar amount of all Allowed General Unsecured Claims less (B) the sum of (i) $2.7 million and (ii) the Transferred Avoidance Action Proceeds. The Projections assume the General Unsecured Deferred Payment liability to be in the amount of $6.3 million and that no payment is made on this deferred liability during the FY2006 to FY2009 time period.

- The Projections assume the Company will receive payments from its insurance company regarding out-of-pocket expenses incurred as part of Hurricane Katrina and its business interruption insurance in the fourth quarter of FY2006. The Company also anticipates receiving tax refunds due to Hurricane Katrina losses in the fourth quarter of FY2006. The amount and timing of any tax refund for the amended FY2001 tax return is still being determined at this time. The Projections assume these proceeds will be applied to the New Term Loan Facility and the Working Capital Revolver on a pari pasu basis.

- The Company projects it will achieve value in connection with its litigation with the defaulting and inactive practices of $10-$20 million (A midpoint of $15 million was assumed in the Projections). This range of value is an estimate only. Favorable results in the litigation or in settlement may result in a greater recovery than $10-$20 million, and unfavorable results in litigation or in settlement may result in a smaller recovery than $10-$20 million.

The debtors have also included in its Plan motions to assume the contracts with the inactive and litigating contracts, which is a component of litigation with the inactive and defaulting practices. Favorable results in connection with the efforts to assume the contracts, or favorable settlements with practices in connection with those efforts, could increase the value of the claims against the litigating and inactive practices or increase the value of the core business of the company. At the present time, pending further results in that litigation, the Company cannot place a value on the efforts to assume the contracts in the Plan.

These estimates and statements are for purpose of the Projections, and are not intended to limit or diminish the debtors' rights or remedies with respect to the defaulting or inactive practices. The timing of these payments is not known and the Projections assume that these payments do not occur during the projected period.

## 2.   **Financial Reporting**

As previously described, the Company's results for FY2005 and first and second quarter of FY2006 were prepared in accordance with FIN 46R, Consolidation of Variable Interest Entities. As a result, the revenues and expenses generated by its affiliated doctors are reported within the Company's financial statements as if they were part of OCA.

Consistent with the SSAs, the Projections show the financial statements beginning in the third quarter of FY2006 and thereafter as a services company. The Projections assume the new fee structure will become effective on July 1, 2006.

## 3.   **OCA Service Fee Structure**

As part of revising the contractual arrangements between the Company and the doctors, the SSAs will provide for the new fee structure to be effective immediately. The Projections are based on a minimum flat fee and a declining percentage of revenues as revenue received from patients exceed certain levels.

The practice revenues used to calculate the service fee will be based on the combined patient revenues of all offices managed by a doctor or a partnership of doctors on the date of executing the SSAs.

The Projections assume the Company will reconcile the service fee collected at the end of each 12 month period.

| ($ Thousands) | Pro Forma Actual FY2005 | Pro Forma Estimated FY2006 [2] | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|
| Patient Revenues of Affiliated Doctors [1] | $234,260 | $248,704 | $261,140 | $274,197 | $287,906 |
| OCA Service Fee | 32,478 | 30,842 | 32,090 | 33,237 | 34,485 |
| % of Patient Revenues | 13.9% | 12.4% | 12.3% | 12.1% | 12.0% |

(1) Represents results for the 168 affiliated doctors only.
(2) Pro Forma FY2006 assumes the new service fee structure starting January 1, 2006.

The Projections currently assume five new "De Novo" offices in FY2006, five new "De Novo" offices in FY2007 and ten new "De Novo" offices in FY2008 and FY2009.

## 4.   Gross Practice Revenues

Given that mature offices represent over 95% of total, the Projections use the same growth rate for all offices. The majority of OCA's practices and offices are considered to be mature and have been open for more than 2 years. A mature office has an established pattern of new patients and its incremental patient growth is due to the doctor's and OCA's efforts. A "De Novo" office is a new office that is building its patient base and the Company estimates that a "De Novo" office will take approximately two years to grow into a mature practice. The Projections currently assume five new "De Novo" offices in FY2006, five new "De Novo" offices in FY2007 and ten new "De Novo" offices in FY2008 and FY2009.

Practice revenues grew by 3.5% to $234.3 million in FY2005. During the first quarter of FY2006 and based on the estimated sales for the second quarter of FY2006, practice revenues grew by approximately 7%. The growth in the first two quarters was primarily generated by 20 new offices opened in FY2005 and the combination of the doctors' and OCA's efforts to expand these practices. As these new offices continue to mature, the growth rate for these offices will decline and become more consistent with the growth rate for mature offices. The sales growth rate of only matured offices for the first quarter of FY2006 is approximately 5.3%. Given that most of the offices will have been open for close to two years by the end of 2006 the Projections assume a sales growth of 5.0% over prior comparable period sales.

| ($ Thousands) | Actual Q1'04 | Actual Q2'04 | Actual Q3'04 | Actual Q4'04 | Actual FY2004 | | | |
|---|---|---|---|---|---|---|---|---|
| Practice Revenues | $58,851 | $55,503 | $57,164 | $54,874 | $226,393 | | | |

| ($ Thousands) | Actual Q1'05 | Actual Q2'05 | Actual Q3'05 | Actual Q4'05 | Actual FY2005 | | | |
|---|---|---|---|---|---|---|---|---|
| Practice Revenues | $61,424 | $58,350 | $57,858 | $56,628 | $234,260 | | | |
| Comp Sales Growth | 4.4% | 5.1% | 1.2% | 3.2% | 3.5% | | | |

| ($ Thousands) | Actual Q1'06 | Estimated Q2'06 | Projected Q3'06 | Projected Q4'06 | Projected FY2006 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|
| Practice Revenues | $65,983 | $62,511 | $60,751 | $59,460 | $248,704 | $261,140 | $274,197 | $287,906 |
| Comp Sales Growth | 7.4% | 7.1% | 5.0% | 5.0% | 6.2% | 5.0% | 5.0% | 5.0% |

| ($ Thousands) | Actual Q1'06 | Projected Q2'06 | Projected Q3'06 | Projected Q4'06 | Projected FY2006 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|
| New Denovo Practice Revenues | $0 | $0 | $73 | $183 | $257 | $2,092 | $6,067 | $12,415 |

The projections assume that OCA will add no new doctor affiliations during this time period.

## 5.  Practice Salaries and Benefits

The Projections assume that all practice employees will continue to be OCA employees. OCA will continue to make available an employee medical and retirement benefits package to the practice employees consistent with past practices. Practice employee expenses include compensation and benefits for front office administrative staff. The Projections assume practice employee expenses will grow at 5% over the prior comparable period. Practice Salaries and Benefits of new "De Novo" offices are projected beginning in FY2007. The Projections currently assume five new "De Novo" offices in FY2006, five new "De Novo" offices in FY2007 and ten new "De Novo" offices in FY2008 and FY2009.

| ($ Thousands) | Actual Q1'04 | Actual Q2'04 | Actual Q3'04 | Actual Q4'04 | Actual FY2004 |
|---|---|---|---|---|---|
| Practice Salaries and Benefits | $13,235 | $12,977 | $13,099 | $13,314 | $52,625 |

| ($ Thousands) | Actual Q1'05 | Actual Q2'05 | Actual Q3'05 | Actual Q4'05 | Actual FY2005 |
|---|---|---|---|---|---|
| Practice Salaries and Benefits | $13,521 | $13,932 | $14,170 | $14,116 | $55,740 |
| Inflation Rate | 2.2% | 7.4% | 8.2% | 6.0% | 5.9% |

| ($ Thousands) | Actual Q1'06 | Estimated Q2'06 | Projected Q3'06 | Projected Q4'06 | Projected FY2006 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|
| Practice Salaries and Benefits | $14,633 | $14,629 | $14,879 | $14,822 | $58,963 | $61,911 | $65,006 | $68,257 |
| Inflation Rate | 3.2% | 5.0% | 5.0% | 5.0% | 5.8% | 5.0% | 5.0% | 5.0% |

| ($ Thousands) | Actual Q1'06 | Projected Q2'06 | Projected Q3'06 | Projected Q4'06 | Projected FY2006 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|
| New Denovo Practice Salaries and Benefits | $0 | $0 | $68 | $86 | $154 | $644 | $1,470 | $2,719 |

## 6.  Corporate Level Expenses

Corporate Level Expenses have been projected based on the initial budgets provided by the Company. Corporate Level Expenses include post Hurricane Katrina rebuilding costs, systems upgrades and investments in field personnel. Beginning in the third quarter of FY2007, the corporate level expenses are projected to increase at the current level of inflation as provided from the Consumer Price Index.

## 7.  Restructuring and Non Recurring Costs

This represents primarily professional fees related to the Chapter 11 Bankruptcy and other non recurring costs. In the first quarter of FY2006, these costs include approximately $3 million of professional fees related to services provided in prior periods but were not previously entered into the accounting system. The Company expects second quarter costs to be approximately $5.1 million primarily due to restructuring costs. These costs are expected to decline in the third quarter to approximately $4.4 million.

## 8.  Earned Interest

Earned interest assumes the doctors will be paying cash interest on their respective Capital Account balances at the prime rate.

**9. Interest Expense**

Interest expense is based on a rate of LIBOR + 6.00% for both the $50.0 million senior secured term loan and $10.0 million senior secured Working Capital Revolver.

**10. Income Tax**

The Debtors estimate that there will be approximately $100.0 million of NOL carryforwards as of December 31, 2005 prior to any limitations being applied. The Projections assume no benefit from the NOL carryforwards due to the cancellation of indebtedness, the effect of the amended or restatement of previously filed tax returns, and Section 382 limitations.

The Projections assume a tax rate of 36.5% during the projected period.

**11. Equipment and Capital Assets**

Equipment and other capital assets may be purchased by the affiliated practice with the assistance of OCA in selecting the equipment. If requested by the practice, OCA will finance the purchase of the equipment on the same basis as costs of establishing "De Novo" practices. Any such financing will be evidenced by a promissory note and amortization of interest and principal will commence on the making of the secured loan. The Projections do not currently assume any new equipment loans.

**12. Service Fees Receivable**

Consistent with the new service fee structure, the Company shall retain the appropriate percentage from practice patient revenues as its service fee on a monthly basis. The Projections assume that it will require approximately 15 days from month end to determine the amount of service fees owed to the Company.

**13. Intercompany Accounts Receivable and Investment in Subsidiaries**

The Projections assume a value of up to $625 thousand on OCA's receivable from OCAI and no value on the equity interest in OCA International ("OCAI"). OCA has both a long-term receivable from as well as an equity investment in OCAI. The face value of the receivable is $12.5 million and the equity interest, which is currently subject to dispute, ranges from 44% to 100%. Under terms of the receivable, payments are not due until OCAI reaches certain levels of profitability, that OCAI has never before achieved. The Company believes that it is doubtful that OCAI will achieve such a level of profitability.

**14. Tax Refunds and Business Interruption Insurance**

The Projections assume the Company will receive payments from its insurance company in the fourth quarter of FY2006 for out-of-pocket expenses of approximately $1.6 million, and business interruption insurance between $0.9 million and $3.6 million as a result of Hurricane Katrina. Based on conversations with professionals retained by the Debtors to assist with these matters

the Company also anticipates receiving a tax refund due to Hurricane Katrina losses in the fourth quarter of FY2006 for approximately $14.0 million and a FY2005 state income tax refund of approximately $0.7 million. The Projections assume no proceeds from the amendment or restatement of previously filed tax returns.

## 15.    Litigation Settlement

The Company projects it will achieve value in connection with its litigation with the defaulting and inactive practices of $10-$20 million (A midpoint of $15 million was assumed in the Projections). This range of value is an estimate only. Favorable results in the litigation or in settlement may result in a greater recovery than $10-$20 million, and unfavorable results in litigation or in settlement may result in a smaller recovery than $10-$20 million.

The debtors have also included in its Plan motions to assume the contracts with the inactive and litigating contracts, which is a component of litigation with the inactive and defaulting practices. Favorable results in connection with the efforts to assume the contracts, or favorable settlements with practices in connection with those efforts, could increase the value of the claims against the litigating and inactive practices or increase the value of the core business of the company. At the present time, pending further results in that litigation, the Company cannot place a value on the efforts to assume the contracts in the Plan.

These estimates and statements are for purpose of the Projections, and are not intended to limit or diminish the debtors' rights or remedies with respect to the defaulting or inactive practices. The timing of these payments is not known and the Projections assume that these payments do not occur during the projected period.

## 16.    Capital Accounts

The Projections assume all Capital Account Balances outstanding are due and payable within five years (or such other time period agreed to by OCA and the doctor), shall bear interest at prime, with the principal thereof payable in 20 equal quarterly installments commencing with entering into the SSA.

## 17.    Notes Payable to Doctors

These notes represent debt owed to doctors for affiliation purchases during prior periods. As of the third quarter of FY2006, $0.2 million of the debt is projected to continue to be amortized. The remaining is debt owed to defaulted doctors that is expected to be settled in litigation.

## 18.    General Unsecured Deferred Payment Liability

The Company's General Unsecured Claims Pool is expected to receive approximately $2.7 million in cash and the Projections assume $6.3 million in a general unsecured deferred payment liability as described in the Plan of Reorganization. The Projections assume that no payment is made during the FY2006 to FY2009 time period.

**19.**    <u>**Working Capital Facility**</u>

The Company will pay off any outstanding amounts under the DIP Revolver from the proceeds of a new senior secured Working Capital Revolver estimated to be $10.0 million. The Working Capital facility will have a 4 year term and an interest rate of LIBOR + 6.00% and will have an opening outstanding balance of $9.96 million upon emergence.

**20.**    <u>**Term Loan**</u>

As outlined in the Plan of Reorganization, the Company will convert its existing post-petition term debt of approximately $92.2 million into a $50.0 million senior secured term loan at LIBOR + 6.00% due in 4 years and the remaining amount into 100% of the Company's equity.

**21.**    <u>**Shareholders' Equity**</u>

The Projections assume that $42.2 million of the existing post-petition term debt will be converted into 100% of the Company's equity. The reorganization equity value of the Debtors as of the Effective Date is estimated to be $27.7 million.

**C.**     **Assumptions for the Pro Forma Balance Sheet**

1.     The confirmation and consummation will be accomplished according to the terms of the Plan as described in the Disclosure Statement.

2.     Fresh-Start Reporting - The American Institute of Certified Public Accountants (the "AICPA") has issued a Statement of Position on Financial Reporting by Entities in Reorganization Under the Bankruptcy Code ("SOP 90-7"). The Projections have been prepared with consideration to the basic principles of "fresh-start" financial reporting set forth in the SOP 90-7, giving effect thereto as of the Effective Date. The principal effects of the application of the fresh-start reporting principle are summarized below:

> Under the SOP 90-7, the Reorganized Debtors will be required to record as an intangible asset the excess, if any of total reorganization value over the fair value of identifiable net assets, as of the emergence from Chapter 11. The allocation of the reorganization value to individual assets and liabilities at this point has not been made in accordance to SOP-97. For purposes of the projections, the reorganization value in excess of net book value does not amortize during the Projected Period.

The reorganization value as of the Effective Date is assumed to be $94.0 million. Based upon the assumed reorganization value and net debt of $66.3 million, the reorganization equity value of the Reorganized Debtors is calculated to be $27.7 million.

3.     As previously described, the Company's results for FY2005 and first and second quarter of FY2006 were prepared in accordance with FIN 46R, Consolidation of Variable Interest Entities. Given the change in the Company's operating structure to make it clear that OCA is a services company and not an owner of the affiliated doctors' practices, and consistent with the SSAs, the Projections show the financial statements beginning in the third quarter of FY2006 and thereafter as a services company.

The Pro Forma Balance Sheet shows the third quarter of FY2006 with FIN 46R treatment and then provides the estimated accounting adjustments that would be made to reflect the balance sheet of a services Company. Adjustments made to the balance sheet related to the emergence from Chapter 11 are outlined in the Notes to Pro Forma Balance Sheet.

| Pro Forma Balance Sheet ($ Thousands) | FIN 46 Pre Reorg BS | Accounting Adjustments (A) | Adjusted Pre Reorg BS | POR | Debt Reclass | Cash Adj | Fresh Start | Post Reorg BS | Notes |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| Current Assets: | | | | | | | | | |
| Cash | (0) | 0 | 0 | (2,700) | | 2,700 | | 0 | (A) |
| Patient Receivables, net | 71,201 | (71,201) | 0 | | | | | 0 | |
| Service Fee Receivables | 0 | 1,196 | 1,196 | | | | | 1,196 | |
| Supplies Inventory | 6,222 | (6,222) | 0 | | | | | 0 | |
| Intercompany A/R ($12.5 Million Less Reserves) | 12,500 | 0 | 12,500 | | | | (11,875) | 625 | (B) |
| Income Tax Refund | 54,209 | 0 | 54,209 | | | | (39,504) | 14,705 | (C) |
| Katrina Related Insurance Proceeds | 1,649 | (0) | 1,649 | | | | 2,250 | 3,899 | (D) |
| Litigation Settlement | 0 | 0 | 0 | | | | 15,000 | 15,000 | (E) |
| Other Assets | 4,174 | (4,103) | 71 | | | | (71) | 0 | (F) |
| Total Current Assets | 149,955 | (80,330) | 69,625 | (2,700) | 0 | 2,700 | (34,200) | 35,425 | |
| | | | | | | | | | |
| Gross PP&E | 102,778 | (83,346) | 19,433 | | | | (18,433) | 1,000 | |
| Accumulated Deprec. & Amort. | (60,756) | 50,993 | (9,762) | | | | 9,762 | 0 | |
| Net PP&E | 42,023 | (32,352) | 9,670 | 0 | 0 | 0 | (8,670) | 1,000 | (G) |
| | | | | | | | | | |
| Capital Account | 7,132 | 33,612 | 40,743 | | | | (15,965) | 24,778 | (H) |
| Advances to Practitioners | 8,315 | (8,315) | 0 | | | | | 0 | |
| Tax Assets | 12,675 | (12,675) | 0 | | | | | 0 | |
| Non Performing Assets | 25,446 | (25,446) | 0 | | | | | 0 | |
| Goodwill & Intangibles | 187,750 | (100,499) | 87,251 | | | | (50,267) | 36,984 | (I) |
| Deposits | 149 | (149) | 0 | | | | | 0 | |
| Investment in Sub ($1.5 Million Less Reserves) | 1,500 | 0 | 1,500 | | | | (1,500) | 0 | (B) |
| Other Assets | 221 | (221) | 0 | | | | | 0 | |
| TOTAL ASSETS | 435,165 | (226,375) | 208,790 | (2,700) | 0 | 2,700 | (110,602) | 98,188 | |
| | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | |
| Current Liabilities: | | | | | | | | | |
| Accounts Payable | 8,899 | (3,254) | 645 | | | | | 645 | |
| Accrued Expenses | 11,501 | (2,076) | 9,425 | (6,000) | | | | 3,425 | (A) |
| Deferred Revenue | 50,636 | (50,636) | 0 | | | | | 0 | |
| Total Current Liabilities | 71,036 | (60,966) | 10,070 | (6,000) | 0 | 0 | 0 | 4,070 | |
| | | | | | | | | | |
| Note Payable to Former Officer | 3,000 | 0 | 3,000 | (3,000) | | | | 0 | (A) |
| Notes Payable to Doctors | 725 | (447) | 277 | | | | (114) | 163 | (J) |
| Amounts Payable to Practitioners | 9,172 | (9,172) | 0 | | | | | 0 | |
| Pre-Petition Senior Debt | 0 | 0 | 0 | | | | | 0 | |
| Post-Petition Senior Debt | 92,182 | 0 | 92,182 | (42,182) | (50,000) | | | 0 | (K) |
| DIP Revolver | 7,255 | 0 | 7,255 | | (7,255) | | | 0 | (L) |
| General Unsecured Deferred Payment Liability | 0 | 0 | 0 | 6,300 | | | | 6,300 | (A) |
| $50 Million Senior Secured Term Loan | 0 | 0 | 0 | | 50,000 | 0 | | 50,000 | (K) |
| $10 Million Working Capital Facility | 0 | 0 | 0 | | 7,255 | 2,700 | | 9,955 | (L) |
| Total Liabilities | 183,369 | (70,585) | 112,784 | (44,882) | 0 | 2,700 | (114) | 70,488 | |
| | | | | | | | | | |
| Total Shareholders Equity | 251,796 | (155,790) | 96,006 | 42,182 | 0 | 0 | (110,488) | 27,700 | (I) |
| | | | | | | | | | |
| LIABILITIES & SHAREHOLDERS' EQUITY | 435,165 | (226,375) | 208,790 | (2,700) | 0 | 2,700 | (110,602) | 98,188 | |

Q3'06 Pro Forma Balance Sheet Adjustments

## NOTES TO PRO FORMA BALANCE SHEET

(A)  The Plan provides for $2.7 million in cash to be paid to the General Unsecured Claims Pool on the Effective Date. The Company will have a General Unsecured Deferred Payment liability in an amount equal to the sum of (A) the aggregate dollar amount of all Allowed General Unsecured Claims less (B) the sum of (i) $2.7 million and (ii) the Transferred Avoidance Action Proceeds. The Projections assume the General Unsecured Deferred Payment liability to be in the amount of $6.3 million.

(B)  OCA has both a long-term receivable from and an equity investment in OCA International ("OCAI"). The face value of the receivable is $12.5 million and the equity interest, which is currently subject to dispute, ranges from 44% to 100%. Under the terms of the receivable, payments are not required to be made by OCAI until OCAI reaches certain profitability levels that OCAI has never before achieved. The Debtors believe it is doubtful that OCAI will ever achieve such a level of profitability. Accordingly, the Projections assume no recovery from the Debtors' receivable from or interest in OCAI.

(C)  The Company anticipates receiving a tax refund due to Hurricane Katrina losses in the fourth quarter of FY2006 for approximately $14.0 million and a FY2005 state income tax refund of approximately $0.7 million.

(D)  The Projections assume the Company will receive payments from its insurance company in the fourth quarter of FY2006 for out-of-pocket expenses of approximately $1.6 million, and business interruption insurance between $0.9 million and $3.6 million as a result of Hurricane Katrina.

(E)  The Company expects to receive funds from inactive and litigating practices as a result of a buyout, settlement or under the terms of their BSAs. For purposes of the Projections, the Company has assumed that inactive and litigating practices ultimately pay the Company to settle outstanding claims of approximately $15.0 million.

(F)  Represents past due accounts from OrthAlliance since 1991 in the amount of $0.1 million. The Projections assume it will be written off per fresh start accounting.

(G)  The value of the property, plant and equipment as of the Effective Date is estimated to be $1.0 million. However, appraisals and valuations of these assets have not been obtained and are expected to affect the value of property, plant and equipment. There can be no assurance that appraisals and valuations, when obtained, will increase management's estimates of related value.

(H)  The Projections assume that the 168 affiliated doctors will enter into an SSA which will become effective as of July 1, 2006. Pursuant to the SSA, the affiliated doctors with

Capital Account Balances outstanding will begin making interest and quarterly principal payments beginning in the third quarter of FY2006.

(I)     Goodwill and Intangibles represents the excess of total reorganization value over the fair value of identifiable net assets, as of the Effective Date. Based upon the assumed reorganization value of $94.0 million and net debt of $66.3 million, the reorganization equity value of the Reorganized Debtors is calculated to be $27.7 million. The allocation of the reorganization value to individual assets and liabilities at this point has not been made in accordance to SOP-97.

(J)     Notes Payable to Doctors represents debt owed to doctors for affiliation purchases during prior periods. As of the third quarter of FY2006, $0.2 million of the debt is projected to continue to be amortized. The remaining is debt owed to defaulted doctors that is expected to be settled in litigation.

(K)     As outlined in the Plan of Reorganization, the Company will convert its existing post-petition term debt of approximately $92.2 million into a $50.0 million senior secured term loan at LIBOR + 6.00% due in 4 years and the remaining amount into 100% of the Company's equity.

(L)     The Company will pay off any outstanding amounts under the DIP Revolver from the proceeds of a new senior secured Working Capital Revolver estimated to be $10.0 million. The Working Capital facility will have a 4 year term and an interest rate of LIBOR + 6.00% and will have an opening outstanding balance of $9.96 million upon emergence.

**D.** **Debtors' Financial Projections.**

| Income Statement ($ Thousands) | Unaudited FIN 46 Actual FY2005 | Unaudited FIN 46 Actual Q1'06 | FIN 46 Estimated Q2'06 | FIN 46 Estimated YTD Q2'06 | Projected Q3'06 | Projected Q4'06 | Projected Q3'06-Q4'06 | Projected Q1'07 | Projected Q2'07 | Projected Q3'07 | Projected Q4'07 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Practice Revenues [2] | 353,735 | 72,956 | 64,311 | 137,267 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Service Fee Revenue [2] | 455 | 86 | 86 | 173 | 7,276 | 7,033 | 14,309 | 7,897 | 9,184 | 7,638 | 7,371 | 32,090 | 33,694 | 35,387 |
| Total Revenues | 354,190 | 73,043 | 64,397 | 137,440 | 7,276 | 7,033 | 14,309 | 7,897 | 9,184 | 7,638 | 7,371 | 32,090 | 33,694 | 35,387 |
| **Practice Level Expenses** | | | | | | | | | | | | | | |
| Doctor Expenses | 117,915 | 22,152 | 21,547 | 43,699 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Marketing Expenses | 15,644 | 4,512 | 4,246 | 8,758 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent Costs | 23,580 | 4,730 | 4,473 | 9,203 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Clinical Supplies | 30,666 | 6,094 | 6,397 | 12,491 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Practice Related SG&A | 27,087 | 5,499 | 6,126 | 11,625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Practice Salaries and Benefits | 84,541 | 16,824 | 14,629 | 31,453 | 14,947 | 14,908 | 29,855 | 15,468 | 15,480 | 15,822 | 15,785 | 62,555 | 66,477 | 70,976 |
| Reimbursement of Salaries and Benefits | 0 | 0 | 0 | 0 | (14,947) | (14,908) | (29,855) | (15,468) | (15,480) | (15,822) | (15,785) | (62,555) | (66,477) | (70,976) |
| Total Practice Level Expenses | 299,633 | 59,811 | 57,218 | 117,030 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % of Total Revenues | 84.6% | 81.9% | 88.9% | 85.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Corporate Level Expenses** | | | | | | | | | | | | | | |
| Salaries & Benefits | | | | | 3,507 | 3,571 | 7,078 | 3,581 | 3,668 | 3,668 | 3,668 | 14,584 | 15,111 | 15,565 |
| Accounting/Legal | | | | | 492 | 298 | 791 | 325 | 247 | 257 | 257 | 1,086 | 1,049 | 1,061 |
| Insurance/Liability | | | | | 364 | 364 | 728 | 364 | 364 | 379 | 379 | 1,487 | 1,546 | 1,608 |
| Marketing | | | | | 198 | 198 | 396 | 198 | 198 | 206 | 206 | 807 | 840 | 873 |
| Rent | | | | | 175 | 175 | 349 | 175 | 175 | 182 | 182 | 716 | 745 | 774 |
| Licenses/Taxes/Fees | | | | | 240 | 240 | 480 | 240 | 240 | 250 | 250 | 980 | 1,019 | 1,062 |
| Equipment Purchases/Leasing/Maint. | | | | | 152 | 150 | 302 | 152 | 150 | 158 | 155 | 615 | 639 | 665 |
| Utilities & Telephone | | | | | 108 | 108 | 216 | 108 | 108 | 112 | 112 | 440 | 458 | 476 |
| Office Supplies/Shipping & Postage | | | | | 78 | 78 | 156 | 79 | 82 | 81 | 82 | 323 | 336 | 349 |
| Meetings/Conferences/Training | | | | | 5 | 325 | 330 | 117 | 588 | 68 | 400 | 1,173 | 1,220 | 1,269 |
| Public Relations/Recruiting/Other | | | | | 150 | 155 | 306 | 162 | 162 | 156 | 162 | 638 | 665 | 692 |
| Total Corporate Level Expenses [2] | 22,901 | 5,806 | 4,125 | 9,831 | 5,469 | 5,662 | 11,131 | 5,499 | 5,981 | 5,517 | 5,853 | 22,858 | 23,627 | 24,421 |
| % of Total Revenues | 6.5% | 7.9% | 6.4% | 7.2% | 75.2% | 80.5% | 77.8% | 69.6% | 65.1% | 72.2% | 79.4% | 71.2% | 70.5% | 69.0% |
| Depreciation and Amortization | 12,905 | 3,076 | 3,045 | 6,121 | 542 | 57 | 599 | 59 | 60 | 62 | 63 | 245 | 269 | 293 |
| Operating Income | 18,749 | 4,348 | 9 | 4,358 | 1,266 | 1,313 | 2,579 | 2,339 | 3,142 | 2,060 | 1,454 | 8,995 | 9,598 | 10,674 |
| % of Total Revenues | 5.3% | 6.0% | 0.0% | 3.2% | 17.4% | 18.7% | 18.0% | 29.6% | 34.2% | 27.0% | 19.7% | 28.0% | 28.7% | 30.2% |
| Restructuring & Non-Recurring Costs | 6,024 | 6,454 | 5,103 | 11,557 | 4,250 | 0 | 4,250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Earned Interest | (633) | (118) | (160) | (279) | (496) | (471) | (966) | (446) | (424) | (396) | (377) | (1,635) | (1,259) | (849) |
| Interest Expense | 7,333 | 3,397 | 3,697 | 7,094 | 2,801 | 1,412 | 4,213 | 1,103 | 1,036 | 968 | 909 | 4,016 | 3,114 | 2,448 |
| Loss on Asset Disposal | 23,202 | 634 | 0 | 634 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Expense / (Income) | 68,739 | 39,729 | 0 | 39,729 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Before Income Taxes | (85,836) | (45,748) | (8,629) | (54,377) | (5,390) | 371 | (5,018) | 1,682 | 2,527 | 1,488 | 917 | 6,615 | 7,744 | 9,068 |
| Income Taxes | (31,367) | (16,765) | 0 | (16,765) | 0 | 136 | 136 | 614 | 922 | 543 | 335 | 2,414 | 2,819 | 3,310 |
| Net Income (loss) | (54,469) | (28,983) | (8,629) | (37,613) | (5,390) | 236 | (5,153) | 1,068 | 1,605 | 945 | 582 | 4,200 | 4,906 | 5,758 |
| Operating Income | 18,749 | 4,348 | 9 | 4,358 | 1,266 | 1,313 | 2,579 | 2,339 | 3,142 | 2,060 | 1,454 | 8,995 | 9,598 | 10,674 |
| Depreciation and Amortization | 12,905 | 3,076 | 3,045 | 6,121 | 542 | 57 | 599 | 59 | 60 | 62 | 63 | 245 | 269 | 293 |
| EBITDA [1] | 31,654 | 7,475 | 3,054 | 10,479 | 1,807 | 1,370 | 3,178 | 2,398 | 3,203 | 2,122 | 1,518 | 9,240 | 9,867 | 10,966 |
| % of Sales | 8.9% | 10.2% | 4.7% | 7.6% | 24.8% | 19.5% | 22.2% | 30.4% | 34.9% | 27.8% | 20.6% | 28.8% | 29.5% | 31.0% |

(1) FY2005, Q1'06 and Q2'06 gross practice revenues and EBITDA includes non-cash deferred revenues of $11.5 million, $2.1 million and $1.8 million, respectively.

(2) Projections assume the new fee structure effective as of July 1, 2006 for the 168 active doctors pursuant to their SSA agreements.

(3) FY2005 and Q1'06 G&A expenses have been adjusted for $6.0 million and $3.0 million of non-recurring expenses, respectively.

| Balance Sheet ($ Thousands) | Unaudited FIN 46 Actual FY2005 | Unaudited FIN 46 Actual Q1'06 | FIN 46 Estimated Q2'06 | Projected Q3'06 | Projected FY2006 | Projected Q1'07 | Projected Q2'07 | Projected Q3'07 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | |
| Current Assets: | | | | | | | | | | | |
| Cash | 5,274 | 6,504 | (0) | 0 | 0 | 0 | 0 | 0 | 0 | 3,298 | 4,125 |
| Patient Receivables, net | 96,437 | 87,300 | 75,448 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Service Fee Receivables | 0 | 0 | 0 | 1,196 | 1,156 | 1,298 | 1,510 | 1,256 | 1,212 | 1,291 | 1,374 |
| Supplies Inventory | 8,622 | 7,671 | 6,593 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Intercompany A/R ($12.5 Million Less Reserves) | 40,578 | 40,578 | 12,500 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 |
| Income Tax Refund | 86,168 | 95,416 | 54,209 | 14,705 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Katrina Related Insurance Proceeds | 0 | 0 | 1,649 | 3,899 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Litigation Settlement | 0 | 0 | 0 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Other Assets | 3,910 | 3,764 | 4,174 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Assets** | 240,989 | 241,233 | 154,573 | 35,425 | 16,781 | 16,923 | 17,135 | 16,881 | 16,837 | 20,214 | 21,123 |
| | | | | | | | | | | | |
| Gross PP&E | 113,924 | 101,443 | 102,111 | 1,000 | 1,030 | 1,060 | 1,090 | 1,120 | 1,150 | 1,270 | 1,390 |
| Accumulated Depres. & Amort. | (59,799) | (55,441) | (58,098) | 0 | (57) | (116) | (177) | (239) | (302) | (571) | (863) |
| Net PP&E | 54,125 | 46,002 | 44,012 | 1,000 | 973 | 944 | 913 | 881 | 848 | 699 | 527 |
| | | | | | | | | | | | |
| Capital Account [1] | 8,174 | 7,193 | 7,132 | 24,778 | 23,539 | 22,300 | 21,062 | 19,823 | 18,584 | 13,628 | 8,672 |
| Advances to Practitioners | 11,279 | 6,948 | 8,315 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tax Assets | 12,442 | 12,675 | 12,675 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non Performing Assets | 28,665 | 25,595 | 25,446 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Goodwill & Intangibles | 209,537 | 187,749 | 187,750 | 36,984 | 36,984 | 36,984 | 36,984 | 36,984 | 36,984 | 36,984 | 36,984 |
| Deposits | 29 | 116 | 149 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investment in Sub ($1.5 Million Less Reserves) | 5,085 | 5,176 | 1,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Assets | 253 | 220 | 221 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL ASSETS** | 570,578 | 532,908 | 441,772 | 98,188 | 78,277 | 77,151 | 76,093 | 74,568 | 73,252 | 71,525 | 67,306 |
| | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | |
| Current Liabilities: | | | | | | | | | | | |
| Accounts Payable | 10,021 | 12,337 | 9,430 | 645 | 688 | 631 | 761 | 608 | 719 | 747 | 777 |
| Accrued Expenses | 16,339 | 15,015 | 12,187 | 3,425 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 |
| Deferred Revenue | 61,040 | 64,471 | 53,656 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | 87,400 | 91,824 | 75,273 | 4,070 | 3,813 | 3,755 | 3,886 | 3,733 | 3,843 | 3,872 | 3,902 |
| | | | | | | | | | | | |
| Note Payable to Former Officer | 3,000 | 3,000 | 3,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Notes Payable to Doctors | 652 | 729 | 725 | 163 | 152 | 140 | 129 | 117 | 105 | 56 | 4 |
| Amounts Payable to Practitioners | 7,432 | 6,967 | 9,172 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pre-Petition Senior Debt | 91,056 | 91,108 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Post-Petition Senior Debt | 0 | 0 | 92,182 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DIP Revolver | 0 | 0 | 5,211 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| General Unsecured Deferred Payment Liability | 0 | 0 | 0 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 |
| $50 Million Senior Secured Term Loan | 0 | 0 | 0 | 50,000 | 33,451 | 32,417 | 31,359 | 30,254 | 29,114 | 24,256 | 14,300 |
| $10 Million Working Capital Facility | 0 | 0 | 0 | 9,955 | 6,625 | 5,535 | 3,811 | 2,610 | 1,753 | 0 | 0 |
| **Total Liabilities** | 189,579 | 193,627 | 185,563 | 70,488 | 50,341 | 48,147 | 45,484 | 43,014 | 41,116 | 34,484 | 24,507 |
| | | | | | | | | | | | |
| Total Shareholders Equity | 380,999 | 339,280 | 256,210 | 27,700 | 27,936 | 29,004 | 30,609 | 31,554 | 32,137 | 37,041 | 42,799 |
| | | | | | | | | | | | |
| **LIABILITIES & SHAREHOLDERS' EQUITY** | 570,578 | 532,908 | 441,772 | 98,188 | 78,277 | 77,151 | 76,093 | 74,568 | 73,252 | 71,525 | 67,306 |

(1) Capital Account for fiscal 2005, Q1'06 and Q2'06 reflects promissory notes made by the Company to practioners.

Capital Account for Q3'06 and thereafter represent the capital account of active doctors pursuant to the new SSA agreements.

| Cash Flow Statement ($ Thousands) | Projected Q3'06 | Projected Q4'06 | Projected Q3-Q4 2006 | Projected Q1'07 | Projected Q2'07 | Projected Q3'07 | Projected Q4'07 | Projected FY2007 | Projected FY2008 | Projected FY2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| **PRACTICE LEVEL CASH FLOW:** | | | | | | | | | | |
| Practice Level Patient Receipts | $60,824 | $59,643 | $120,468 | $69,575 | $66,040 | $64,376 | $63,240 | $263,231 | $280,264 | $300,322 |
| Less Practice Level Disbursements | (37,744) | (37,475) | (75,220) | (40,626) | (39,872) | (40,086) | (39,838) | (160,422) | (169,612) | (180,402) |
| Less Doctor Compensation | (15,804) | (15,135) | (30,939) | (21,053) | (16,984) | (16,651) | (16,031) | (70,719) | (77,158) | (84,533) |
| Less OCA Service Fee | (7,276) | (7,033) | (14,309) | (7,897) | (9,184) | (7,638) | (7,371) | (32,090) | (33,494) | (35,387) |
| **Net Cash From Practices** | ($0) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | |
| **OPERATING ACTIVITIES:** | | | | | | | | | | |
| Net Income / (Loss) | ($5,390) | $236 | ($5,153) | $1,068 | $1,605 | $945 | $582 | $4,200 | $4,905 | $5,758 |
| Depreciation and Amortization | 542 | 57 | 599 | 59 | 60 | 62 | 63 | 245 | 269 | 293 |
| Change in Service Fee Receivables | 3,330 | 40 | 3,370 | (142) | (212) | 254 | 44 | (56) | (79) | (83) |
| Change in Income Tax Receivables | 0 | 14,705 | 14,705 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Change in Katrina Related Insurance | 0 | 3,899 | 3,899 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Change in Other Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Change in Accounts Payable | 5 | 43 | 48 | (57) | 130 | (153) | 111 | 31 | 29 | 30 |
| Change in Accrued Liabilities | (500) | (300) | (800) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Cash From Operating Activities** | ($2,014) | $18,681 | $16,667 | $928 | $1,584 | $1,108 | $800 | $4,420 | $5,123 | $5,998 |
| | | | | | | | | | | |
| **INVESTING ACTIVITIES:** | | | | | | | | | | |
| Capital Expenditures | (30) | (30) | (60) | (30) | (30) | (30) | (30) | (120) | (120) | (120) |
| Goodwill and Other Intangibles | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investments in Subs / International | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Doctor Debt Receivable | 0 | 1,239 | 1,239 | 1,239 | 1,239 | 1,239 | 1,239 | 4,956 | 4,956 | 4,956 |
| **Net Cash From Investing Activities** | ($30) | $1,209 | $1,179 | $1,209 | $1,209 | $1,209 | $1,209 | $4,836 | $4,836 | $4,836 |
| | | | | | | | | | | |
| **FINANCING ACTIVITIES:** | | | | | | | | | | |
| Note Payable to Former Officer | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Notes Payable to Doctors | 0 | (11) | (11) | (11) | (12) | (12) | (12) | (47) | (49) | (52) |
| Pre-Petition Senior Debt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Post-Petition Senior Debt | (50,000) | 0 | (50,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DIP Revolver | (5,211) | 0 | (5,211) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unsecured Creditors Committee | (2,700) | 0 | (2,700) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| $50 Million Senior Secured Term Loan | 50,000 | (16,549) | 33,451 | (1,034) | (1,058) | (1,105) | (1,141) | (4,338) | (4,858) | (9,556) |
| $10 Million Working Capital Facility | 9,955 | (3,330) | 6,625 | (1,091) | (1,723) | (1,201) | (857) | (4,872) | (1,753) | 0 |
| **Net Cash From Financing Activities** | $2,044 | ($19,890) | ($17,846) | ($2,137) | ($2,793) | ($2,317) | ($2,009) | ($9,256) | ($6,660) | ($10,007) |
| | | | | | | | | | | |
| **CASH BALANCE:** | | | | | | | | | | |
| Beginning Balance | 0 | (0) | (0) | (0) | 0 | 0 | 0 | (0) | (0) | 3,298 |
| Net Change | (0) | 0 | (0) | 0 | (0) | 0 | (0) | (0) | 3,298 | 826 |
| **Ending Balance** | ($0) | ($0) | ($0) | $0 | $0 | $0 | ($0) | ($0) | $3,298 | $4,125 |

## EXHIBIT "D-5"

**NOTE:** **While the references herein are to doctors, they include all related corporate, limited liability and partnership entities.**

## CURRENT BSA'S TO BE ASSUMED:

| | |
|---|---|
| Adams, II, Clement | Costanza, Adrian |
| Alborzi, Alexa | Crawford, Keith |
| Alexander, Richard | Crosby, Douglas |
| Allwood, Janet | Cupo, Darrin |
| Amason, Robert | Daughtry, Curtiss |
| Angolkar, Padmaraj | Davis, Larry |
| Apollon, Warren | Davis, Laura |
| Arango, Jose | DeJesus, Roy |
| Atkins, Jr., Charles | Delgado, Michael |
| Augustine, Peggy | Devereux, Jack |
| Aylward, Gerard | Dillingham, Michael |
| Barry, Daniel | Doan, Don |
| Bevis, Richard | Dornsife, Roy |
| Birth, Sheila | Dorsey, Jr., Joseph |
| Birth-Keller, Sheila | Dowling, David |
| Bonney, Teodora | Duchon, Stuart |
| Booker, Winifred | Echandy, Irma |
| Brand, David | Echols, Eric |
| Brown, Justin | Emmanuelli, Jr., Juan |
| Buchman, Dennis | Farabee, Ernest |
| Buchsieb, II, W. Charles | Geigel, Edgar |
| Cain, Steve | Ghiz, Fredrick |
| Camps, Robert | Goggans, Greg |
| Carey, Charles | Gordy, Don |
| Carlos Regala, Zinnia | Griffin, William |
| Carter, Gary | Guay, Jeffrey |
| Carter, Stephen | Guy, Jr., Louis |
| Cauble, Charles | Hamilton, Rachel |
| Caycedo, Claudio | Harbour, John |
| Charbonnet, Jr., Clayton | Hayes, Richard |
| Cho, Benjamin | Herman, David |
| Christian, Wayne | Herrscher, Rick |
| Clark, Darrell | Hishaw, Laila |
| Clark, John | |
| Clark, Maxine | |
| Cloth, Mark | |

**CURRENT BSA'S TO BE ASSUMED (CONTINUED):**

| | |
|---|---|
| Holland, Jr., Kenneth | McConnell, Gerald |
| Holloway, Marsha | McConnell, Jr., Beechard |
| Holte, Helen | McQueen, Jana |
| Huber, Emerick | Meader, Jennifer |
| Hughes, David | Metcalf, James |
| Hymas, T. Allan | Montini, Reid |
| Jackson, Jr., Joseph | Moore, James |
| Jacob, Robert | Nazarov, Andre |
| Jeansonne, Jr., Edmund | Nelson, Chauncy |
| Ji, John | Okun, Martin |
| Johnson, Jr., S. Meredith | Ornella, Eric |
| Johnson, Robert | Palma, Michael |
| Jones, Osmond | Park, Susan |
| Jones, Theodore | Parker, Jason |
| Jordan, Glenwood | Patel, Anand |
| Kapley, Kenneth | Petrover, Jonathan |
| Karkenny, Malko | Phillips, Kent |
| Kates, Dale | Pickard, William |
| Kelly, Vincent | Powell, Mark |
| Kelson, R. Paul | Pryor, Dennis |
| Kim, Michael | Ray, Robert |
| Kincaid, J. Jeff | Risinger, Ronald |
| Kishiyama, Craig | Rocke, Paul |
| Konegni, John | Rosenberg, Robert |
| Kopuri, N. Rao | Rothstein, Richard |
| Korsen, Glen | Sauter, John |
| Kuhn, Michael | Schimek, Joseph |
| Lala, Amitabha | Schrody, David |
| Lamb, Robert | Scotese, Terry |
| Lee, Causey | Shoopak, Alan |
| Lindsey, Robert | Silver, Arthur |
| Litowitz, Arthur | Silverman, Mitchell |
| Lovinggood, Thomas | Silvert, Michael |
| Ludwig, Steve | Sinha-Kennewick, Pramod |
| Machi, Grace | Smith, Robert |
| Martin, Dana | Souers, James |
| Martin, John | Stewart, Charles |
| Martisius, Daniel | Sturrup, Randolph |
| Mayfield, Samuel | Swenson, Reid |
| McCarthy, Karen | Torres, Daniel |

## CURRENT BSA'S TO BE ASSUMED (CONTINUED):

| | |
|---|---|
| Very, Daniel | Williams, Timothy |
| Waitkus, Alexander | Woehrle, Richard |
| Walters, Candace | Wolfe, Jr., Lloyd |
| Walters, Edward | Woodard, Thomas |
| Weir, Jr., G. Thomas | Woodworth, Don |
| Wells, Elgin | Yatrofsky, Steven |
| White Brown, Kerry | Youngker, Mark |

**CURRENT BSA'S NOT TO BE ASSUMED WITH RESERVATION OF RIGHTS BY DEBTORS TO REJECT OR WITH RESPECT TO TERMINATION OR OTHER RIGHTS:**

Casper, Jerome
Christakos, George
Costanzo, Michael
Cusimano, Joseph
Giacona, F. Thomas
Khan, Farah
Pawlak, Richard
Rencher, Kevin
Wakefield, Candace

**DEFAULTED BSA'S TO BE ASSUMED:**

| | |
|---|---|
| Acosta, John | Halliburton, Donald |
| Adams, Timothy | Harris, Billy |
| Bandeen, Roger | Hassel, Brent |
| Barbieri, Alan | Hickory, Wayne |
| Beitel, Brian | Hodges, Kellyn |
| Bevans, James L. | Hodgkins, Dudley |
| Boice, John K. | Hook, Bradley K. |
| Brehnan, Kenneth | Ison, Kevin |
| Brenkert, Dennis | Izzard, William R. |
| Brown, Kevin | Keller, Joe |
| Brown, Ronald | Kendrick, James |
| Buck, Robert | Kerns, Lisa |
| Burnheimer, John | Kiss, Lance |
| Bush, Hector | Krob, Raymond |
| Callender, Sr., Ralph | Kuipers, Peter |
| Cater, Robert | Littlefield, Kim |
| Cole, Steven N. | Lorentz, Robert |
| Cooper, Ford | Maness, Richard |
| Corwin, Charles | Mason, Jr., James |
| Crist, Michael | McCarthy, Michael |
| Cutler, Alan | McWilliams, Albert |
| DeGuzman, Lucy | Michaels, Christine |
| Dormois, Larry | Newbern, Jefferson L. |
| Eatmon, Kevin | Nicholson, Cornelius |
| Eberhardt, Thomas | Nirenblatt, Bradley |
| Eichel, Ronald | Packard, Robert |
| Enger, Daniel | Peters, Nicole |
| Etessami, Michael M. | Plikerd, William D. |
| Evans, Bruce A. | Roberts, Keith J. |
| Evans, James | Quas, Juliana Panchura |
| Fields, Robert | Quas, Vincent |
| Flanagan, Don | Schnibben, Charles |
| Fryar, Brian | Scott, Stuart |
| Fryar, Gene | Serrano, Paul |
| Fulcher, Roland L. | Sexson, Gary |
| Fuson, Steven | Shaver, Theresa |
| Gentile, John | Simon, Jan |
| Grandison, Nigel | Skibell, Richard |
| Grant, Damien | Smith, Austin |
| Grant, Ralph | |

**DEFAULTED BSA'S TO BE ASSUMED (CONTINUED):**

Starr, Stanley
Stevenson, Eugene
Terhune, William
Thacker, Robert A.
Turner, David
Watson, Jr., Garland
Watts, Samuel

Weinbach, Jonathan
Wetzel, Michael
White, David
Wilson, Timothy
Wood, Leighton
Wyatt, David

**DEFAULTED BSA'S NOT TO BE ASSUMED WITH RESERVATION OF RIGHTS AS TO REJECTION, AND ALL RIGHTS, CAUSES OF ACTION, CLAIMS AND DAMAGES INCLUDING BUT NOT LIMITED TO THOSE FOR BREACH OF CONTRACT, FRAUDULENT CONVEYANCE AND ALL OTHER LEGAL AND EQUITABLE RELIEF:**

Blount, Jimmie
Cook, Ronnie L.
Goodman, Angela
Hobson, David C.
Lee, Sung
Suadi, Carlos
Wilkinson, Bradley
Winn, II, Dennis
Wood, Eric