UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                          CASE NO. 06-10179

OCA, INC., ET AL.                               CHAPTER 11

　　DEBTORS                                       JOINTLY
                                                ADMINISTERED

## MEMORANDUM OPINION

This matter came on for hearing on September 5, 6, 11, 14 and 15, 2006 for the

confirmation of the amended and supplemental joint Chapter 11 plan of reorganization.

For the reasons set forth below, the court finds that the proposed plan of reorganization is

not confirmable under 11 U.S.C. § 1129.

**I.      Background Facts**

**A.      History of the Debtor**

Orthodontic Centers of America, Inc., (the "debtor" or "OCA") was formed in

1989 by Bart Palmisano, Sr., to develop a system to provide start up capital, equipment,

office space and business services to providers of dental care.  Mr. Palmisano was the

president and CEO of the company until May of 2006, when he resigned.  OCA has 51

wholly owned domestic subsidiaries and operates through these subsidiaries in most

states.  In addition, OCA has interests in a partially owned subsidiary, Orthodontic

Centers of America International, Inc., which operates in several countries worldwide.

The stock of OCA was publicly traded on the New York Stock Exchange, but trade was

suspended on November 8, 2005, partially as a result of OCA's failure to file required

1

financial statements.  According to OCA, the failure to file the financial statements was a result of its failure to complete its audits for the years 2004 and 2005 due to accounting irregularities that occurred in 2001 that have yet to be resolved.  The stock of OCA continues to be delisted and now trades on the Pink Sheets Electronic Quotation Service.

The basic business model of OCA and its subsidiaries is that they enter into business services agreements ("BSAs") with affiliated dental practices, primarily orthodontists.  OCA provides the necessities for starting up and running a dental practice, i.e., office space, equipment, trained office staff, computer software for managing the practice, etc., and in exchange the affiliated practice pays a monthly service fee based on a percentage of the practice's profits and practice related expenses.  These BSAs are the primary operating asset of OCA and are the means through which it generates its revenue. Beginning in late 2004, some of the affiliated practices began to stop performing under the BSAs, and litigation ensued between OCA and the affiliated practices.  Since late 2004 a significant portion of the affiliated practices have either terminated or indicated an interest in terminating their BSAs with the debtor.  Additionally, in late August 2005, Hurricane Katrina struck the Gulf Coast and had such a devastating effect on OCA's Louisiana headquarters that it had to be relocated to Florida, which created numerous operating problems for OCA.

**B.     History of the Case**

OCA and certain of its subsidiaries filed a Chapter 11 petition under the

2

Bankruptcy Code with this court on March 14, 2006.[1]  A small number of additional

subsidiaries filed Chapter 11 petitions on March 17, 2006 and June 2, 2006.  All of the 51

subsidiary debtors' cases have been consolidated and are being jointly administered with

the main case.[2]  The plan proponents filed a plan of reorganization followed by several

modified and amended plans, and the confirmation hearing was held over several days in

September 2006.[3]  The main objections to the plan were raised by Bart Palmisano, Sr., the

former president, chief executive officer and chairman of the board of directors of the

debtor, and a current shareholder and creditor of the debtor, who was entitled to vote in

both classes 4 and 6;[4] Mr. Palmisano voted against the plan in both classes in which he

was entitled to vote.  The debtor did not obtain enough favorable votes to confirm the

plan under 11 U.S.C. § 1129(a), and thus, it seeks a cramdown of the plan under §

1129(b) of the Bankruptcy Code over the objections of Mr. Palmisano.


## II.    Legal Analysis

At the confirmation hearing, the court found that the plan conformed to the

---

[1]  See title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

[2]  For simplicity, when the court refers to OCA or the debtor, the court means all of the 52 debtor companies collectively unless it specifically enumerates an individual company.

[3]  The plan proponents are the debtor, the Unsecured Creditors' Committe, Silver Point Finance, LLC (the secured lender) and the Official Equity Committee.

[4]  Class 4 consists of all allowed general unsecured claims, and class 6 consists of all allowed equity interests in OCA.

majority of the requirements of 11 U.S.C. § 1129(a); thus, the court will address only the few objections remaining at this time.  The questions the court must address are 1) the correct value of the debtor, and if the debtor is undervalued, whether the secured lender, Silver Point, is receiving value for its claim in excess of the allowed amount of its claim in contravention of 11 U.S.C. § 1129(b)(2)(A)(i); 2) whether the plan contravenes the absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B)(ii); and 3) whether the proposed contribution by the equity holders constitutes new value such that the plan can be confirmed over the objections of Mr. Palmisano.

### A.      The value of the debtor

Mr. Palmisano first objects to the plan on the basis that it violates the requirement under 11 U.S.C. § 1129(b) that a plan confirmed under that section be fair and equitable to each dissenting class.  The crux of Mr. Palmisano's argument is that the debtor is worth more than the debtor's experts say it is worth, and as a result, the secured creditor, Silver Point is receiving more than the value of its claim under the plan.

The debtor presented extensive testimony and exhibits concerning its value, and estimated the reorganization value of the debtor at somewhere between $73 million and $119 million, with a mid-range value of approximately $96 million.[5]  A second reorganization valuation for the debtor was presented and produced similar figures; the

---

[5]  Debtors' Exhibit 19 at p. 6.  This projected value of the debtor was calculated by Mr. Michael Gries who, along with his company Conway, DelGenio, Gries & Co., was hired as the chief restructuring officer and interim chief executive officer of the debtor.  The court recognized Mr. Gries as an expert for purposes of valuing the debtor.  See Transcript September 5, 2006 at p. 142.

second value was calculated to be between $78.2 million and $117.4 million, with a mid-range value of $97.8 million.[6]   Mr. Palmisano presented contradictory evidence, stating that his estimate of the reorganization value of the company was between $148 million and $189.9 million, with a mid-range value of $168.95 million.[7]

### 1.     Non-core assets[8]

Mr. Palmisano presents several reasons why the court should adopt his estimate of the value of the reorganized debtor over the valuation of the debtor's current CEO and Chief Restructuring Officer, Michael Gries, and the valuation of Mr. Jones, the expert retained by the Unsecured Creditors' Committee ("UCC").   Specifically, Mr. Palmisano disputes the debtor's valuation of the following "non-core" assets of the company: the debtor's 2005 Hurricane Katrina tax refund, a potential 2006 Hurricane Katrina tax refund, and the debtor's business interruption insurance claim for the disruption to the debtor's business resulting from Hurricane Katrina.   The court will examine each of these

---

[6]   Debtor's Exhibit 63 at p. 4.   The second estimate is provided by Mr. Jeffrey Jones of Loughlin, Meghji & Co., an investment banking and restructuring firm retained by the Unsecured Creditors' Committee.   The court also recognized Mr. Jones as an expert for purposes of providing a valuation of the debtor.

[7]   Palmisano Exhibit 89 at p. 1.   The court did not recognize Mr. Palmisano as an expert, but allowed him to testify as to his layman's opinion of the value of OCA because of his position in establishing the company and acting as an officer and director for the company from its inception until just after the Chapter 11 filing.   See Rule 701 of the Federal Rules of Evidence and *Texas A&M Research Foundation v. Magna Transportation, Inc.,* 338 F.3d 394, 403 (5th Cir. 2003) (Rule 701 does not preclude testimony by business owners or officers on matters that relate to their business affairs).

[8]   Although the terms "core" and "non-core" in the bankruptcy context usually refer to jurisdiction under 28 U.S.C. § 157, here the court uses the term "non-core", as the expert witnesses did, to refer to one-time revenue producing events.

potential assets.

The controversy with respect to the treatment in the expert's report of the 2005 Hurricane Katrina tax refund seems to be one of form rather than substance. Both parties agree that a tax refund in the amount of approximately $11 million has been applied for by the debtor. In the debtor's valuation report, this is reflected as a high value of $11 million, a low value of zero, and a mid-range value of $5.5 million.[9] In his valuation, Mr. Palmisano values the refund at $10.9 million, and treats the refund as a certainty, valuing it at $10.9 million at all levels, high, low and mid-range. Because this is simply a matter of which number is put in a column on an expert report, the court does not see this as a problem in need of resolution. Because the debtor included this $11 million figure in its evaluation, Palmisano's objection that the report has a zero figure is meaningless.

Mr. Palmisano states that the debtor has a potential 2006 Hurricane Katrina tax refund in the amount of $12.7 million dollars.[10] From the testimony and the evidence, it appears this calculation is based on the assumption that all of the doctors who sent notices to terminate their Business Service Agreements ("BSAs") in 2006 did so because of the 2005 hurricane.[11] The debtor presented as evidence several of the letters sent by doctors to the debtor terminating the BSAs.[12] These letters showed that out of the 31 doctors

---

[9] Debtor Exhibit 19 at p. 10-11.

[10] Palmisano Exhibits 89 and 91.

[11] Palmisano Exhibit 91; Trial Transcript of September 11, 2006 at pp. 248-248.

[12] Debtor's Exhibit 23.

listed by Mr. Palmisano in his Exhibit 91 as a basis for the purported 2006 tax refund, 21

of them sent letters declaring among other things that the reason for their notice

terminating their individual BSA was the decision rendered in a U.S. District Court in

Illinois declaring a similar BSA void under state law as an illegal practice of dentistry by

the debtor.[13]  The termination letters also cited the failure of the debtor to perform its

obligations under the agreements as reasons for termination.  None of these 2006 letters

admitted into evidence at the trial state that the reason for termination of a BSA was due

to Hurricane Katrina.  Mr. Palmisano's lame explanation for this was simply that it would

not have been "politically correct" for the doctors to mention Hurricane Katrina as a

reason for termination, apparently implying that the doctors were manufacturing other

reasons to support their terminations.[14]  The court notes, however, that Mr. Palmisano also

testified at one point that the 2006 termination letters were received as a result of the

aggressive actions of the lender, Silver Point, toward the debtor, not because of Hurricane

Katrina.[15]

The testimony of Mr. Jeandron, the tax expert retained by the debtor, establishes

that the tax legislation enacted in response to Hurricane Katrina allows a business

---

[13]  The U.S.D.C. case is entitled *Orthodontic Centers of Illinois, Inc. v. Michaels*, 403 F.Supp.2d 690 (N.D.Ill. 2005).  The court notes that 10 of the affiliated practices that were listed in Palmisano 91 did not have corresponding letters of termination in the Debtor's Exhibit 23. This is because the debtor did not include them; Mr. Palmisano, however, also did not produce them, so their contents are not in evidence for either side.

[14]  Trial Transcript of September 14, 2006 at p. 79.

[15]  Trial Transcript of September 14, 2006 at p. 79.

7

affected by the hurricane to calculate certain losses and deduct those losses on its tax return.  Mr. Jeandron further testified that any loss claimed must be "by reason of" or attributable to the hurricane.[16]  Mr. Gries stated that in his opinion, which was based on the information he was given by the accountants and attorneys retained by the debtor, it was not realistic to assume that the loss of business from most of the doctors who terminated their BSAs in 2006 would be considered as a loss attributable to Hurricane Katrina.[17]

Mr. Palmisano's contention that the losses from these doctors' cancellations should be attributed as a loss due to Hurricane Katrina for tax purposes was not adequately supported by enough evidence to overcome the weight that the court gives to the testimony of Mr. Greis and the termination letters entered into evidence.  This leads the court to find that Mr. Palmisano's estimate for a 2006 tax refund is overstated, and that the debtor's estimate of zero for a potential 2006 Hurricane Katrina related tax refund is a more accurate estimate for valuation purposes.

Mr. Palmisano also contends that the debtor has a claim under its business interruption insurance policy in the range of $10 to $25 million.  The debtor has estimated this claim in the range of $200,000 to $4.5 million.  Mr. Palmisano testified that his valuation was based on his knowledge that the debtor had a business interruption insurance policy with a policy limit of $30 million in place when Hurricane Katrina

---

[16]  Trial Transcript of September 6, 2006 at pp. 217-219.

[17]  Trial Transcript of September 6, 2006 at pp. 99-102.

8

struck.[18]  Mr. Palmisano further testified that he believed that Hurricane Katrina was the

cause of the doctors leaving, and that the debtor's losses from the doctors leaving was "in

the hundreds of millions of dollars of value."[19]  Mr. Palmisano then testified that he

believed the debtor had a claim under the insurance policy of $10 to $25 million:

> We had $30 million of insurance coverage.  That's the limit.  And, for the
> same reason that you were able to get the tax deductions as a result of
> Katrina, for the same reasons, I think you may have to litigate, but, you
> know, if I were at OCA, there would be a lawsuit filed against the insurance
> company right now showing the amount of the losses in value of these
> Business Service Agreements, and it's not even a struggle to get to $30
> million.  And, it seems to me that, even settlement value, you'd wind up
> with close to $10 million, it would seem to me.  And, that's not even
> trying.[20]

This testimony illustrates the tendency of Mr. Palmisano either to overestimate the value

of the insurance claim and/or to underestimate the difficulty of collecting from insurance

companies for Hurricane Katrina related losses.

On cross examination, Mr. Palmisano admitted that he had not done a calculation

as to the loss of business income for the period covered by the policy but had hired

someone to do so when he was still employed by the debtor.[21]  Mr. Palmisano also

admitted that he did not have the expertise to make a study of the policy and what was

---

[18]  Trial Transcript of September 11, 2006 at p. 242.

[19]  *Id.*

[20]  Trial Transcript of September 11, 2006 at pp. 245-246.

[21]  Trial Transcript of September 14, 2006 at p. 74.

actually covered by the policy.[22]

Mr. Gries testified that his valuation of the business interruption claim was based on the estimates put together with input and advice from the debtor's insurance advisors, and that it was based on a calculation of income lost from doctors that the debtor had determined had left because of the hurricane.[23]  Mr. Gries also testified that the insurance advisor whose advice he had relied on to calculate the loss of business income was the same one hired by Mr. Palmisano when he was still employed by the debtor.[24]

The court finds that the evidence presented by the debtor as to the value of the business interruption claim was more persuasive than the evidence presented by Mr. Palmisano; thus, the court accepts the value of the business interruption claim as somewhere between $200,000 and $4.5 million as stated by the debtor.

2.      **Enterprise value**[25]

Mr. Palmisano also disputes the valuation by Mr. Gries on behalf of the debtor as to the "enterprise value" of the debtor, stating that Mr. Gries, in conducting his analysis of

---

[22]  Trial Transcript of September 14, 2006 at p. 75.

[23]  Trial Transcript of September 6, 2006 at p. 93.

[24]  Trial Transcript of September 6, 2006 at p. 95 and Trial Transcript of September 14, 2006 at p. 74.  Although the transcripts respectively spell the name of the advisor as Alex Sill and Alex Sewell, the parties are referring to the same advisor.

[25]  The enterprise value of the debtor consists of the going concern value of the company as well as the discounted present value of non-operating assets (capital accounts, debt and other obligations owed by affiliated practices under the BSAs, service fees, and proceeds relating to objecting doctors).  Debtor's Exhibit 19 at p. 7.

10

the debtor, inconsistently and arbitrarily excluded certain revenues of the debtor, namely

the revenues from active and stipulating doctors,[26] and the revenues from the collection of

capital advances made to affiliated practices, before applying the comparable company

trading multiples.[27]  Mr. Palmisano also argued that Mr. Gries made incorrect

assumptions about the debtor's corporate level expenses going forward.

The court begins by addressing what Mr. Palmisano refers to as the "capital

account" on his spreadsheet.[28]  Mr. Palmisano values this at a low value of $25 million, a

high value of $38 million and a mid-range value of $31.5 million.  Mr. Palmisano defines

"capital account" as, "doctor debt, amounts owed to OCA from doctors for amounts that

OCA had loaned to them for their share of the fixed assets and the start-up costs for their

practices."[29]  Mr. Palmisano stated that the total amount owed in this category was about

$50 million.[30]  The debtor's liquidation analysis lists this as "other advances to

practitioners" at a value of $50.6 million,[31] so the parties seem to agree as to the initial

amount of the advances.  They disagree quite strongly, however, as to how collectible this

---

[26] Active and stipulating doctors refers to those doctors that have expressed a desire to
terminate their BSAs but are currently paying the fees due under those BSAs until litigation as to
the validity and enforceability of those BSAs can be completed.

[27] Mr. Palmisano similarly disputes the valuation of Mr. Jones, the UCC's expert because
parts of his calculations are based on figures produced by Mr. Gries.

[28] Palmisano Exhibit 89.

[29] Trial Transcript of September 11, 2006 at p. 249.

[30] Trial Transcript of September 11, 2006 at p. 249.

[31] Debtor's Exhibit 22 at p. 9.

$50 million will be. Mr. Palmisano offered no evidence of his calculations as to the value

of this asset other than to say that when he was employed by the debtor he had a

spreadsheet of the value indicating the collectible amount was $38 million.[32]  Mr.

Palmisano did not produce this spreadsheet.  He later stated that he believed 70 to 80

percent of the doctors who owed money to the debtor in this category were paying on that

debt.[33]  His explanation as to his low value of $25 million was even less probative:

> I started off with the $38 million.  Just based on some court records I saw,
> there's a term sheet to the doctors whereby their debt would be converted
> into this thing called a capital account.  And, there would be some debt
> reduction.  I don't know what the amount of the debt reduction would be,
> but I would suspect – it can't be any higher than $38 million, and I just
> picked $25 million as a low amount; that might be a good number.

In its valuation approach the debtor presented differing testimony as to the value of

this category of assets.  On direct examination Mr. Gries indicated that he had valued

what Mr. Palmisano termed capital accounts at around $16 to $18 million.  On redirect,

Mr. Gries clarified that he had valued the potential recovery of this asset at about $17.5

million.  Mr. Gries explained that there was no single line in his valuation report that gave

this figure directly, but that it was included as part of the non-operating value.  Mr. Gries

further stated that his value of $17.5 million for this category of assets stemmed from:

> An actual doctor by doctor review that we did and because what we found
> out was again, contrary to what I think Mr. Palmisano said is there's only
> about 15 percent of the doctors who are actually amortizing, currently
> amortizing, meaning paying, Your Honor.  And of the active – and that

---

[32]  Trial Transcript of September 11, 2006 at p. 251.

[33]  Trial Transcript of September 14, 2006 at p. 90.

12

includes all doctors.  Of the active doctors, only 25 percent of them are currently paying.[34]

Mr. Gries also testified that one reason the value of this asset was fairly low was because these were debts owed by doctors for which the debtor did not have promissory notes or other good supporting documentation, and that this would make collecting these debts through litigation difficult.[35]  Mr. Gries also stated that some of the doctors who owed these debts were simply not capable of ever paying the debt given the amount of cash that their practices generate.[36]

Although there is no supporting documentation that was entered into evidence that would give further probative value to these statements, the court finds Mr. Gries's testimony credible.  The court further finds that an analysis done with the intent of determining a value for the debtor that proceeded on a doctor by doctor basis as to the collectability of this debt to be more indicative of the true value than an estimate based on Mr. Palmisano's memory of an unidentified spreadsheet created at some time when Mr. Palmisano was still employed by the debtor; thus, the court finds the debtor's estimate as to the value of these accounts to be the more persuasive.

The court next addresses Mr. Palmisano's contention that the debtor's allowance for corporate level expenses is overstated.  The debtor estimates its total corporate

---

[34]  Trial Transcript of September 14, 2006 at p. 152.

[35]  Trial Transcript of September 6, 2006 at p. 72.

[36]  *Id.*

13

overhead expenses will be approximately $22 million per year going forward. The debtor presented significant testimony through Mr. Gries that supported its figures for corporate expenses. Mr Gries testified that although he expected the litigation expenses included in this category to fall as a result of renegotiating contracts with doctors and reaching settlements, there would be no guarantees that the litigation expenses would disappear entirely.[37]

Mr. Gries's testimony was consistent with Mr. Palmisano's statement that the employees were the biggest expense. Mr. Gries stated there were currently 125 to 150 corporate level employees at an annual cost of approximately $13 to $14.4 million.[38] Mr. Gries stated that the debtor planned to add a significant number of employees, which would increase corporate expenses. He testified that the debtor needed to expand its finance and control department to address the problems in financial oversight that the debtor had experienced pre-petition.[39] He also stated that the debtor intended to expand its practice enhancement group so that the debtor could provide better service to the

---

[37] Trial Transcript of September 6, 2006 at p. 75. The litigation expenses cannot be expected to disappear or even decrease in 2007. There are approximately 96 adversary proceedings pending between the debtor and the affiliated practices scheduled for trial commencing in March 2007.

[38] Trial Transcript of September 6, 2006 at pp. 76-77.

[39] Trial Transcript of September 6, 2006 at pp. 77-78; Trial Transcript of September 14, 2006 at pp. 149-150. The debtor is currently delisted by the New York Stock Exchange and under investigation by the Securities and Exchange Commission because of its failure to file financial statements required by publicly traded companies. This failure in turn is apparently due to accounting irregularities in the debtor's records that need to be resolved.

14

doctors, presumably to eliminate the pre-petition problems that had led to a large number of doctors deciding to terminate their contracts.[40]  Mr. Gries also testified that the debtor planned to recruit new doctors and expand its business, which would also require additional staff; however, he did elaborate that his projections were conservative and did not assume that these expansion efforts would be successful.[41]

Mr. Palmisano argues that $22 million is excessive and estimates that corporate overhead should cost no more than $12.8 million per year.  Mr. Palmisano testified that his estimate was based on the fact that much of the expense incurred in the corporate expenses category was attributed to employee costs.  He stated that before Hurricane Katrina, there were 170 corporate level employees, and after Katrina there were 120 corporate level employees.[42]  Additionally, he stated that the number of doctors being serviced had fallen from 400 to 150, and that in 2004 and 2005 there had been extra corporate level employees added to assist in plans to open additional offices.[43]  Thus, Mr. Palmisano stated that, in his opinion, the corporate expenses should be significantly reduced from pre-petition levels.  Mr. Palmisano's testimony did not address the testimony of Mr. Gries as to the reorganization plans of the debtor and apparently relied

---

[40]  Trial Transcript of September 6, 2006 at p. 77; Trial Transcript of September 14, 2006 at p. 150.

[41]  Trial Transcript of September 6, 2006 at p. 78.

[42]  Trial Transcript of September 14, 2006 at p. 23.

[43]  Trial Transcript of September 14, 2006 at pp. 22-24.

on Palmisano's belief that because the debtor is now smaller, less corporate overhead would be needed.  This is not an altogether unreasonable assumption, however, the court finds it significant that Mr. Palmisano's assumption did not take into account the current plans of the debtor as outlined above.

The court has considered the testimony of both parties as to the necessity for and probable amount of corporate expenses and finds the testimony of Mr. Gries to be more persuasive.  Although Mr. Palmisano is certainly correct that the debtor is operating as a much smaller company, the additions to staff that Mr. Gries stated the debtor plans to make, do appear necessary.  It is evident to the court that the debtor had significant problems pre-petition that need to be addressed if the debtor is to reorganize successfully, and putting additional finance and accounting staff in place as well as hiring additional staff to support the doctors both appear to be much needed changes that should contribute to the health of the reorganized debtor.  The court also finds persuasive Mr. Gries's testimony that the debtor does plan to expand, contrary to Mr. Palmisano's assumptions to the contrary.  The court finds that Mr. Gries's decision not to add revenues from doctors who may at some time in the future contract to use the debtor's services into his projections is reasonable under the circumstances.  The court agrees that at this point in the debtor's trajectory it is best for the debtor to proceed cautiously when estimating future revenue.

Finally, the court addresses Mr. Palmisano's contention that the debtor arbitrarily excluded revenues from active and stipulating doctors when calculating the

16

reorganization value of the debtor.[44]  Mr. Palmisano argues that when calculating the

projected 2007 earnings before interest, taxes, depreciation and amortization,

("EBITDA") Mr. Gries incorrectly subtracted $2.9 million and thus, the adjusted

EBITDA used by Mr. Gries to calculate the value of the reorganized debtor is too low.

Mr. Gries testified, however, that the $2.9 million was subtracted because it represented

revenue from doctors who had objected to the assumption of their BSAs by the debtor

and therefore could not be counted in the EBITDA that was to be multiplied to arrive at a

projected value for the reorganized debtor.  Mr. Gries explained that this was proper

because when calculating the reorganization value, he was looking forward for a period of

three years.  Because it is unlikely that the objecting doctors will still be performing in

three years, it is not proper to calculate a three year projection using the revenues

expected from those doctors.[45]  Thus, Mr. Palmisano's contention that, "Mr. Gries offered

no sound explanation for this seemingly inconsistent manipulation of these revenues,

which resulted in a substantially reduced estimate of enterprise value," is wrong and is

flatly rejected by this court.[46]  Mr. Palmisano did not offer any testimony that rebutted the

correctness of Mr. Gries's calculations.  Additionally, on cross-examination, Mr.

Palmisano testified that he was unaware that Mr. Gries's calculations were adjusted for

the probability that several doctors would probably leave in two years or less and

---

[44]   Bartholomew F. Palmisano, Sr.'s Post-Hearing Memorandum at pp. 4-6 (P-1878).

[45]   Trial Transcript of September 6, 2006 at pp. 79-81.

[46]   Bartholomew F. Palmisano, Sr.'s Post-Hearing Memorandum at p. 6 (P-1878).

admitted that he would not use a high EBITDA multiplier for doctors who were projected to leave in two years.[47]

The court finds that the objections of Mr. Palmisano as to the supposed under-valuation of the debtor by Mr. Gries to be unsupported by the evidence presented at the hearing.  Mr. Gries presented a detailed valuation report calculating the value of the company under several methods.  This multiple valuation approach has been recommended as the best way to obtain an accurate valuation.[48]  The valuation report contained both the above mentioned comparable company analysis, which valued the debtor at between $74.5 and $119.3 million, as well as a discounted cash flow analysis, which presented both a terminal EBITDA multiple model valuing the company at between $71.6 and $116.7 million, and a perpetuity growth model estimating the company's value at between $69.9 and $119.6 million.[49]  The results of the different valuation models were consistent with each other and with the valuation presented by Mr. Jones, the UCC's expert.  Mr. Palmisano's valuation was far higher than any other valuation, and it lacked sufficient supporting documentation to lend weight to the credibility of his estimate.  Comparing the mid-range figures shows that Mr. Palmisano's evaluation of the company's worth exceeds that of the debtor by approximately $72

_____

[47]  Trial Transcript of September 14, 2006 at pp. 95-97.

[48]  *See* 7 Collier on Bankruptcy ¶ 1129.06[2], p. 1129-172-188 (rev. 15th ed. 2004); Pantaleo & Ridings, Reorganization Value, 51 Bus. Law. 419 (1996).

[49]  Debtor's Exhibit 19 at pp. 13-23.

18

million, such a substanital over evaluation that it leads the court to give far less weight to

Mr. Palmisano's testimony than that afforded to the testimony of the two recognized

experts.  Accordingly, the court holds that the value presented in the debtor's expert

report and supplemented by the testimony of Mr. Gries  represents a reasonable value for

the debtor.  The plan proponents carried their burden of proving the appropriate value of

the debtor to be used for purposes of plan confirmation is the range between $74 and

$119 million with a midpoint of approximately $96 million.[50]  The aggregate amount of

the secured claim and the estimated administrative expenses as of September 25, 2006

was approximately $111 million.[51]  The court finds that the secured lender, Silver Point, is

not receiving more than the value of its claim in violation of 11 U.S.C. §1129(b)(2)(A)(i).

## B.    Absolute priority rule

Mr. Palmisano also objects to the debtor's plan of reorganization because he

contends that the plan violates the absolute priority rule codified at 11 U.S.C. §

1129(b)(2)(B)(ii).[52] The plan provides for payment in full of the secured creditor, Silver

---

[50]  Although it may initially appear strange that the court accepts such a wide range of
value ($74 to $119 million) for the debtor and that accepting a mid-range of $96 million is
overly simplistic, this is an acceptable valuation finding because valuation of a business, despite
all the theories, explanations and formulas, is still an inexact science:  "Entity valuation is much
like a guess compunded by an estimate."  See 7 Collier on Bankruptcy ¶ 1129.06[2][c], p. 1129-
188 (rev. 15th ed. 2004), quoting Peter Coogan, *Confirmation of a Plan Under the Bankruptcy
Code,* 32 Case W. Res. L. Rev. 301, 313 n.62 (1982).

[51]  Plan Supporters' Proposed Findings of Fact and Conclusions of Law (P-1877) at p. 14.

[52]  11 U.S.C. § 1129(b)(2)(B)(ii) reads:

For purposes of this subsection, the condition that a plan be fair and equitable

19

Point.  It also provides for payments to the general unsecured creditors, potentially

payment in full over time, but the plan does not provide for any interest on the allowed

general unsecured claims; thus, their claims are not paid in full.[53]  At issue is section 3.6.3

of the plan which outlines a proposed settlement (the "Equity Settlement") by which

Silver Point, the senior lender, extends to the equity holders certain "Participation

Rights".  Section 3.6.3 provides that the senior lender waives its right to receive up to

15% of the new common stock that it is entitled to receive under the plan in favor of the

equity holders in exchange for their agreeing not to raise objections to the plan and to

issue a press release setting forth their support of the plan.[54]

### 1.    Cases holding the absolute priority rule inapplicable

The plan proponents argue that the Participation Rights are a "gift" to the equity

holders from the secured lender.  They further argue that because the debtor owes more to

the secured lender than it is worth, the secured lender takes all of the debtor's assets under

---

with respect to a class includes the following requirements:
(B) With respect to a class of unsecured claims–
(ii) the holder of any claim or interest that is junior to the claims of such class
will not receive or retain under the plan on account of such junior claim or
interest any property...

[53]  *See* 7 Collier on Bankruptcy ¶ 1129.04[4][a][i][C] p. 1129-97 (rev. 15th ed. 2004); *In re Made in Detroit, Inc.,* 299 B.R. 170, 182 (Bankr.E.D.Mich. 2003).

[54]  Only former equity holders holding at least 1 million shares of stock are eligible to participate in the Rights Offering under the terms of the agreement.  *See* Plan Supporter's Reply Brief (P-1903) at p. 10.  *See also* Exhibit A to P-1684 (which is not in evidence) that describes more fully the Participation Rights to be made available to the equity holders through a modification to the plan that the plan proponents ask the court to confirm.

any plan or liquidation; thus, the argument goes, the secured lender has the right to do whatever it wants with its money, including sharing some of it with the equity holders through the Participation Rights if it chooses to do so.  Palmisano argues, however, that this is not permissible, and that section 3.6.3 violates the absolute priority rule by giving property to the equity holders even though the general unsecured creditors will not be paid the full value of their claims.

The plan proponents argue that this court should follow a line of cases beginning with *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1ˢᵗ Cir. 1993), a Chapter 7 case in which the secured lender and the Unsecured Creditors' Committee reached an agreement, while the debtor was in Chapter 11, to cooperate in order to maximize their respective recoveries from the debtor.  Among other things, the agreement called for the secured lender to pay some of its recovery to the unsecured creditors.  The debtor eventually converted to Chapter 7 and was liquidated.  A motion was then filed to require distribution of the entire sale proceeds to the secured creditor; the motion further stated that the secured creditor would then remit a portion of those proceeds to the unsecured creditors in accordance with the agreement.  An objection was filed on behalf of certain tax creditors who claimed a priority status and argued that it would be a violation of Chapter 7's scheme of distribution for the unsecured creditors to receive payment ahead of a priority tax creditor.  The bankruptcy court and the district court agreed, but the United States Court of Appeals for the First Circuit reversed, holding that because the secured creditor held a lien on all property of the estate, the entire proceeds of the

21

bankruptcy estate belonged to the secured creditor.  Thus, the priority tax creditor could

take nothing from the estate because until the claims of all valid lien holders against the

property of the estate were satisfied, the distribution scheme of 11 U.S.C. § 726 was not

implicated.[55]  Because the agreement stated that the secured creditor and the unsecured

creditors were to pool whatever they received from the bankruptcy estate and then divide

the pooled funds, the sharing did not occur until after the distribution of estate property,

having no effect on the bankruptcy distributions to other creditors.[56]  The *SPM* court

concluded, "the Code does not govern the rights of creditors to transfer or receive

nonestate property.  While the debtor and the trustee are not allowed to pay nonpriority

creditors ahead of priority creditors, creditors are generally free to do whatever they wish

with the bankruptcy dividends they receive, including to share them with other

creditors."[57]  Additionally, and the court finds this to be an important distinction in the

instant case, the *SPM* decision did not implicate the absolute priority rule because the

debtor was in Chapter 7 and not Chapter 11; here, OCA is in Chapter 11, and the absolute

priority rule must be applied.

The *SPM* decision was followed by *In re MCorp Financial*, *Inc.,* 160 B.R. 941

(Bankr. S.D.Tex. 1993), in which a liquidating Chapter 11 plan was approved by the

district court.  In  *MCorp*, the debtor had been in protracted litigation with the FDIC, and

---

[55]   *In re SPM Manufacturing Corp.,* 984 F.2d 1305, 1312 (1st Cir. 1993).

[56]   *Id*.

[57]   *Id* at 1313 (internal citations omitted).

the senior creditors funded a settlement with the FDIC in order to put an end to the case so they could receive a distribution on their senior debt.[58] The junior creditors, who were subordinated bondholders, objected stating that the FDIC could not receive anything before they did because of the absolute priority rule.  The court held that because the plan in question was a straight liquidation, the proceeds of the assets were to be distributed in order of the classes' priority under the code: "The plan gives nothing to the classes below the subordinated bondholders," so § 1129(b)(2)(B)(ii) was met.[59]  The court did not make a finding as to whether the claim of the FDIC was in fact inferior to the junior creditors' claims.  The court simply held that, "the seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive as (sic) least as much as what they would without the sharing."[60]

The difference between the *MCorp* holding and the instant case, as this court sees it, is that the  *MCorp* court was approving a settlement of hotly contested litigation that had endured for over four years, and that settlement was funded by the senior bondholders to put an end to that litigation so that they could receive a distribution from the debtor's estate.  In the case before this court, the Participation Rights offered to the equity holders, although styled a "settlement" cannot be truly said to be a settlement in that same sense; there has been no litigation between the equity holders and the debtor, or

---

[58]  *In re MCorp Financial,Inc.,* 160 B.R. 941, 948 (Bankr. S.D.Tex. 1993).

[59]  *Id* at 960.

[60]  *Id.*

between the equity holders and Silver Point, that is ended by the approval of the plan
before this court.  The language of the purported settlement clearly states that the equity
holders are receiving the right to purchase new equity in exchange for agreeing not to
object to the plan.  This is not similar enough to the facts in *MCorp* for this court to
circumvent the absolute priority rule on the same grounds as approved by the court in
*MCorp.*

The next case cited by the plan proponents is   *In re Genesis Health Ventures, Inc.,*
266 B.R. 591 (D.Del. 2001), which allowed a senior lender to contribute to a management
incentive plan that even the court agreed was probably a thinly disguised payment to the
managers on account of their equity interests in the debtor.[61]  The court, however,  chose
to view the payment as "an allocation of the enterprise value otherwise distributable to the
Senior Lenders, which the Senior Lenders have agreed to offer the top executives as
further incentive to remain and effectuate the debtors' reorganization."[62]  The court went
on to hold that the senior lenders were free to make such an offer without violating the
"fair and equitable" requirement of § 1129(b), because of the court's determination that
the payment was not "on account of" the managers' former equity interests in the
debtor.[63]  The *Genesis* bankruptcy court's opinion has no precedential effect on this court

---

[61] *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 617 (D.Del. 2001).

[62] *Id* at 618.

[63]  The amendment made to 11 U.S.C. § 503(c) by BAPCPA, which severely limits the
payments allowed to be made to retain key employees or management, furthers the likelihood
that this type of arrangement would not be approved today.

and is not persuasive to this court for at least two reasons: 1) *Genesis* relies heavily on

*SPM* and *MCorp,* which this court feels do not support the proposed distribution through

a plan; and 2) many of the incentives offered to the top executives had already been

approved by the *Genesis* court by a final order six months before the objections to the

confirmation were raised.

Thus, in this court's view, the *SPM, Mcorp,* and *Genesis* cases do not support the

plan proponents' argument that the Participation Rights offered in the present case as a

part of plan confirmation is supported by caselaw, because the fact patterns and holdings

in those cases are all distinguishable from the case under consideration by this court.

## 2.    Cases applying the absolute priority rule

The ruling in *In re Sentry Operating Company of Texas, Inc.,* 264 B.R. 850

(Bankr.S.D.Tex. 2001) highlights why the proposed approach of the plan proponents is

problematic.  Although the case itself is not on point because it deals with unfair

discrimination between classes instead of absolute priority, it does offer a short discussion

as to why the Participation Rights offer proposed in the plan under consideration by this

court is violative of the absolute priority rule:

> To accept [the senior lender's] argument that a secured lender can, without
> any reference to fairness, decide which creditors get paid and how much
> those creditors get paid, is to reject the historical foundation of equity
> receiverships and to read the § 1129(b) requirements out of the Code.  If the
> argument were accepted with respect to § 1129(b) (sic) "unfair
> discrimination requirement," there is no logical reason not to apply it to the
> § 1129(b) "fair and equitable" requirement, or to the § 1129(a)(10)
> requirement that at least one class has accepted the plan.  To accept that
> argument is simply to start down a slippery slope that does great violence to

25

> history and to positive law.. . . The advantage of an equity receivership, and
> its descendant the chapter 11 reorganization, is (among others) (i) that going
> concern value is preserved or enhanced, (ii) that the debtor (in this case in
> league with the secured lender) is left in possession and control of the
> business to decide how to restructure it, (iii) that executory contracts can be
> assumed or rejected, (iv) that preferences and fraudulent conveyances can
> be recovered, and (v) that all other creditors are held at bay under an
> automatic stay while the plan is formulated and implemented.  The
> Bankruptcy Code establishes the price of these powerful equitable tools
> (when any class of creditors is impaired) as negotiation to win over the
> acceptance of an impaired class and treatment of all non-accepting classes
> fairly, equitably, and without unfair discrimination. [P]ropos[ing] to obtain
> the benefits of equitable tools without paying the price [is not a part of the
> statute].[64]

This language highlights this court's concern about attempts to circumvent the absolute

priority rule through section 3.6.3 of the plan .  Although this court agrees with the

proposition that a creditor receiving a distribution from an estate may do whatever it likes

with the money it receives *after* distribution, the court finds it troublesome when the

creditor purports to share with other creditors or equity, over the objection of an

intermediate class, through the mechanism of a plan in a Chapter 11 that this court is

called upon to confirm.

Mr. Palmisano argues that the case of *In re Armstrong World Industries,* 432 F.3d 507

(3rd Cir. 2005) is applicable to the provisions of this plan that attempt to allow the equity

holders to participate in the Participation Rights through the plan of reorganization.  In

*Armstrong* the bankruptcy judge entered findings of fact and conclusions of law

---

[64] *In re Sentry Operating Company of Texas, Inc.,* 264 B.R. 850, 865-866
(Bankr.S.D.Tex. 2001).

26

recommending confirmation of a Chapter 11 plan in which the debtors proposed to

distribute warrants to equity interest holders where the unsecured creditors received less

than a 100% distribution on their claims.  The warrants were to be issued to Class 7, a

class of asbestos personal injury claimants, who would in turn automatically waive the

distribution, causing the warrants to go to Class 12, the equity holders, who were the most

junior class.  The district court found that the plan violated the absolute priority rule,[65]

and the United States Court of Appeal for the Third Circuit upheld the district court.

The *Armstrong* district court made a point to distinguish the *SPM, MCorp,* and

*Genesis* cases on their facts and held that to the extent those cases "stand for the

unconditional proposition that creditors are generally free to do whatever they wish with

the bankruptcy dividends they receive, including sharing them with other creditors, so

long as recoveries received under the plan by other creditors are not impacted, without

adherence to the strictures of 11 U.S.C. § 1129(b)(2)(B)(ii), that contention is flatly

rejected here."[66]  The Third Circuit agreed with this reading of the *SPM, MCorp,* and

*Genesis* cases noting that, "the legislative history shows that section 1129(b) was at least

designed to address 'give-up' situations where a senior class gave property to a class

junior to the dissenting class."[67]  The Third Circuit concluded that the absolute priority

---

[65] *In re Armstrong World Industries,* 320 B.R. 523 (D.Del. 2005).

[66] *In re Armstrong World Industries,* 320 B.R. 523, 540 (D.Del. 2005) (internal citations omitted).

[67] *In re Armstrong World Industries,* 432 F.3d 507, 513 (3rd Cir. 2005).

rule applied and was violated by the distribution scheme set forth in *Armstrong*.  It also

recognized, however, that the absolute priority rule is not always absolute because there

are exceptions.  It dismissed the exceptions argued for by the plan proponents in that case

as inapplicable and affirmed the denial of confirmation by the district court.

This court finds that the Participation Rights proposed in this case are very similar

to the warrants that were to be distributed to Class 12 equity holders in *Armstrong*.  This

court also finds that the reasoning and holding of the district court and the Third Circuit in

*Armstrong* is far more persuasive than the tangential support the plan proponents rely

upon from *SPM, MCorp,* and *Genesis*.  This court therefore holds that the Participation

Rights offer to be granted to the equity holders in section 3.6.3 of the plan violates the

absolute priority rule set forth in §1129(b)(2)(B)(ii).

The other cases cited and discussed by the plan proponents do not support their

contention that the absolute priority rule is not violated here.  *In re World Health*

*Alternatives, Inc.,* 344 B.R. 291 (Bankr.D.Del. 2006) (settlement agreement approved and

treated as a carve out by the court, which also noted that the case was about to be

converted to a Chapter 7, so the absolute priority rule would not be implicated); *In the*

*Matter of Union Financial Services,* 303 B.R. 390 (Bankr.E.D.Mo. 2003) (old equity

receiving interest in reorganized debtor by virtue of "new value" exception to the absolute

priority rule).

The plan proponents also have provided the court with citations to several

unpublished cases, which the court has reviewed and found to be inapposite.  *In re*

28

*Iridium Operating LLC,* 2005 WL 756900 (S.D.N.Y.) (agreement treated as a Rule 9019

approval of compromise, not through a plan of reorganization); *In re WorldCom,* 2003

WL 23861928 (Bankr.S.D.N.Y.) (no junior class receiving anything under plan); *In re*

*Protocol Services, Inc.,* Nos. 05-6782 JM11 & 05-6786 JM11 (Bankr.S.D.Cal. 2005)

(equity granted to noteholders as a carve out provision); *In re Radio Unica*

*Communications Corp.,* No. 03-16837 (CB) (Bankr.S.D.N.Y. 2003) (deal approved as

part of a prepackaged bankruptcy, and no objections were raised).

   The problem with the cases that the plan proponents argue support their

interpretation is that none of the cited cases are factually on point with what the plan

proponents are proposing to this court, namely that the court approve a distribution to

equity holders through a plan of reorganization even though a dissenting class of

unsecured creditors is not paid in full and objections have been raised. This represents

quite a stretch beyond what has been approved in the published cases cited by the plan

proponents. Although the court recognizes that there has been a recent movement to

allow equity holders or other junior constituencies to receive payments through carve outs

and/or settlements, this does not appear to be a case in which such treatment is

appropriate. The purported settlement agreement between the equity committee, the

debtor and the senior lender states only that the lender agrees to waive its right to up to

15% of the common stock in the reorganized debtor in exchange for the equity committee

agreeing not to object to the plan confirmation and issuing a press release supporting the

settlement.[68]  If this is a settlement of some cause of action that the equity holders have

against the debtor, then it should have been explicitly presented as such through the plan

of reorganization or presented to the court through a Rule 9019 motion, and the parties

should have made a showing that the settlement is in the best interests of the estate, and

that it satisfies the three point test that the Fifth Circuit requires for approval of a

settlement.[69]  That was not done here and had a settlement of this nature been presented to

the court, it is doubtful that the court would have approved it as meeting the *Jackson*

*Brewery* criteria.

### C.    New Value Exception

The plan proponents contend that even if the proposed Equity Settlement does

violate the absolute priority rule, it falls under the new value exception to that rule.[70]  The

---

[68]  Term Sheet for Plan Settlement Agreement between Equity Committee, the Lenders, OCA Inc. (P-1684, Exhibit A).

[69]  *In re Cajun Elec. Power Co-op., Inc.* 119 F.3d 349 (5th Cir. 1997), *citing In re Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir. 1980), which holds that to assure a proper compromise a bankruptcy judge must evaluate:

    1.    The probability of success in the litigation, with due consideration for the uncertainty in fact and law;
    2.    The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and
    3.    All other factors bearing on the wisdom of the compromise.

[70]  The new value exception (or corollary, or doctrine) "provides that the objection of an impaired senior class does not bar junior claim holders from receiving or retaining property interests in the debtor after reorganization, if they contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise."  *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 442, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

Fifth Circuit has not ruled on the issue of whether the new value exception survived the

enactment of the Bankruptcy Code.[71]  The other Circuit courts are divided on the issue.[72]

Of the few bankruptcy and district courts in the Fifth Circuit that have addressed the

issue, all have held that there is a new value exception to the absolute priority rule.[73]

Although this court is not at all convinced that the Fifth Circuit would hold that a new

value exception exists, for now the court will go along with the majority of the courts that

have addressed the issue to date and will examine whether the plan proponents have

carried their burden of proof by proving by a preponderance of the evidence that the new

value exception to the absolute priority rule should be recognized here.[74]  The court

---

[71]  The Fifth Circuit issued a ruling holding that there was no new value exception but then on a petition for rehearing held that the portion of the opinion holding there was no new value exception was withdrawn.  *In the Matter of Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991).  Thus, no binding precedent on whether there is a new value exception exists for this court.

[72]  The Seventh and Ninth Circuits have held that the new value exception continues to be valid.  *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership,* 126 F.3d 955 (7th Cir. 1998), *rev'd without deciding issue,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999); *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir. 1993).  The Second and Fourth Circuits have questioned whether the new value exception still exists without expressly rejecting it.  *In re Coltex Loop Central Three Partners, L.P.,* 138 F.3d 39 (2nd Cir. 1998); *In re Bryson Properties, XVIII,* 961 F.2d 496 (4th Cir. 1992).

[73]  *Southern Pacific Transp. Co. v. Voluntary Purchasing Groups, Inc.* 252 B.R. 373 (E.D.Tex. 2000); *In re Way Apartments, D.T.,* 201 B.R. 444 (N.D.Tex. 1996); *Matter of Treasure Bay Corp.,* 212 B.R. 520 (Bankr.S.D.Miss. 1997); *In re Bluff Springs Paper Co., Ltd.,* 1994 WL 928894 (Bankr.N.D.Miss.).

[74]  In *Matter of Treasure Bay Corp.,* 212 B.R. 520 (Bankr.S.D.Miss. 1997), this particular bankruptcy judge held that the new value exception continued to exist and was satisfied in that case.  212 B.R. at 545.  That finding was based in part on a recognition by a bankruptcy court in Mississippi of the validity of the new value exception.  This court's reluctance now to hold squarely that the exception still exists is based in part on the fact that the Fifth Circuit, on

concludes that here the plan proponents have failed to meet the requirements for the

exception.

First, the court considers the requirements for the new value exception set forth by

the Supreme Court in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct.

1, 84 L.Ed. 110 (1939).  In *Case*, the court stated:

> It is, of course, clear that there are circumstances under which stockholders
> may participate in a plan of reorganization of an insolvent debtor.  Where
> the necessity for new capital exists and the old stockholders make a fresh
> contribution and receive in return a participation reasonably equivalent to
> their contribution, no objection can be made.  We believe that to accord the
> creditor his full right of priority against the corporate assets where the
> debtor is insolvent, the stockholder's participation must be based on a
> contribution in money or money's worth, reasonably equivalent in view of
> all the circumstances to the participation of the stockholder.[75]

Thus, for the equity holders to take advantage of the new value exception, there must be

1) a contribution that is new capital; 2) the contribution must be necessary for a

successful reorganization; 3) the contribution must be in money or money's worth; and 4)

the contribution must be reasonably equivalent to the value of the property acquired by

the equity holders.[76]

---

rehearing, withdrew its initial opinion finding that the new value exception did not survive in the
Bankruptcy Code.  Whether it exists or not does not affect the outcome of this case because this
court finds that the plan provision for the Participation Rights does not meet the requirement for
applicability of the exception.

[75] *203 N. LaSalle St. Partnership,* 526 U.S. at 445, 119 S.Ct. 1411, 143 L.Ed.2d 607
(1999), quoting *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed.
110 (1939).

[76] *Id.*

The court finds that the proposed contribution by the equity holders in this case does not meet these requirements.  The only immediate contribution provided for by the plan is that the equity holders will support the plan and will issue a press release to that effect.  Even if the court accepts for a moment the plan proponents' argument that the support of the equity holders is necessary for a successful reorganization, that is only one of the requirements of the exception.  The record is devoid of any evidence that this support is equivalent to new capital, that it is "money's worth," and certainly no evidence as to the value, either now, on the effective date, or in the future of the stock in the reorganized debtor that these certain equity holders would have a right to purchase.[77]

Although a new contribution in money for an indeterminate amount is eventually to be made by the equity holders, that is at some time in the distant future, and there has really been no showing that the contribution is necessary to confirmation.  In fact, as the court reads the plan, it is an option for some of the equity holders to purchase new common stock in the reorganized debtor.  If it is optional, then it cannot be said that it is necessary.

---

[77] The term sheet governing the Participation Rights provides that the equity holders as of the "Participation Record Date" shall be entitled to participate in the Participation Rights. The Participation Record Date is defined as three business days after the effective date.  The Participation Rights are good for thirty days after the Participation Rights Date.  The term sheet further states that the reorganized debtor shall notify those who qualify to participate of the exercise price for the Participation Rights two business days after the offering expires.  Thus, the price of the shares in the reorganized debtor is not determinable at this time.  Although a range of estimates of the price of the stock in the reorganized debtor was set forth as Exhibit A to the Term Sheet for Plan Settlement Agreement between Equity Committee, the Lenders, OCA Inc., there was no testimony as to these estimates presented to the court at the confirmation hearing, nor was the term sheet entered into evidence.

A second reason the court declines to find that the equity holders are contributing new value involves the United States Supreme Court's holding in *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) that the opportunity to buy something is property of some value.[78]  In *203 N. LaSalle,* the plan of reorganization proposed to offer an opportunity to certain former partners of the debtor to contribute new capital over a period of five years in exchange for ownership of the new debtor.  Although not all old equity would be contributing, only old equity holders could contribute because the purpose of the plan was to allow the former equity holders to avoid tax liabilities.  Those former partners who did not contribute would have their ownership interest extinguished.  The Supreme Court stated:

> Given that the opportunity [to contribute new capital] is property of some value, the question arises why old equity alone should obtain it, not to mention at no cost whatever.  The closest thing to an answer favorable to the Debtor is that the old equity partners would be given the opportunity in the expectation that in taking advantage of it they would add the stated purchase price to the estate.  But this just begs the question why the opportunity should be exclusive to the old equity holders.  If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain.  There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor.  And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning of subsection (b)(2)(B)(ii).  Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the

---

[78]  526 U.S. at 456.

34

purchase price by means of competing bids or even competing plan
proposals, renders the partners' right a property interest extended "on
account of" the old equity position and therefore subject to an unpaid senior
creditor class's objection.[79]

The court went on to state that, "under a plan granting an exclusive right, making no
provision for competing bids or competing plans, any determination that the price was top
dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to
determine value is exposure to a market."[80]  The court finished by holding that even if one
were to assume that there was a new value corollary, "plans providing junior interest
holders with exclusive opportunities free from competition and without benefit of market
valuation fall within the prohibition of §1129(b)(2)(B)(ii)."[81]  Thus, this court finds that
because the opportunity to purchase 15% of the common stock of the reorganized debtor
is permitted to only certain prior equity holders - those holding over one million shares of
old stock in the debtor as of the Participation Record Date - the requirements for new
value as set forth in *203 N. LaSalle* have not been met.[82]

The final reason the court finds that the proposed contribution is insufficient under
the new value exception is that the rationale employed by courts in continuing to accept

---

[79]  526 U.S. at 456 (internal citations omitted).

[80]  *Id* at 457.

[81]  *Id* at 458.

[82]  The court does recognize that the situation here is slightly different than in *203 N. LaSalle* in that the old equity entitled to participate is not old equity as of the filing date, but as of the Participation Record Date, and that the stock in the debtor has been trading since the time that the Chapter 11 petition was filed.

35

the new value exception is that doing so helps to balance the two major policies of the

Bankruptcy Code: preserving going concerns through reorganization and maximizing

property available to satisfy creditors.[83]   The plan proposed here provides that the new

capital infused through the proposed contribution by the equity holders will flow directly

to the reorganized debtor as a capital infusion.[84]   At no point do the funds that may be

contributed by the equity holders as "new value" go to pay unsecured creditors, rather, the

funds apparently are directed to the reorganized debtor.   The problem with this, as the

court sees it, is that the money contributed by the equity holders will go to boost the post-

confirmation value of the reorganized debtor, but will not necessarily result in additional

distributions to creditors.[85]   The plan as presented to the court provides for payments to

unsecured creditors in Class 4 as follows: the reorganized debtor will make a payment of

$3 million to the unsecured creditors' trust ("UCT") on the effective date;[86] thereafter,

upon the attainment of certain reference amounts that are tied to the value of the

reorganized debtor, additional contributions will be made to the UCT.   These reference

---

[83] *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)

[84] Plan Supporters' Proposed Findings of Fact and Conclusions of Law and Incorporated Memorandum of Law in Support of Confirmation of Amended and Supplemental Joint Chapter 11 Plan of Reorganization for OCA, Inc., and Filed Subsidiaries as of September 14, 2006 (P-1877) at ¶ 22.

[85] *See e.g.* 7 Collier on Bankruptcy ¶ 1129.04[4][c][i][B] p. 1129-117 (rev. 15th ed. 2004).

[86] The UCT is then charged with making distributions to holders of allowed unsecured claims.

amounts are tied to 1) actual cash dividends paid on the new common stock of the

reorganized debtor ("New Stock"); 2) other cash distributions made on the New Stock; 3)

cash or non-cash distributions on the New Stock in the context of a sale or other

disposition of the reorganized debtor; 4) cash pay downs on the new loan taken out by the

reorganized debtor; and 5) cash or non- cash received from third parties from a sale,

merger or other transaction involving the reorganized debtor.[87]  As the court understands

it, as the new debt is paid down, and/or the stock price of the reorganized debtor rises

such that dividends are paid or distributions are made, or if the reorganized debtor is sold

at a profit, then additional distributions may be made to general unsecured creditors in

Class 4.  These additional distributions do not appear to be tied to the "new value" being

paid into the debtor by old equity, however, and as such the court declines to recognize

the proposed contributions as new value for purposes of constituting an exception to the

absolute priority rule.

**III.    <u>Conclusion</u>**

This plan, though not confirmable in its present form, does not reflect a hopeless

case for reorganization.  This case is less than a year old.  If further modifications can be

made by the plan proponents so that the plan complies with the absolute priority rule, the

court will entertain a future plan by the debtor or other proponents.  If the debtor can

resolve its differences with the affiliated practices seeking to cancel the BSAs, this debtor

---

[87]  Amended and Supplemental Joint Chapter 11 Plan of Reorganization for OCA, Inc., and Filed Subsidiaries as of November 22, 2006 (P-2063).

appears to be a good candidate for reorganization.  For the reasons set forth in this

opinion, however, the court finds that the amended and supplemental joint Chapter 11

plan of reorganization in its current form is not confirmable under 11 U.S.C. § 1129(b).

Confirmation is hereby denied.

New Orleans, Louisiana, December 29, 2006.

Jerry A. Brown
U.S. Bankruptcy Judge